

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUL 22 2013
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| LODGE CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 13-499 C |
| v. ) | |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff, Lodge Construction, Inc., by its undersigned counsel, in connection with its Complaint against the United States of America, alleges as follows:

### PARTIES

1. Plaintiff, Lodge Construction, Inc., ("Lodge"), is a corporation duly organized pursuant to the laws of the State of Florida with its principal place of business located at 2161 McGregor Boulevard, Fort Meyers, Florida 33901.

2. Defendant is the United States of America, acting by and through the Jacksonville District of the U. S. Army Corps of Engineers (the "Corps").

### JURISDICTION

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601 et seq. This action is a timely appeal pursuant to the CDA and the Contracting Officer's final decision dated July 23, 2012.

4. This action seeks the conversion of a termination for default on a construction contract to a termination for convenience, and a judgment for damages sustained by Lodge due to the Corps' wrongful default termination.

## COUNT I

5. On June 2, 2010, the Corps issued Solicitation Number W912EP-10-R-0100 for the construction of a project referred to as the "Site 1 Impoundment Phase I, Palm Beach County, Florida" (the "Project").

6. The Defendant solicited proposals for a firm fixed-price contract.

7. The Project involved the on-going "Everglades Upgrade" project being conducted by the Corps, and others, and necessitated design and construction activities that included the following: miscellaneous demolition work; levee construction; installation of temporary access bridges; clearing and grubbing of vegetation; dewatering; borrow and disposal area operations; excavation and fill placement; construction of an armored spillway; erosion control, including soil cement and reinforced grass; installation of embankment instrumentation; construction of a six (6) acre wildlife wetland area; and other miscellaneous embankment construction activities, including an extensive sheet pile operation. All of these activities are more particularly described in the August 13, 2009 Master Agreement between the Department of the Army and the South Florida Water Management District for Cooperation in Constructing and Operating, Maintaining, Repairing, Replacing, and Rehabilitating Projects Authorized to be Undertaken Pursuant to the Copperheads of Everglades Restoration Plan (the "Master Agreement").

8. Lodge submitted a proposal to perform the work and, by letter dated August 24, 2010, was awarded Contract Number W912EP-10-C-0042 in the amount of $44,125,000.

9. Lodge was required to complete the work within 720 calendar days of being issued a Notice to Proceed.

10. Before initiating on-site activities, however, Lodge was responsible for providing the Corps with a design to dewater the areas of construction. Part of that design included the

construction of a temporary cofferdam wall comprised of metal sheet piling, the purpose of which was to prevent water from entering into active construction areas.

11. In conjunction with its engineering consultant, CardnoENTRIX, Lodge prepared a dewatering plan for the project (the "Dewatering Plan"). The Dewatering Plan was submitted to the Corps on November 29, 2010.

12. In preparing the Dewatering Plan, Lodge relied upon the representations made by the Corps in the Solicitation.

13. Significantly, the Solicitation was clear that Lodge was not permitted to perform any pre-proposal subsurface geotechnical investigations of its own.

14. Instead, Lodge was required to rely upon a report issued by the Corps' geotechnical engineer, Challenge Engineering and Testing, Inc. ("Challenge"), of Mobile, Alabama, and a boring log prepared prior to the Challenge Report, along with whatever information could be gleaned from a pre-proposal site inspection.

15. The Challenge Report, issued in July of 2009, was more than one thousand pages long and provided copious graphs, charts, pictures and calculations to support its findings of the subsurface conditions at the project site.

16. Included in the Challenge Report were the results of various slug tests, which appeared to indicate that there was a high degree of permeability in the soil conditions that Lodge would encounter during construction.

17. The above comported with the conclusion that Lodge reached following its pre-proposal site investigation and was also consistent with the Solicitation and its various references, attachments and amendments, one of which was the boring log prepared prior to the Challenge Report.

18. As a result of the above, the Dewatering Plan called for removal of surface water in the area of construction activities and placement of that surface water in immediately adjacent retention areas.

19. The premise was that effluent removed from the areas of construction would be assimilated into the environment by a combination of percolation and evaporation as it sat in these retention basins.

20. This premise not only became the basis of Lodge's Dewatering Plan, but it was also identified in Lodge's proposal to the Corps.

21. The technical information upon which Lodge reasonably relied ultimately proved to be misleading and incorrect.

22. In July of 2011, when dewatering efforts began in earnest, Lodge followed its plan and pumped effluent into on-site retention basins to allow construction activities to proceed.

23. Soon thereafter, it was evident that the effluent was not dissipating consistent with the rate of construction such that the project could be completed within the allotted contract time of seven hundred and twenty (720) calendar days.

24. While the Corps eventually permitted Lodge to utilize other nearby areas under the Corps' control for the deposit of effluent, it took a tremendous amount of time and effort by Lodge to secure approval and, even after obtaining approval, this revised dewatering effort proved costly and ineffective.

25. The Corps refused to take responsibility for the delays and additional costs caused by this change in procedure, despite Lodge's contemporaneous protests.

26. On June 6, 2012, Lodge submitted a certified claim to the Corps in the amount of $3,282,123.02 based upon the additional efforts required, and the delays cause by, the alternative

dewatering efforts that were required (the "Dewatering Claim"). As part of this claim, Lodge also asked for ninety-one (91) additional calendar days to complete its work.

27. As part of the Dewatering Claim, Lodge made it very clear that it reasonably relied upon the information contained in, and referred to by, the Solicitation in developing its Dewatering Plan.

28. As set forth in the Dewatering Claim, based upon the information contained in, and referred to by, the Solicitation, including any and all amendments thereto, the methodology set forth in Lodge's Dewatering Plan should have been effective.

29. However, problems associated with Lodge's dewatering effort, were not the only problems experienced by Lodge during the course of the project.

30. The project also required the installation of sheet pile walls.

31. As part of its work, Lodge was required to both design and construct approximately fifteen thousand (15,000) lineal feet of temporary sheet pile walls.

32. On April 25, 2011, Lodge submitted its original sheet pile design; the Corps responded on May 10, 2011, requesting that Lodge revise and resubmit the design.

33. Lodge submitted its revised sheet pile design on June 2, 2011, wherein it addressed each of the issues raised by the Corps.

34. The Corps approved Lodge's revised sheet pile design on July 1, 2011.

35. Thereafter, Lodge began installing the sheet pile walls, which were to be constructed in six (6) connected, but independent, segments.

36. Segments one (1) and two (2) of the sheet pile installation process were complete when, on March 16, 2012, without warning, a breach occurred in two small areas, identified as stations 97+00 and 102+00.

37.     Lodge immediately investigated this failure and reported back to the Corps that the subsurface conditions in the "breach zone" differed from what Lodge reasonably expected to encounter based upon the information contained in the Solicitation, and all amendments thereto, as well as its own investigation.

38.     Despite the existence of these differing site conditions, the Corps refused to recognize them.

39.     Instead, by letter dated March 29, 2012, the Corps retroactively disapproved Lodge's sheet pile design, even though the breach in the sheet pile wall was in a very small, distinct area.

40.     This retroactive disapproval consisted of nothing more than a brief letter and a one page narrative explaining the basis for the disapproval. Conspicuously absent was any type of engineering analysis in support of the Corps' position.

41.     Thereafter, Lodge submitted two (2) certified claims, one pertaining to the retroactive disapproval of its sheet pile design (the "Design Claim") and the other covering the time and money to which Lodge deemed entitlement to address the actual breach of the sheet pile wall (the "Wall Breach Claim").

42.     Each claim was tied to the differing site conditions that Lodge encountered in the area where the sheet pile wall breached.

43.     The Design Claim was submitted on June 21, 2012. In it Lodge claimed entitlement to additional costs of $679,279.58 and additional time totaling sixty-three (63) days.

44.     The Wall Breach Claim was submitted on July 6, 2012. In that claim Lodge claimed entitlement to additional costs of $1,805,760.33 and an indeterminate number of days to redesign, remove and reinstall the sheet pile wall in the "breach zone."

45. While each of these claims, as well as the Dewatering Claim, will be the subject of separate, subsequent appeals, they provide the bases for Lodge's position with respect to what immediately followed their submission: the Corps' decision to terminate Lodge for default.

46. On July 23, 2012, the Corps impermissibly, and without justification, terminated Lodge's contract for default.

47. The Corps' letter terminating the contract for default identified the following reasons for the termination:

   a. Lodge's alleged failure to diligently prosecute the work to assure completion by the contract completion date;

   b. Lodge's alleged the failure to submit an acceptable sheet pile design; and

   c. The Contracting Officer's disagreements with, or objections to, Lodge's July 9, 2012 response to the Corps' Show Cause Notice.

48. Lodge refutes each and every allegation proffered by the Corps in support of its termination for default.

49. As of the date of termination, Lodge was entitled to substantial extensions of contract performance time to which it claimed entitlement and which were denied by the Corps.

50. As of the date of termination, Lodge's inability to proceed with the contract work was the result of government-caused delays, was beyond its control, and was without fault on the part of Lodge.

51. As of the date of termination, Lodge was not in breach of its contract.

52. As of the date of termination, Lodge was ready, willing and able to do everything possible to overcome the government's defective conceptual design, defective specifications, and the differing site conditions and to perform the remaining contract work, provided the Corps agreed to compensate Lodge appropriately.

53. Lodge submitted claims pursuant to the provisions of the contract requesting additional money and time to compensate it for the impact of defective conceptual design, defective specifications, differing site conditions, government directed suspensions of work, and government directed changes, all of which were impermissibly rejected by the Corps.

54. The Corps, acting unreasonably and without just cause, arbitrarily and capriciously terminated the contract for default knowing that the field conditions that Lodge was forced to contend with were not the fault or responsibility of Lodge and that those conditions made contract performance impractical, if not impossible.

55. The Corps' decision to terminate for default failed to give due consideration to the defective design, defective specifications, differing site conditions, excusable causes of delay, and further failed to give due consideration to the adverse impact on Lodge's performance that resulted from factors that were the fault and responsibility of the Corps. The termination for default was wrongful, arbitrary and capricious, and was simply not warranted by the facts.

## COUNT II

56. The allegations set forth in paragraphs 1 through 55 are incorporated by reference as if fully set forth herein.

57. On or about April 14, 2009, Lodge, among others, executed an Agreement of Indemnity ("Indemnity Agreement"), a true copy of which is attached hereto, in favor of Hanover.

58. On or about August 24, 2010, The Hanover Insurance Company ("Hanover") issued a performance bond (the "Performance Bond") and a payment bond (the "Payment Bond," collectively with the Performance Bond, the "Bonds"), each bearing Bond No. 1921209 and each

in the penal sum of $46,283,204.14 on behalf of Lodge, as Principal, and in favor of the Government, as Obligee, in connection with the Contract.

59.     By letter dated July 23, 2012, the Corps advised Lodge that it was terminated for default (the "Termination") and made demand on Hanover to perform in accordance with its obligations under the Performance Bond.

60.     In response to the Corps' demand on Hanover pursuant to the Performance Bond, the Corps and Hanover agreed to resolution of the obligation of Hanover under the Performance Bond, pursuant to which Hanover procured and tendered Munilla Construction Management, LLC (the "Tender Contractor") to the Corps to perform the work remaining under the original Contract.

61.     On or about December 31, 2012, Hanover and the Corps entered into an agreement (the "Tender and Release Agreement"), a true copy of which is attached hereto, pursuant to which Hanover procured and the Corps accepted the Tender Contractor to perform the remaining work of Lodge under the original Contract.

62.     Pursuant to the terms of the Tender and Release Agreement, the Tender Contractor was to perform the work remaining under the original Contract for the amount of $47,778,910 subject to adjustments by any change orders to the original Contract executed by the Corps and the Tender Contractor in accordance with the original Contract documents.

63.     Pursuant to the terms of the Tender and Release Agreement, Hanover paid the Government under the Performance Bond the amount of $23,995,183.86 which amount represented the completion price for the original Contract less the balance of the original Contract.

64. Pursuant to the terms of the Indemnity Agreement, Lodge agreed to indemnify and hold Hanover harmless from, among other things, any and all claim, demand, liability, losses, damages, costs or expenses, incurred by Hanover on account of having issued the Bonds.

65. Hanover has made demand on Lodge for indemnity for, among other things, the amount tendered to the Government as well as for other loss, cost and expense that it has or may incur under the Performance Bond and the Payment Bond.

66. Pursuant to Lodge's contractual and common law indemnification obligations owed to Hanover, Hanover has taken the position that Lodge is liable to Hanover for, and Hanover seeks reimbursement for, all sums paid by Hanover to the Corps pursuant to the Tender and Release Agreement, in addition to all other costs and expenses incurred by Hanover on account of having issued the Bonds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court find that the Corps' termination of the contract for default was wrongful, that the Court order the termination for default be converted to a termination for the convenience of the government that will effectively result in the reimbursement to Lodge of all of the costs it incurred in the performance of the project, including, but not limited to, all sums owed to Hanover on account of Hanover having issued the Bonds and having entered into the Tender and Release Agreement with the Corps, all of which have been demanded by Hanover, overhead and profit, and further requests that the Court enter judgment against the Corps awarding Lodge damages, interest, costs, and attorneys' fees allowed by law, and such other relief as the Court deems appropriate.

                                        Respectfully submitted,

Dated: 7-22-2013

                                        Michael H. Payne, Esquire
                                        Cohen Seglias Pallas Greenhall
                                        & Furman PC
                                        United Plaza, 19th Floor
                                        30 South 17th Street
                                        Philadelphia, PA 19103
                                        Tel:  215-564-1700
                                        Fax: 267-238-4456
                                        e-mail:    mhpayne@cohenseglias.com

                                        Attorneys for Lodge Construction, Inc.

Of Counsel:

Edward T. DeLisle, Esquire
Cohen Seglias Pallas Greenhall & Furman PC

Brett D. Divers, Esquire
Mills Paskert Divers
100 North Tampa Street, Suite 3700
Tampa, Florida 33602