IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LODGE CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-499C, 13-800C, |
| | ) | |
| v. | ) | (Judge David A. Tapp) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## **THE UNITED STATES' POST TRIAL MEMORANDUM OF FACT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

DEBORAH A. BYNUM
Assistant Director

JOHN H. ROBERSON
Senior Trial Counsel

IOANA CRISTEI
STEVEN C. HOUGH
Trial Attorneys
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-7972
Fax: (202) 514-8610
Email: john.roberson@usdoj.gov

*Attorneys for Defendant*

August 30, 2021

# TABLE OF CONTENTS

I.      Formation Of Contract And Initial Work ............................................................. 1

II.     The Failure Of The Cofferdam And Lodge's Failure To Provide A Revised Design ........ 1

III.    Lodge Submits Claims To USACE .................................................................. 2

IV.     Lodge Files A Complaint Appealing The CO's Denial Of Lodge's Claims ..................... 3

V.      Lodge's Amended Complaints And The United States' Fraud Counterclaims ................. 3

VI.     The Facts Concerning Lodge's Claims For Costs Involving Its Euclids ........................... 5

        A.      Lodge's Fraudulent Claim For The Costs Of Its 1988-To-1993 Vintage Euclid
                Trucks Based Upon The Value Of A 2006 Truck .................................................. 5

        B.      The Fraud In Lodge's Claim For The Costs Of Its Euclids ..................................... 7

        C.      Knowledge And Intent ..................................................................................... 8

                1.      Mr. Dunn's Purported Subjective Belief Is Not A Shield From Fraud ...... 9

                2.      There Is No Substance To Lodge's Claim That Its Repair And
                        Rebuilding Efforts Were Such As To Equalize The Value Of Its 1988-
                        Vintage Euclids With A 2006 Vintage Truck .......................................... 10

                3.      Mr. Perkins Warned Mr. Dunn To Not Use The USACE Manual Rates,
                        But Mr. Dunn Intentionally Disregarded Mr. Perkins Advice .................. 11

                4.      Lodge Did Not Disclose The Age Of Its Euclids Or Its Valuation
                        Methodology To USACE ...................................................................... 13

        D.      Lodge's Explanations For The Use Of Its Valuation Do Not Withstand
                Scrutiny ....................................................................................................... 13

        E.      The Amount Of The Fraud ................................................................................ 14

VII.    Lodge Used A Fraudulent Methodology For Calculating Its Alleged Costs ................... 15

        A.      Lodge's Inefficiency Ratio ............................................................................... 15

                1.      Lodge's Inefficiency Ratio Was Flawed ................................................. 15

2.     Lodge Intentionally Used Its Flawed Methodology .................................. 17

B.     Lodge's Inclusion Of Activity Days And Costs Outside The Stated Period For Its Dewatering Claim ....................................................................................... 18

1.     Ms. Callaway's Undisclosed Spreadsheet Shows That Lodge Included Activity Days After the January 14, 2012 Completion Date Set Forth In Lodge's Dewatering Claims ................................................................. 18

2.     The Post January 14, 2012 Fraud (The 55 Day Fraud) ............................ 18

3.     Knowledge And Intent ............................................................................. 20

4.     Lodge's Explanations For The Use Of The 55 Days Do Not Withstand Scrutiny ................................................................................................... 21

5.     The Amount Of The Fraud ....................................................................... 23

C.     Lodge's Claim Disregarded The P00009 Contract Modification ........................ 28

1.     The REA For CLIN 0007 And CLIN 0021 ............................................. 28

2.     Contract Modification P9 .......................................................................... 29

3.     Lodge Revises Its Baseline Contract Performance Schedule .................. 30

4.     Mr. Dunn Requests The Removal Of The 81 Days Granted In P9 From The Schedule That Lodge Presented To USACE ..................................... 31

5.     By Not Taking P9 Into Account, Lodge Increased Its Damages .............. 31

6.     Knowledge And Intent With Respect To The Failure To Include P9 In Lodge's Inefficiency Ratio ...................................................................... 32

7.     Lodge's Explanation For Its Failure To Include The Days Granted In P9 Is Belied By Lodge's Statements In This Court And Documents Lodge Submitted To USACE ............................................................................... 33

8.     The Amount Of The P9 Fraud ................................................................. 36

VIII.    Lodge's Claims For The Batch Plant Costs ................................................................ 37

A.     The Facts Of Lodge's Claimed Batch Plant Costs .................................................. 37

B.     The Batch Plant Fraud ........................................................................................ 39

C.      Knowledge And Intent ........................................................................ 40

D.      Lodge's Explanations Concerning Its Batch-Plant Charges Do Not Withstand
        Scrutiny .............................................................................................. 42

E.      The Amount Of The Fraud .................................................................. 42

IX.    Lodge's Claims For Its Dewatering Pumps' Costs ........................................ 43

A.      The Facts Of Lodge's Claims For Dewatering Pump Costs ................................ 43

B.      The Dewatering Pump Fraud ................................................................. 44

C.      Knowledge And Intent ........................................................................ 44

D.      Lodge's Explanations For Its Dewatering Pump Costs Do Not Withstand
        Scrutiny .............................................................................................. 47

E.      The Amount Of The Fraud .................................................................. 47

X.     Mr. Van Noy's Opinion Was Unreliable ...................................................... 48

A.      Mr. Van Noy's Opinion Was Not The Product Of Reliable Principles ............... 48

B.      Mr. Van Noy's Opinion Was Not Based On Sufficient Facts Or Data ............... 49

C.      Mr. Van Noy Did Not Reliably Apply His Principles To The Facts .................... 50

## THE UNITED STATES' POST TRIAL MEMORANDUM OF FACT

The United States respectfully submits its post-trial memorandum of fact.

### I.   Formation Of Contract And Initial Work

The contract for the Site 1 project required the rehabilitation of three miles of a levee located next to a canal on the edge of the Everglades.  *See* Joint Stipulation of Facts (June 11, 2021) (JSOF) at ¶¶ 1-5; Tr. 31:19-32:9 (Gannon).  Lodge began work in October 2010, but in July 2011 began experiencing dewatering difficulties.  JSOF ¶ 6-7.  Eventually, Lodge was permitted to allow water to flow (by gravity) from its water retention areas into a nearby canal. JSOF ¶ 8; Tr. 129:16-131:2, 131:25-132:4 (Gannon); Tr. 541:12-20 (Gore).

### II.   The Failure Of The Cofferdam And Lodge's Failure To Provide A Revised Design

On March 16, 2012, two sections of Lodge's cofferdam sheetpile failed.  *See* JSOF ¶ 12; DX248.  On June 11, 2012, USACE issued a "Cure Notice" requiring that Lodge cure its failure to provide a revised cofferdam design.  JX102.

After USACE issued the Cure Notice and a Show Cause Notice, Lodge rushed to submit three claims with the contracting officer (CO), with the goal of forestalling the looming termination of its contract.  Specifically, Lodge followed the advice of Paul Perkins, a claims consultant who testified that he could see that USACE was going to terminate Lodge's contract. To avoid the termination, Lodge set out to "bombard" the CO with arguments to forestall the termination, including the submission of Contract Disputes Act claims.  Tr. 725:21-726:4 (Perkins); JX105.[1]  Mr. Perkins put "teeth and bite" in Lodge's claims to get USACE's attention,

---

[1]  Mr. Perkins viewed shifting responsibility for Lodge's problems onto USACE as part of his job. Tr. 706:17-25 (Perkins); JX75.  He admitted he was "trying real hard" to shift Lodge's problems to the Government.  Tr. 707:13-708:16 (Perkins).  His goal was to make as many activities as possible compensable.  For example, given rainfall several times the historic average

with the goal of obtaining a beneficial settlement.  Tr. 722:11-17 (Perkins).  His goal with Lodge

was to get the CO to interject herself in order to have USACE solve Lodge's problems.  Tr.

722:18-23 (Perkins).

### III.  **Lodge Submits Claims To USACE**

On June 21, 2012, Lodge submitted to the CO its Design claim, requesting a CO's final

decision regarding the disapproval of Lodge's cofferdam design.  JX104.  Lodge claimed costs

of $679,279, and an additional 63 days to complete its contract.  JX104.001; JSOF ¶¶ 15, 16.

On June 26, 2012, Lodge submitted its Dewatering claim, requesting a CO's final

decision regarding costs that Lodge claimed resulted from its dewatering difficulties.  JX108;

JX109; JSOF ¶¶ 18, 19.  Lodge claimed $3,282,123 in costs and 91 additional calendar days to

complete its contract.  JX108; JSOF ¶¶ 20, 21.

On July 6, 2012, Lodge submitted its Wall Breach claim to the CO, seeking $1,805,706

for Lodge's estimated costs to fix the sheet pile failures.  JX111; Tr. 50:10-18 (Gannon).[2]

Submitting the Wall Breach claim was part of Mr. Perkins's strategy of getting the CO to avoid

the termination.  Tr. 673:17-674:16 (Perkins).  Notably, Lodge did not consult Mr. Perkins as to

whether its claims were accurate or truthful.  Tr. 668:25-669:7, 672:7-14 (Perkins).  Indeed,

Mr. Perkins admitted he did not know whether Lodge's claims were true, and that he had no

responsibility for their accuracy.  Tr. 677:22-678:1, 688:16-18, 689:2-5 (Perkins).

---

at Site 1, he worked to place that occurrence into a compensable differing site condition (DSC)
claim.  Tr. 692:5-694:14, 696:8-697:9 (Perkins); DX192.

[2]  In the fall of 2012, the CO denied Lodge's Design, Dewatering, and Wall Breach claims.
JX116; JX117; JX111; Tr. 50:19-51 (Gannon).

Mr. Perkins told Lodge that USACE would likely dispute some claims, but that in his experience, USACE would negotiate, whereby Lodge would get 60 or 70 cents on the dollar (of the amount Lodge sought against USACE).  Tr. 731:6-732:5 (Perkins).

## IV.   Lodge Files A Complaint Appealing The CO's Denial Of Lodge's Claims

On October 15, 2013, Lodge filed suit in this Court, seeking $3,282,123 in damages for its Dewatering claim (DX456 at ¶¶28-39; Tr. 735:23-736:20); $679,279 in damages for its Design claim (*id.* at ¶¶ 56-65); and $1,805,760 for its Wall Breach claim.  *Id.* at ¶¶ 66-77.  Both Lodge and Hanover knew that Lodge did not incur the $1.8 million costs asserted in the Wall Breach claim.  Tr. 795:6-16 (Riggs); DX395.003.  Thus, that claim, originally filed to bombard the CO and facilitate negotiation, was entirely without merit.  *Cf.*  Tr. 883:2-18 (Dunn).

## V.   Lodge's Amended Complaints And The United States' Fraud Counterclaims

On April 27, 2017, after the Court consolidated the Hanover and Lodge complaints under 13-500C, Lodge filed its first amended complaint in CFC 13-800C.  This complaint set forth a revised cumulative damages claim of $4,476,302, a figure that reflects Lodge's withdrawal of its appeal of the Wall Breach claim, and an increase of $514,899 in its Design claim damages. *Lodge Construction, Inc. v. United States*, 13-500C (April 27, 2017) (Docket 74) at ¶¶ 65, 84.

On April 28, 2017, and September 20, 2017, the United States filed its amended answer asserting fraud counterclaims.  Def. Amended Answer (April 28, 2017) (Docket 75); Def. Amended Answer (Sept 20, 2017) (Docket 94); JSOF ¶¶ 26-29.

On May 2, 2018, Lodge moved to amend its complaint in 13-800C to fully withdraw its Dewatering claim and its monetary claims set forth in the Design claim.  *See* DX429.

With respect to its Design claim, Lodge admitted:

> While Lodge and its subcontractors did continue to incur daily costs
> on the project, Lodge has determined that the calculations of its daily

3

> costs contained errors which, when corrected, reduced its actual daily costs in the amounts claimed in the design claim.

Tr. 732:22-733:4; DX429:003 ¶¶ 16, 17; Tr. 734:13-19 (The Court).

With respect to the Dewatering claim, Lodge admitted:

> During discovery, Lodge determined that the calculations it performed for determining the additional costs and time it incurred as a result of the dewatering issues and sought in the dewatering claim contained errors.

Tr. 734:21-735:2; DX429.004 ¶¶ 21, 22; Tr. 735:6-13 (The Court).

On June 15, 2018, Lodge filed its second amended complaint with respect to 13-800C.

JSOF ¶ 30; DX430. With respect to the Design claim, Lodge admitted:

> During discovery Lodge has learned that the calculations and methodologies it used to calculate its daily costs methodologies it used to calculate its daily costs included in the design claim contained errors.

Tr. 892:8-11 (Dunn); DX430.010 at ¶ 62; Tr. 897:19 (The Court). At trial, Mr. Dunn testified that this statement is not accurate or truthful because he believes that there were no errors in the Design claim methodologies. Tr. 898:22-899:6 (Dunn).[3]

With respect to the Dewatering claim, Lodge admitted:

> Through the course of discovery, Lodge has determined that the calculations it performed for formulating the additional costs and time it incurred as a result of the dewatering issues and sought in the dewatering claim contained errors.

DX430.006 at ¶ 30; Tr. 887:22-888:4 (Dunn); Tr. 889:22-890:6 (The Court). At trial, Mr. Dunn testified that he does not disagree with this statement. Tr. 891:25-892:2 (Dunn). But contradicting this admission, he also testified that *he believed* that the claim was correct, truthful,

---

[3] Just before this statement, however, Mr. Dunn admitted that he did not remember what the Design claim was. Tr. 882:11-12, 882:18-21, 951:8-10 (Dunn).

and without errors.  Tr. 884:17-885:3, 885:17-23 (Dunn).  He also testified that the $3.2 million

that Lodge sought in the Dewatering claim represented actual costs that he intended that USACE

pay.  Tr. 880:10-881:3; 900:8-13; 952:18-21 (Dunn).  And Mr. Dunn attributed Lodge's

withdrawal of its monetary claims to counsel.  Tr. 885:4-886:8 (Dunn).

## VI.   The Facts Concerning Lodge's Claims For Costs Involving Its Euclids

### A.   Lodge's Fraudulent Claim For The Costs Of Its 1988-To-1993 Vintage Euclid Trucks Based Upon The Value Of A 2006 Truck

Lodge's Dewatering claim included costs Lodge asserted arose from the standby and

operating rates of four Euclid R50 off-road dump trucks (Euclids) that Lodge owned.  JSOF

¶ 33.  The Euclid trucks make up $229,459 of the $1.6 million of equipment that Lodge asserted

as owned equipment in its cost pool.  JX119 at ¶ 49 & Attach. 10.  Specifically, Lodge's

inefficiency calculation includes inefficiency damages for its Euclids at operating rates of

$133.89 per hour and standby rates of $31.71 per hour.  JX109.093; JSOF ¶¶ 35, 39.  To obtain

these rates, Lodge used a USACE publication titled "Construction Equipment Ownership and

Operating Expense Schedule" (USACE manual).  JX1; JSOF ¶ 36; Tr. 906:22-907:1 (Dunn).

Contractors are supposed to use the USACE manual for pricing hourly costs for equipment they

own, provided the equipment is equivalent in configuration and value.  Tr. 72:1-12 (Gannon); Tr.

1242:23-1243:14 (Lester).  Lodge used Table 2-1, titled "Hourly Equipment Ownership and

Operating Expense Schedule."  JX1.033; JSOF ¶ 37.  Lodge used rates that match the entry in

Table 2-1 for a "TRUCK, OFF-HIGHWAY, RIGID FRAME, 46.9 CY, 57.7 TON, 4X4, REAR

DUMP."  JSOF ¶ 38.

The USACE manual's explanation of the headings for Table 2.1 defines the value as

"based on equipment purchased new in 2006."  JX1.033.  In the relevant section of Table 2.1 for

Category T55, Trucks Off-Highway, the "VALUE(TEV)" column  "reflects the predetermined

'equipment cost' used to compute the rates [in Table 2.1] and is based on equipment purchased new in 2006." JX1.033, JX1.252.  Table 2-1, "Trucks, Off Highway," Category T55 Off-Highway Trucks, Rigid Frame, Identification Number T55CA002," shows that such a truck, purchased new in 2006, had a value of $888,686, with an hourly operating rate of $133.89, and a standby rate of $31.71.  JX1.252.  Thus, Lodge chose to use rates that correspond exactly to the value of a 733 D Caterpillar Truck purchased new in 2006 for more than $888,000.  JX1.252; Tr. 1163:6-21 (Schaeb); JX119.018.

In contrast, Lodge's Euclids were actually built between 1988 and 1993 and Lodge purchased them used at a price of between $14,000 and $24,000 each.  *See* JX71.002; JX72.005-8.  Thus, Lodge's Euclids were not equivalent in value to the equipment in the USACE manual. 1292:4-7 (Lester).[4]  Certainly, the USACE manual would not have the same operating rate for a 1988 truck and a 2006 truck because the depreciation and cost of capital would be much lower for the older truck.  Tr. 1209:5-24 (Schaeb).

The USACE manual provides "predetermined rates for certain makes, models, configurations, and value[s] of equipment.  And if the equipment in question is consistent with that, then you use 2.1 – Table 2.1, which is the bulk of this document.  If not, then there are other processes to follow to determine an appropriate operating and standby rate."  Tr. 1294:25-1295:16 (Lester).  Lodge disregarded "quantifying or calculating the equipment rate based on its older and more used . . . vehicles than what was . . . in the predetermined rates in Table 2.1" of

---

[4]  The USACE Manual explains in detail how to use a rate if the equipment is not equivalent in configuration and value.  Tr. 1292:8-15 (Lester); JX001.337.  Paragraph 3.14 further provides that "[a] detailed methodology for computing a total hourly rate for equipment purchased used is not included in this pamphlet."  However, paragraph 3.14(a) qualifies that statement by providing that "[w]hen actual cost data . . . is not available, an hourly rate and standby rate for equipment purchased can be computed on the basis that the equipment was purchased new by the contractor in the year it was manufactured."  Tr. 1294:2-23 (Lester).

the guide.  Tr. 1292:22-1293:1 (Lester).  Instead, Lodge selected a piece of equipment from the guide that was not equivalent in either configuration or value.  Tr. 1293:13-18 (Lester).

Because Lodge did not follow the USACE manual's requirement that equipment be equivalent in both configuration and value, the rates Lodge used in its claim were "substantially higher" than if Lodge had adjusted the rates for its significantly older Euclid dump trucks.  Tr. 1243:15-1244:20 (Lester).  Thus, Lodge's claims for the operating and standby costs for its four Euclids are incorrect because its claims are based on a 2006-purchased, $888,686 value truck.  Importantly, Lodge admits this "miscalculation," and that it "***should have adjusted the published rates to account for the age and actual price of the dump trucks*** . . . . [which] would have decreased the hourly rates."  *See* DX421.027-28 (emphasis added).

Lodge included both operating and standby costs for its Euclid dump trucks in the Dewatering claim submitted in Serial Letter H-0049, certified by Mr. Dunn.  JSOF ¶ 39.  *See, e.g.*, JX109.140.  Lodge also presented these claims as part of its Dewatering claims in this Court.  *See* Compl. CFC no. 13-800C at ¶¶ 28-39, 56-65.

### B.      The Fraud In Lodge's Claim For The Costs Of Its Euclids

Using the USACE manual, Lodge used $133.89 as the operating rate for the Euclids, and $31.71 as the standby rate, assuming the purchase price of $888,000.  Costs for equipment owned by a contractor fall into either ownership costs or operation costs.  Tr. 1161:14-1162:1 (Schaeb).  Ownership costs include the depreciation of the purchase price as well as the cost of capital or interest if the contractor borrowed money to pay for the equipment.  Tr. 1162:2-1163:3 (Schaeb).  Operating costs include costs such as fuel, maintenance, repairs, and overhaul.  Tr. 1162:9-16 (Schaeb).  Assuming a higher purchase price or value of a piece of equipment artificially inflates the ownership costs, specifically the depreciation and cost of capital rates

charged to USACE.  Tr. 1163:22-1164:10 (Schaeb); JX119.018.  Because both the operating and standby rates in the USACE manual include depreciation and cost of capital (*see* JX001.013, JX001.026), Lodge's operating and standby rates for the Euclids are both artificially inflated.

Lodge's Euclid trucks were a fraction of the value of the 2006-vintage truck that Lodge used as its valuation point.  The average cost of Lodge's Euclids was $17,505, which is only 1.97 percent of the value of the 2006 773D Caterpillar trucks Lodge used.  Tr. 1164:13-24 (Schaeb); JX119.018-019; JX072.005-008.[5]  The USACE manual defines a comparable piece of equipment as within 10 percent of configuration and value, but Lodge's Euclids were about 98 percent away from being comparable to the 2006 Caterpillars.  Tr. 1165:16-21 (Schaeb); JX001.252.[6]

Mr. Dunn knew the manufacturing date and purchase price for each Euclid at the time that Lodge submitted its claim to USACE for its four Euclids at a rate of $31.71 in standby and $133.89 in operating costs.  Tr. 903:20-904:18, 909:13-911:6 (Dunn); JX109.093; JX072.005-009.  Furthermore, he understood that the rates in Lodge's claim were based upon trucks purchased new in 2006. Tr. 919:9-921:11 (Dunn).

### C. Knowledge And Intent

In presenting operating and standby costs for its 1988 and 1993 vintage Euclids based on the value of a 2006-vintage, $888,686 valued truck, Lodge presented false claims in reckless

---

[5]  Lodge's Euclid truck 73573 was purchased for $14,598.65.  Tr. 910:1-23 (Dunn); JX72.005. Truck 73573 was manufactured in 1988.  Tr. 912:14-18 (Dunn); JX71.002.  Euclid truck serial number 73574 was manufactured in 1988 and purchased in 2011 for $14,598; Euclid truck serial number 74795 was manufactured in 1993 and purchased for $16,844; Euclid truck serial number 73759 was manufactured in 1988 and purchased for $14,598.  Tr. 912:25-913:16 (Dunn); JX71.002; JX72.005.

[6]  The USACE manual also assumes that equipment is in sound, workable condition in order to be comparable to a piece of equipment listed in the guide.  Tr. 1167:15-20 (Schaeb).  Lodge had four Euclids, but one was not operating because it was being used for parts to repair the other Euclids.  Tr. 918:9-919:2 (Dunn); *see also* Tr. 71:16-19 (Gannon); Tr. 647:8-22 (Gore).

disregard of the truth.  More than that, however, the evidence demonstrates that Lodge fully intended to obtain payment based on the $888,686-valued truck – Mr. Dunn stated that, because he believed his 1988 vintage trucks were as "good as new," he was entitled to price his trucks as though they were manufactured in 2006.  Mr. Dunn fully intended that USACE pay Lodge at the rates set forth in the manual.  Tr. 904:19-21 (Dunn); JX109.093.  Mr. Dunn's pronouncement belies any claim of a careless error.

This is especially so given that Mr. Dunn – and Lodge in its filings – stated that the rationale for equating the value of trucks was based upon alleged repairs and rebuilding work on its old trucks; but Lodge produced no records whatsoever of amounts it spent on alleged repairs and rebuilding work.  Indeed, Lodge has made no representation concerning the total amount it spent refurbishing its Euclids, with Mr. Dunn exclaiming at one point during his deposition that he "wasn't going to play that game."  Tr. 913:25-914:23 (Dunn).  Mr. Gore also admitted that he did not know how much Lodge spent on Euclid repairs.  Tr. 648:1-6 (Gore).

Furthermore, Lodge's use of the USACE manual is manifest error, and Lodge was expressly warned by Mr. Perkins to not use the USACE manual or the Blue Book in pricing the costs of its old Euclids.  The evidence demonstrates that Lodge's fraud was intentional.  As Mr. Lester opined, "there was no evidence to support" that "[t]his was just a simple or careless mistake or oversight . . . or even lack of understanding . . . on Lodge's part."  Tr. 1242:15-22.

## 1.  Mr. Dunn's Purported Subjective Belief Is Not A Shield From Fraud

Mr. Dunn was warned by Mr. Perkins that the Defense Contract Audit Agency (DCAA) would require that the equipment rates in the USACE manual be adjusted downward when pricing older equipment that has been depreciated.  Nevertheless, Mr. Dunn did not adjust downward the rates for his Euclids because he considered them to be more new than used.  Tr.

921:17-923:21 (Dunn); JX68.  Mr. Dunn admitted, however, that he could understand how

Mr. Perkins and DCAA auditors could consider Lodge's Euclids more used than new.  Tr.

923:22-924:3 (Dunn).  Indeed, Mr. Dunn understood that to buy and sell in a given market, there

is an objective market that a person has to engage in.  Tr. 924:16-22 (Dunn).  Nonetheless,

Mr. Dunn propounded his theory that whether a piece of equipment is as good as new even when

it its far past its prime *is a subjective matter*.  Tr. 924:23-925:5 (Dunn).  For an admitted

seasoned businessman, this claim has no credibility.

Undercutting Mr. Dunn's professed theory of subjective valuation, Mr. Dunn

acknowledged that a $40,000 potential sale price for all four Euclids, as indicated in an email

from Mr. Dunn to SunTrust (when it repossessed the Euclids), probably provides an indication of

the value of Lodge's four Euclid trucks in 2013.  Tr. 925:12-928:9 (Dunn); DX397.

### 2. There Is No Substance To Lodge's Claim That Its Repair And Rebuilding Efforts Were Such As To Equalize The Value Of Its 1988-Vintage Euclids With A 2006 Vintage Truck

Prior to trial, Lodge made binding, judicial admissions that the reason for its valuation of

the Euclids at the rate of a 2006 truck was that it had undertaken repair and rebuilding work on

its trucks:  "Lodge admits that it utilized rates for more recently purchased equipment but did so

to account for the recent repairs and rebuilding of the engines performed by Lodge on its

equipment."  Lodge Answer (13-499C) (Nov. 27, 2017) at ¶¶ 115, 116.

Witnesses testified that Lodge made repairs to its Euclids, but Lodge did not present any

evidence of invoices related to such repairs.  Tellingly, Mr. Gore did not testify that the Euclid's

engines were "new," but only that they *looked* like it.  Tr. 614:11-18 (Gore).  He also testified

that the "motors were tore down and put back together."  Tr. 615:2 (Gore).  But Lodge would

have had to make $860,000 worth of improvements to each truck in order to bring them within a value comparable to the 2006 Caterpillar truck.  Tr. 1165:22-1166:3 (Schaeb).

Moreover, Lodge never presented USACE with information concerning the condition, or repair and refurbishing costs of its Euclids in its claim for dewatering costs.  Indeed, Mr. Dunn does not have the information concerning the repair and restoration work that was performed on Lodge's four Euclid trucks *anywhere*.  Tr. 913:17-24 (Dunn).  During Mr. Dunn's testimony in 2019, Mr. Dunn testified that Lodge had spent more than $20,000 on the costs of refurbishing the Euclids, but when asked if Lodge had spent more than $30,000, Mr. Dunn testified "I don't recall.  I'm not going to play that game."  Tr. 913:25-914:23 (Dunn).  Mr. Dunn then admitted that he did not calculate the amount of money that went into the Euclid's refurbishing.  Tr. 914:24-915:2 (Dunn).  Indeed, Lodge *never* calculated the amount of money Lodge spent refurbishing its Euclids.  Tr. 915:3-917:10 (Dunn).  Nonetheless, based upon its alleged repair work, Lodge intended to be paid by USACE for its Euclid trucks at a rate comparable to a 2006 truck.  Tr. 917:11-14 (Dunn).

Certainly, Lodge's reliance upon such an utterly unsubstantiated basis for the rates it charged the United States for its Euclids underscores Lodge's fraudulent intent.

### 3.  Mr. Perkins Warned Mr. Dunn To Not Use The USACE Manual Rates, But Mr. Dunn Intentionally Disregarded Mr. Perkins Advice

Prior to submitting the claims, Mr. Perkins informed Mr. Dunn that he should reduce the USACE manual's rates to account for the actual age of the equipment, and adjust for instances where the equipment had been fully depreciated.  Tr. 922:7-923:21 (Dunn); JX68.[7]  Mr. Perkins

---

[7] Mr. Lester noted that "a new Euclid purchased in 1988 would be fully depreciated most likely by the time that 2006 or 2009 . . . the guide that was used."  Tr. 1293:19-1294:1 (Lester).

also informed Mr. Dunn that the preferred method for calculating equipment rates was to keep accurate and segregated records for each piece of equipment.  Tr. 711:25-712:5 (Perkins).  The fact that Lodge did not have such records is odd, given that Lodge used software to track such costs.  Tr. 1010:17-24, Tr. 1011:23-1012:15 (Dunn).

Mr. Perkins also advised that Lodge was required, if it did not track its equipment costs by individual items, to use the USACE manual.  Tr. 714:3-13 (Perkins); DX209.  And he advised that, if the piece of equipment was not listed, then a similar piece of equipment should be used and, failing that, then the formula in the USACE manual should be used.  Tr. 714:14-715:20 (Perkins); DX209.  Mr. Perkins warned Lodge that its equipment was older than assumed by the rates in the USACE manual, and that fully depreciated equipment would have lower rates.  Tr. 717:14-719:3 (Perkins); JX68.

The USACE manual requires that when pricing equipment, a contractor use its actual costs.  If the actual costs are not available, then the contractor can use the manual, if that piece of equipment, or comparable equipment, is in the guide.  Where there is no comparable equipment, a contractor should use the CHECKRATE spreadsheet.  Tr. 1165:6-15 (Schaeb); JX001.252.

Lodge did not take Mr. Perkins's advice, and did not take into account the age of its Euclids or adjust for their depreciation or the cost of capital.  Tr. 715:21-716:24 (Perkins). Mr. Dunn did not take Mr. Perkins' advice because Mr. Dunn felt that the Equipment Watch Blue Book rate was "very, very similar" to the USACE manual.  Tr. 1066:17-1067:20 (Dunn). But *Mr. Perkins had expressly informed Mr. Dunn that using the Blue Book was not a method approved by USACE for calculating equipment costs*.  Tr. 712:6-713:1 (Perkins); JX60.002.

Mr. Dunn also ignored Mr. Perkins's advice because Lodge had rebuilt and repainted the Euclids and stated they "were closer to new than they were to used" (Tr. 1066:17-1067:20 (Dunn)), an opinion that, as noted above, has no factual basis.

### 4. Lodge Did Not Disclose The Age Of Its Euclids Or Its Valuation Methodology To USACE

Further reinforcing Lodge's fraudulent intent, Lodge hid the age of its Euclids and its valuation methodology from USACE.[8]  Lodge did not disclose to USACE that the rates it used for its Euclids came from the USACE manual.  Tr. 907:2-20 (Dunn); JX119.016-17.  Lodge "never explained that we were using that manual to the Army Corps."  Tr. 907:21-908:4 (Dunn). Lodge did not disclose the age or value of its four Euclid trucks.  Tr. 928:10-14 (Dunn).  And it never produced its records describing the purchase price of the Euclids to USACE in the supporting documents for its claims.  Tr. 910:1-911:2 (Dunn); JX72.005.  But Lodge's Dewatering claim presented supporting documents for CCT's pass-through claim, including pages from USACE's manual in its claim support – demonstrating that Lodge had the ability to make such disclosures.  Tr. 908:6-20 (Dunn); JX109.040-42.

### D. Lodge's Explanations For The Use Of Its Valuation Do Not Withstand Scrutiny

At trial – contradicting Lodge's judicial admission concerning the reason for its chosen Euclid rates – Mr. Dunn claimed that he used the USACE manual rate because it was lower than the rate in Lodge's own job costs record, which was $138 per hour.  Tr. 1032:18-1033:9, 1040:17-25 (Dunn); JX109.140.[9]  But using an incorrect rate on Lodge's job cost records (for

---

[8]  Mr. Van Noy's report notes that concealment is an indicia of fraud (but ignores Lodge's concealment of its fraud in presenting its claim to USACE).  Tr. 1400:21-1401:5 (Van Noy).

[9]  Specifically, Lodge received communications from Equipment Watch concerning the (Blue Book) pricing of its 1988 and 1993 Euclid trucks.  Tr. 1015:8-1017:1 (Dunn); L0116 at 4.  Mr. Dunn used the Equipment Watch (Blue Book) rate of $138 an hour in Lodge's internal job cost

example, by not taking into account the value of Lodge's $14,500 purchase price, 1988-vintage

Euclids) does not make the rate that Lodge propounded in its cost claims against USACE correct.

For the Euclids, Lodge was using applied rates in its job cost system. Tr. 1195:14-22

(Schaeb). Mr. Schaeb compared the Euclid applied rates in Lodge's job cost system to the rates

in its Dewatering claim, and determined that "Lodge's applied rates are inflated. The ones in

their job cost systems don't match reality, what they actually paid and what they were actually

incurring." Tr. 1196:1-9 (Schaeb). While Lodge's claimed rates may have been slightly lower

than its internal accounting system applied rates, the applied rates were inflated and did not

match reality. Tr. 1196:10-21 (Schaeb). Thus, Lodge's applied rates are not "relevant to

anything because they're not true and accurate incurred costs." Tr. 1197:2-17 (Schaeb).

### E.  The Amount Of The Fraud

The standby and operating costs for the four Euclids included in all twenty-nine weekly

cost spreadsheets in the Dewatering Claim equals $229,459.10 – as is included in Lodge's

"Actual Cost of Production." After application of Lodge's alleged "Inefficiency Percentage" and

"Credit for Equipment Down Time Due to Repairs," Lodge's total claim for its Euclids in the

Dewatering Claim was $68,123.69. Tr. 1166:15-167:20 (Schaeb).

Similarly, Lodge included standby costs for the Euclids in its Design claim. *See, e.g.*,

JX104.146. Adding up the "Weekly Standby Costs" for the Euclids in the Design claim and

applying the claimed markup results in $32,543.84 in Euclid standby costs in the Design claim.

Tr. 1166:15-1167:20 (Schaeb).

---

records. Tr. 1020:2-1022:2; 1023:15-22 (Dunn); JX118.153; JX118.239. But, as noted above,
Mr. Perkins warned Mr. Dunn that he should not use Blue Book rates to charge equipment costs
against USACE. Tr. 712:6-713:1 (Perkins); JX60.002.

In its first amended complaint, Lodge increased the amount of the Design claim, which also increased the Euclid portion of the design claim by $27,894.24.  JSOF ¶ 41.  *See Lodge Construction, Inc. v. United States*, 13-500C (April 27, 2017) (Docket 74) at ¶ 65.

Thus, Lodge sought a total of $128,562 for the Euclids.  Tr. 1166:15-1167:20 (Schaeb).  Certainly, a portion of the $128,000 costs consisted of operating costs, some of which Lodge incurred.  Tr. 1195:1-13 (Schaeb).  But because only Lodge would be in possession of that information, and it never produced any such information in either its claim to USACE or in discovery, the onus of calculating the difference between the total costs and the operating costs of its three operable Euclids to compute the actual fraudulent component of its Euclids must fall on Lodge.  As is without such evidence, the total value of our fraud claim is $128,000.

**VII.**    **Lodge Used A Fraudulent Methodology For Calculating Its Alleged Costs**

      **A.  Lodge's Inefficiency Ratio**

           **1.  Lodge's Inefficiency Ratio Was Flawed**

To determine the amount of its Dewatering claim, Lodge calculated and applied an inefficiency ratio to a pool of equipment and labor costs for the period beginning July 6, 2011 and ending January 14, 2012.  JX109.208-209; Tr. 950:3-13 (Dunn); Tr. 1160:9-1161:10 (Schaeb).  The inefficiency ratio was computed by dividing the 285 alleged actual activity days it spent on the project (the numerator) by the baseline-allocated 115 activity days (the denominator).  Tr. 269:2-6; 275:5-21 (Callaway); JX109.209.  The 285 activity days "were developed by going through the daily reports and looking at every daily report and when we were working and equipment was working on these features within the daily report."  Tr. 268:22-269:1 (Callaway).  The 285 days was the summation of the alleged actual durations spent on each of the activities.  Tr. 268:12-16 (Callaway).

According to this ratio, any amount over 100 percent means the contractor was inefficient, while amounts less than 100 percent means there was no inefficiency. Lodge's ratio of 247.8 percent indicates that it took Lodge about 2.5 times as long to do the work as expected. Tr. 1150:21-1151:5 (Schaeb); JX119.008. The ratio does not, however, indicate that Lodge actually spent more money or effort over that same period. Tr. 1151:6-13 (Schaeb); JX119.008.

Ms. Callaway understood that the smaller the baseline schedule (denominator), the greater the inefficiency would be relative to the actual number of days affected by the dewatering problems. Tr. 247:24-248:4 (Callaway). And she understood that the inefficiency ratio would be used to calculate Lodge's dewatering cost claim. Tr. 252:23-253:8 (Callaway).

In calculating the activity days, Ms. Callaway used a "very simple analysis" and "didn't evaluate the magnitude of the work that was going on there." Tr. 471:9-19 (Callaway). That is, in calculating "actual delay days," Ms. Callaway did not use calendar days for this calculation, but instead used what Mr. Schaeb coined as "activity days." Lodge measured these activity days by counting one day for each activity performed, meaning that one calendar day could be made up of multiple activity days. Tr. 1153:14-18 (Schaeb); JX119.008-009.

Ms. Callaway believes that the quantification of 285 actual activity days was accurate. Tr. 276:19-23 (Callaway). She admitted, however, that she had not used her methodology in other instances and her method of counting delay days for her inefficiency ratio was unique to Lodge. Tr. 490:17-24 (Callaway). The pricing sections of the Justification for Inefficiency Ratio were drafted by Mr. Dunn and (likely) Mr. Perkins. Tr. 497:11-21 (Callaway); JX109.209. But the narrative itself was drafted by Ms. Callaway, with edits to that section being undertaken in June 2012, well after Lodge knew the alleged effects in the post-January 14, 2012 period. *See* DX322; Tr. 747:22-748:11 (The Court); Tr. 863:16-867:15 (Dunn); DX319; DX322.003.

16

Mr. Dunn prepared the cost impacts of the Dewatering claim based upon Ms. Callaway's time calculations.  Tr. 899:14-21 (Dunn).  Mr. Dunn does not remember reading anything about another contractor using the method that he developed.  Tr. 900:14-21 (Dunn).

According to Mr. Schaeb, Lodge's use of activity days presented a problem because the method treats every activity day as equal regardless of whether 4 man-hours were worked, or 40 man-hours were worked on an activity.  This method of counting leads to a distorted result. JX119.009.  Moreover, in the narrative in its claims, Lodge did not provide the underlying support to demonstrate what the comparison of the planned versus actual comparison of days was based on, nor did Lodge clearly identify the ratio's methodology.  Tr. 1181:6-16 (Schaeb).

Ms. Callaway claimed that she did not know how the inefficiency ratio was to be used because she was not involved in and did not do anything for the costing of any of Lodge's claims.  Tr. 218:16-219:1; 246:17-21, 276:3-13; 325:25-326:14 (Callaway).  Indeed, Ms. Callaway claimed that she was just keeping track of time and wasn't concerned about pricing. Tr. 497:2-10 (Callaway).  But Ms. Callaway understood that time would have played into costs. Tr. 499:4-5 (Callaway).  And she eventually acknowledged that she "heard numbers bantered about" but "did not know the exact amount."  Tr. 277:14-278:1 (Callaway).

## 2.  Lodge Intentionally Used Its Flawed Methodology

Lodge was warned before submitting its Dewatering claim to the CO that its proposed application of an inefficiency ratio to calculate alleged damages was flawed, yet Lodge proceeded despite this warning.  Specifically, Mr. Perkins advised Lodge that he did not recommend the blanket assignment of some inefficiency factor to all equipment and personnel working on the site over a relatively long period; yet that is exactly what Lodge did for a period between July 2011 and January 2012.  Tr. 698:15-699:18 (Perkins); JX070.022.  Indeed,

Mr. Perkins testified that he disagreed with using an inefficiency ratio as a way of determining inefficiency (and that he had "nothing to do with that ratio").  Tr. 780:20-781:8 (Perkins).

Because of the unreliability of the inefficiency ratio in arriving at a sum certain, a necessary condition for a certified claim, Mr. Perkins recommended that Mr. Dunn convert the Dewatering claim to an REA, but Mr. Dunn rejected Mr. Perkins's advice.  Tr. 727:11-728:9 (Perkins).  Mr. Perkins testified that "somebody who's trying to commit fraud," doesn't take his advice.  Tr. 763:13-18 (Perkins).  Clearly, Mr. Dunn did not take Mr. Perkins' advice here.

### B.  Lodge's Inclusion Of Activity Days And Costs Outside The Stated Period For Its Dewatering Claim

#### 1.  Ms. Callaway's Undisclosed Spreadsheet Shows That Lodge Included Activity Days After the January 14, 2012 Completion Date Set Forth In Lodge's Dewatering Claims

The spreadsheet titled "Production Values.xlsx" (the spreadsheet) (JX95) was the basis for Ms. Callaway's calculation of the inefficiency ratio.  JSOF ¶ 49.  She prepared the spreadsheet to calculate the alleged 285 activity days used in her inefficiency ratio and provided it to Mr. Dunn.  Tr. 269:7-23, 274:2-12 (Callaway); JX95; Tr. 1157:3-17 (Schaeb); JX119.010.  The spreadsheet provides for a total of 55 activity days after January 14, 2012, counting days through March 27, 2012.  Tr. 269:24-270:2 (Callaway); JX95; Tr. 1157:11-17 (Schaeb); JX119.011.  This spreadsheet was the only evidence Lodge produced *in discovery* indicating a source for the 285 days.  Tr. 1155:1-10, 1156:13-25 (Schaeb); JX119.010; JX95.  *But it was not provided to USACE in connection with the Dewatering claim*.  Tr. 949:11-950:2 (Dunn), Tr. 1154:25-1155:10, 1156:13-25 (Schaeb).

#### 2.  The Post January 14, 2012 Fraud (The 55 Day Fraud)

In Ms. Callaway's initial deposition in September 2016, after the United States showed her that the 285 days in the spreadsheet included 55 days after January 14, 2012, she testified

that she did not use the spreadsheet in calculating the inefficiency ratio.  Instead, Ms. Callaway testified that it was a mere coincidence that the 285 days in the spreadsheet matched the number in her inefficiency ratio.  Tr. 270:3-272:20 (Callaway).  She also testified that Lodge was working minimally after January 14, 2012, but also that no days after January 14, 2012 should have been counted by Lodge in its Dewatering claim.  Tr. 285:7-287:19 (Callaway).

Then in Ms. Callaway's December 2017 deposition, and at trial, she admitted that the spreadsheet was, in fact, the basis for the 285 days in the Dewatering claim.  Tr. 273:2-22 (Callaway).  She testified that she intended to "amend" her prior answer based upon documents provided to her by Lodge's counsel.  Tr. 287:20-288:20 (Callaway).  And she stated that Lodge intended to seek damage claims based upon an inefficiency ratio that included days after January 14, 2012.  Tr. 289:2-8 (Callaway).  Thus, when Ms. Callaway prepared her spreadsheet showing 55 delay or activity days after January 14th, she did so intentionally.  Tr. 289:9-16 (Callaway).

Ms. Callaway testified that she determined which days were activity days in the post-January 14, 2012 period by looking at information from daily reports and that she "went through every daily report, yes, sir."  Tr. 289:17-25 (Callaway).  She testified that she carefully went through the reports when she originally performed the 285-day calculation, and that she went through them again prior to trial.  Tr. 290:1-6; 291:4-18; 320:21-25; (Callaway), *see also* Affidavit of Katrin Callaway at Exhibit B to Lodge's Mot. *In Limine* (July 25, 2021), 13-499C. And as she selected the activity days, she understood that Lodge intentionally sought to demonstrate dewatering impacts after January 14th.  Tr. 320:21-321:16 (Callaway).

Later at trial, after Ms. Callaway was presented with several post-January 14, 2012 daily reports, she changed her testimony, stating that, in connection with an affidavit she provided to the Court a week before trial (Tr. 323:9-324:8 (Callaway)), she reviewed the full daily reports for

19

just five or six activity days after January 14, 2021.  Tr. 325:17-24 (Callaway); for the rest she only reviewed summary pages.  Tr. 324:17-24 (Callaway).  But the United States' examination of Ms. Callaway at trial confirmed that the work that was occurring during that period of time after January 14th "was *de minimis*."  Tr. 1254:1-25 (Lester); Tr. 1158:15-25 (Schaeb).

### 3.   Knowledge And Intent

Certainly, the evidence demonstrates that Lodge repeatedly represented to USACE that its excavation and embankment work in Section 1 was complete by January 14, 2012, *and* as Ms. Callaway previously testified, work in Section 1 thereafter was "minimal."  For example, in Lodge's pay request number 12, covering the period of December 20, 2011 to January 20, 2012, Lodge's attached schedule indicated that the excavation work at Section 1 was 100 percent complete as of January 14, 2012.  Tr. 278:2-281:2 (Callaway); JX38.134, 140-42.  The finish date of January 14, 2012 was marked to show that the date was an "A" or "Actual Date."  Tr. 281:4-6 (Callaway).  Thus, the schedule that Lodge presented to USACE showed that the excavation and embankment fill in Section 1 was actually finished by January 14, 2012.  Tr. 281:7-10 (Callaway).  Although Ms. Callaway acknowledged that Lodge had represented that the excavation and embankment work in Section 1 was "actually" completed, she suggested that this was only for "billing purposes."  Tr. 281:7-10 (Callaway).  Thus, Ms. Callaway openly acknowledged that Lodge presented one set of facts to USACE for billing purposes, and another for Lodge's cost claims against USACE.

Most importantly, the Dewatering claim expressly states that the claim was limited to the period of July 6, 2011 to January 14, 2012.  JX109.209.  Specifically, the Justification for Inefficiency Ratio narrative written by Ms. Callaway, states that the impacts of Lodge's Dewatering claim occurred through January 14, 2012:  "The impacts covered as part of this

Contract Disputes Act (CDA) claim occurred from July 6, 2011 through January 14th, 2012, when the Section 1 earthwork was completed." Tr. 281:11-282:12 (Callaway); JX109.209.

Ms. Callaway claimed that this statement in Lodge's certified claim was truthful, but she qualified this by stating that it was true with respect to the pool of costs against which the inefficiency ratio (which included days after January 14, 2012) applied, an understanding she obtained from (her client) Lodge's counsel. Tr. 282:13-20 (Callaway). Ms. Callaway's qualification is both incoherent and in opposition to the plain language of the certified claim, which expressly states that the impacts of the "claim occurred from July 6, 2011 to January 14, 2012." JX109.209. Certainly, it makes little sense that Lodge would use a pool of equipment costs, expressly stated to be from July 6, 2011 to January 14, 2012 (*see* JX109.091, 209), yet use undisclosed activity day computations (as set forth in the spreadsheet) that extend past that date range to March 2012. Unfortunately, Ms. Callaway's attempt to qualify Lodge's unambiguous statements is consistent with her repeated lack of credibility and forthrightness at trial.

### 4. Lodge's Explanations For The Use Of The 55 Days Do Not Withstand Scrutiny

At trial, Ms. Callaway offered multiple explanations for Lodge's use of the 55 post-January 14, 2012 activity days. Her explanations, however, demonstrate that Lodge knew what it was doing; and, because the explanations are facially without merit, that Lodge was attempting to fraudulently obtain payment for those actual days. First, for example, Ms. Callaway testified that she created her methodology whereby five minutes of work could justify billing the United States for a full day *because* Lodge's work efforts in excavating "w[ere] significantly more than we should have ever expected." Tr. 500:14-501:1 (Callaway). She stated that, "maybe that wasn't fair," but it was hard to quantify the impact of the dewatering problems. Tr. 501:19-502:9 (Callaway). Similarly, Mr. Dunn testified that including the days after January 14, 2012

was not mere carelessness:  Lodge intended to be paid for the activity days Ms. Callaway

calculated because they were delays that Lodge was suffering.  Tr. 947:22-948:18 (Dunn).

Ms. Callaway also understood that it was Mr. Dunn's intent (as it was hers) that USACE pay

Lodge for the 55 activity days that fell after January 14, 2012.  Tr. 326:15-22, 327:3-328:1

(Callaway).   Indeed, Ms. Callaway noted that, in setting forth Lodge's cost claims, Mr. Dunn

was aware that the 285-day spreadsheet included 55 days after January 14, 2012.  Tr. 274:23-

275:4 (Callaway).

 Second, Ms. Callaway falsely testified that the narrative in the Dewatering claim was

erroneous only because it was written before the 55 days following January 14, 2012 passed:

"But what ended up happening ***after we drafted this*** is that we had to continue to do work on

these types of activities in those 55 days that you're referencing."  Tr. 283:2-7 (Callaway).  She

then admitted that the narrative could not have been drafted before January 14, 2012, but that she

didn't recall when the Dewatering claim was submitted.  Tr. 283:9-19 (Callaway).[10]  She then

testified that the paragraph describing the date range of the Dewatering claim was drafted after

the 55 days were undertaken – because they had been specifically tallied.  Tr. 284:13-23

(Callaway).  Importantly, Ms. Callaway proceeded to admit that her testimony at trial just

moments before was incorrect and that the date range in the narrative to Lodge's Dewatering

claim (which she prepared) was incorrect:

> Q.   Okay.   So your explanation a few moments ago that this
> paragraph reflects January 14th, all the days, because you hadn't
> done the work yet was incorrect?
> A.  Yeah.  I should have changed that date.
> Q.  And your testimony was incorrect?

---

[10]  On June 14, 2012, Mr. Dunn provided comments to a draft of the Justification for Inefficiency
Ratio section of Lodge's dewatering claim.  Tr. 863:16-865:15 (Dunn); DX319; DX322.003.
These comments demonstrate that Lodge was, contrary to Ms. Callaway's suggestion, drafting
its inefficiency claim long after the last activity day date in the spreadsheet.  *See* JX95.

A.  With regard to that date because there was work after.

Tr. 284:24-285:6 (Callaway).

### 5.  <u>The Amount Of The Fraud</u>

Given that none of the 55 activity days calculated after January 14, 2012 should have been included in the calculation of the inefficiency ratio, 55 days should have been removed from the numerator of Lodge's inefficiency ratio.  Removing these 55 days results in an inefficiency factor of 200 percent.  This change alone causes Lodge's claim to decrease by $358,953.  Tr. 1159:1-10 (Schaeb); JX119.038.

To put a finer point on the severity of the fraud here, especially when viewed against the claimed activities for which Lodge seeks costs, Mr. Schaeb testified that the dollar-value of the 55 days after January 14 is approximately $6,500 per activity day claimed.  Tr. 1159:11-15 (Schaeb).  When applied to the claimed activities undertaken by Lodge in the post-January 14, 2012 period, as we discussed with Ms. Callaway at trial, the costs claimed by Lodge demonstrate grossly outrageous and intentional fraud against the United States.

Thus, for example, for March 8, 2012, Ms. Callaway counted three activity days for excavation and two activity days for embankment activity in Section 1 purportedly caused by dewatering difficulties, and she intentionally included these five activity days in the 285-day numerator of her inefficiency ratio.  Tr. 329:16-331:3 (Callaway); JX95.10, JX95.20.  When counting these activity days, she did not look at how many hours Lodge spent on those tasks, and instead only looked at the daily report's summary pages.  Tr. 331:19-332:3 (Callaway).

Altogether, for March 8, 2012, Ms. Callaway counted a total of five activity days, three in excavation and two in embankment, when Lodge had only performed an hour and 40 minutes of excavation and one hour of embankment work.  Tr. 333:18-336:25 (Callaway); DX3016.063.

When presented with these facts, Ms. Callaway **admitted that it was not reasonable, accurate, or truthful** for Lodge to have counted less than three hours of work as five activity days.  Tr. 337:1-18 (Callaway).  Under Lodge's methodology, less than three hours of work is assessed as 5 activity days, priced at $6,500 per activity day.  Tr. 1159:11-13 (Schaeb).  Lodge thus sought $32,500 in costs from the United States for March 8, 2012, **a rate of over $10,800 per hour**.

As another example, for March 9, 2012, Ms. Callaway counted two activity days for excavation and three activity days for embankment work, for a total of five activity days.  Tr. 337:24-338:22 (Callaway); JX95.010, JX95.020; DX3017.  On that day, a single bulldozer worked for 30 minutes, which Ms. Callaway counted as two activity days.  Tr. 339:17-341:22 (Callaway); DX3017.025, DX3017.027, DX3017.024.  Ms. Callaway admitted that she did not check the amount of time the bulldozer worked.  Tr. 341:18-22 (Callaway).  She also counted one hour of grading embankment overbuild as three activities days.  Tr. 342:7-343:4 (Callaway); DX3017.027.  But the daily report summary states that **several inches of rain** caused embankment operations to shut down all day.  Tr. 341:23-342:6 (Callaway); DX3017.003.

Thus, for March 9, 2012, Ms. Callaway equated 90 minutes of work (30 minutes of excavation and one hour of embankment work) as five activity days.  Tr. 343:5-16 (Callaway).  For these 90 minutes, or five activity days, Lodge sought $32,500 in costs ($6,500 per activity day, Tr. 1159:11-13 (Schaeb)) from the United States – or **$21,667 per hour**.  Although Ms. Callaway said that it was "not necessarily" reasonable or accurate for Lodge to count 90 minutes of work as five activity days, **she admitted that it was not truthful** for Lodge to equate 90 minutes with five activity days.  Tr. 343:13-344:8 (Callaway).

On March 10, 2012, Ms. Callaway counted seven activity days, three for excavation work and four for embankment work.  Tr. 344:22-345:20 (Callaway); JX95.010, JX95.020.  For the

excavation work, she assigned three activity days for work performed by a single laborer who used a shovel to perform excavation work for nine hours, working within two sections of Section 1.  Tr. 345:21-347:15 (Callaway); DX3018.022, DX3018.025.  For this, Ms. Callaway assigned three activity days, for which Lodge asserted costs of $19,500 against the United States ($6,500 per activity day (Tr. 1159:11-13 (Schaeb)).  These costs equate to an hourly rate – billed against the United States – of *$2,167 per hour for the work of one man with a shovel.*

For the embankment work on March 10th, Lodge counted 10.5 equipment hours of work as four activity days.  Tr. 347:16-349:20 (Callaway); DX3018.057, DX3018.022.  This translates, at $6,500 per activity day, to $26,000 in costs for 10.5 hours of work.  Notably, on that day, Lodge's daily report stated that wet conditions from *several inches of rain* caused the embankment backfill operation to shut down all day.  Tr. 348:7-17 (Callaway); DX3018.003.

Ms. Callaway did "not necessarily" believe it was reasonable for Lodge to count 10.5 equipment hours as four activity days and it was "probably not" accurate for Lodge to count those hours as four activity days.  Tr. 349:21-350:17 (Callaway).  But, pivoting from her previous testimony where she acknowledged that her activity day assessment was not truthful, she said that, while it might not have been truthful in other situations, *in the unique circumstances of Lodge's claim, it was truthful:*  "But this was truly a unique situation."  Tr. 350:18-351:4 (Callaway).  She explained that 10.5 hours could equate as four activity days "if you can't work the rest of the time."  Tr. 351:14-18 (Callaway).  Ms. Callaway's explanations only underscore the fraudulent intent.  Using this explanation, unbound by any economic theory or recognized methodology, Lodge claimed it was due over $2,000 an hour from the United States for a shovel man if he could not "work the rest of the time" due to wet conditions.

Ms. Callaway then offered a second rationale for Lodge's equating of 10.5 hours with four activity days. She testified that, if Lodge worked in a portion of a section for any length of time, even ten minutes, under her methodology, "right, wrong, and [in]different," an activity day would result. Tr. 352:7-25 (Callaway). Indeed, for her, it was honest modeling to equate ten minutes of work as a full activity day: "I think I already said that I didn't look into such detail with regard to how many hours they were working there. So in my mind, yes, it was." Tr. 353:1-17 (Callaway). Notably, ***she did not discuss with USACE her method of equating a five-minute activity with a full activity day.*** Tr. 502:17-24 (Callaway).

As additional examples of Lodge's post-January 14, 2012 claims of "actual" dewatering activity days that we discussed with Ms. Callaway at trial:

- For March 12, 2012, Lodge counted two activity days. Tr. 354:9-355:2 (Callaway); JX95.010. Lodge counted two days of excavation activity, but only performed three hours of work using a single bulldozer. Tr. 355:3-356:17 (Callaway); DX3019.022, DX3019.064. For this work, Lodge sought $13,000 in costs, or ***$4,333 an hour***. Ms. Callaway acknowledged it was not reasonable for Lodge to count three hours of work as two activity days. Tr. 357:14-358:10 (Callaway).

- For March 13, 2012, Ms. Callaway intentionally counted four days of embankment work. Tr. 359:23-360:15 (Callaway); JX95.020. But Lodge only performed 13.5 hours of embankment work on March 13th. Tr. 367:6-368:10 (Callaway); DX3020.046, DX3020.069. Ms. Callaway testified it was probably not reasonable or accurate for Lodge to count 13.5 hours as four activity days, but because she hadn't looked at the hourly production, she testified that "***I struggle with the word 'truthful.'***" Tr. 368:14-369:5 (Callaway) (emphasis added).

- For January 20, 2012, Lodge counted two activity days, but no work was performed on that day. Tr. 369:18-372:4 (Callaway); JX95.018; DX3003.03, DX3003.23.

- For February 10, 2012, Ms. Callaway counted two activity days for excavation, even though a single bulldozer worked for only 50 minutes in two sections of Section 1 – from 7:10 am to 8:00 am – and the embankment backfill in levee excavations were shut down all day due to rain. Tr. 372:17-375:22 (Callaway); JX95.010; DX3006.002, DX3006.003, DX3006.025. Counting 50 minutes of work as two activity days was a simplified feature of Ms. Callaway's computation of activity days, which affected the inefficiency ratio. Tr. 375:23-376:3 (Callaway). She testified that she did not "know how the cost was calculated from that ratio," but Mr. Dunn would

26

know.  Tr. 376:4-9 (Callaway).  Moreover – and importantly – ***Mr. Dunn knew the methodology that Ms. Callaway was using to count the activity days, and he had been provided with the spreadsheet.***  Tr. 274:2-12; 376:10-377:18 (Callaway).

Adding together the activity days we discussed with Ms. Callaway as noted above, at trial we discussed 27 of the 55 activity days after January 14, 2012.[11]  These days show minimal work.  This status is consistent with Ms. Callaway's initial deposition testimony that Lodge should not have charged for work after January 14, 2012, and that it had performed minimal work in that period.[12]  And the work shown demonstrates that the claim period in Lodge's Dewatering claim –from July 6, 2011 to January 14, 2012 – was correct, but ignored as Lodge fraudulently attempted to obtain stunningly outsized payments from the United States.

At trial, Lodge sought to explain away its fraudulent attempt to seek damages for periods in which minimal work was performed after January 14, 2012 by soliciting testimony about the potential flaws in their methodology in the period prior to January 14th.  Lodge seems to argue that it could "horsetrade" mistakes in their claim that were to the Government's favor to offset its liability for fraudulently seeking payment for minimal work after January 14th.  This argument is unpersuasive.  First, any calculation of an "undercount" is unsupported.  Lodge did not present any documentary evidence regarding Lodge's planned equipment hours for either excavation or

---

[11]  Lodge presented several daily reports from the period *before* January 14, 2012, showing over 20 hours per activity day computed by Ms. Callaway.  But these daily reports fell *within* the period of Lodge's stated damage claims.  *See* L-100-46 to L-100-49.  Our use of the daily reports was undertaken to show that Lodge should not have included activity day claims after January 14, 2012, because, as Ms. Callaway originally testified, the work was minimal.

[12]  Ms. Callaway misleadingly testified that five calendar days (March 8-10 and 12-13, 2012) discussed in the United States' examination of her only composed 2 percent of the 285 activity days that she set forth in her inefficiency ratio.  Tr. 426:3-18 (Callaway).  The comparison of 5 calendar days to 285 activity days was flawed because calendar days and activity days are different things.  Tr. 476:24-478:9 (Callaway).

embankment fill activities.  It would thus be impossible to evaluate potential "undercounting" without knowing those details.  Tr. 1209:25-1210:20, 1212:7-12 (Schaeb).

Second, Lodge's allegations of potential "undercounts" of activity-days during the period prior to January 14, 2011, are incomplete and potentially misleading because Lodge does not address "overcounts" that may be present during the pre-January 14th period.  There were certain weather-impacted days after January 14, 2012, during which Lodge severely overcounted minimal work as multiple "activity-days" (see discussion of March 10, 2012, *supra*).  As indicated in Mr. Schaeb's report, those circumstances also appeared during the time period before January 14, 2012:  there are multiple calendar days where Lodge's daily reports indicate "Embankment backfill shut down all day," yet Lodge's claim counts multiple activity-days of Embankment Fill. *See, e.g.*, JX119.041-046 at Line 28 (22-Oct-11, 3 activity days); Line 35 (03-Nov-11, 2 activity-days); Line 36 (09-Nov-11, 2 activity-days).  Lodge has failed to prove that there exists a net "undercount" during the period prior to January 14th.  What has been proven is that Lodge intentionally inflated its claim by counting minimal work after January 14th.

### C.  Lodge's Claim Disregarded The P00009 Contract Modification

Lodge's dewatering claim included, among other things, alleged damages and delay days related to inefficient excavation activities along the levee.  But USACE had previously given Lodge a contract modification P-00009 (P9) through which Lodge had already been paid $1.99 million in costs and been given 81 extra days to complete the excavation portion of the contract.  Lodge failed to take the P9 modification into account, inflating its alleged damages.

### 1.  The REA For CLIN 0007 And CLIN 0021

On October 18, 2011, Lodge submitted a Request for Equitable Adjustment (REA) relating to Contract Line Item Numbers (CLIN) 0007 and 0021.  JX61; JSOF ¶ 46.  Lodge's

REA requested an increase in the quantities of excavation under CLIN 0007 and a decrease in the quantities of excavation of unsuitable soil under CLIN 0021, resulting in an increase in the contract price, and 81 calendar days added to the contract completion date.  Tr. 57:2-58:3 (Gannon).  The REA sought increased durations for all excavation activities along the levee, including in Section 1.  See JX61 at Lodge00011574-5; Tr. 1123:15-25, 1124:1-11 (Andres); DX423.012 Fn. n; Tr. 829:24-831:17 (Dunn); JX061.028; JSOF ¶¶ 44-45.

Ms. Callaway prepared the contractor narrative, table, and schedules set forth within the CLIN 0007 and CLIN 0021 REA.  Tr. 229:5-20; JX61.027-029, 044.  To calculate the 81 days, she increased the baseline schedule durations of all excavation activities listed in the table at JX61.028-29, and added time for excavation activities in Section 1A.  Tr. 230:11-231:15 (Callaway).  The result of the increased excavation durations was that the contract's completion date changed from October 8, 2012 to January 3, 2013.  Tr. 231:16-233:5, 234:7-12; JX61.030.

In October 2011, Lodge was already starting excavation and replacement work within Section 1.  Tr. 56:19-57:1 (Gannon).  And when Lodge submitted its REA leading to P9, Lodge had already completed the bulk excavations in Section 1A, 1C, and 1E.  Tr. 485:6-20 (Callaway).  Thus, given that Lodge had already performed excavation in Section 1, the REA was not a forward priced estimate, but was based on work actually performed.  Tr. 129:7-15 (Gannon); Tr. 1183:19-25 (Schaeb).  Mr. Dunn certified this REA to be truthful, and USACE relied upon that certification.  Tr. 845:2-4 (Dunn); Tr. 58:4-25 (Gannon); JX61.026.

## 2.  Contract Modification P9

On December 13, 2011, USACE and Lodge agreed to contract modification P9, which granted Lodge the additional 81 calendars days to complete the contract while increasing the contract price by $1.99 million to compensate Lodge for longer than expected excavation

activities.  *See* JX21.001-4; Tr. 822:8-823:12 (Dunn); 235:3-8 (Callaway); JX61.026; Tr.

1127:17-25, 1128:1-7 (Andres); JSOF ¶¶ 42, 47, 48.

### 3.   **Lodge Revises Its Baseline Contract Performance Schedule**

Lodge then submitted a schedule update on December 20, 2011, which increased the

required completion date from October 2012 to January 2013 to account for the 81-day time

extension granted by P9.  Tr. 1128:8-25 (Andres); DX423.012; JX37.  In the narrative

accompanying this schedule, Lodge noted that the schedule did not adjust for additional time

required for individual activities, which would be realized in a future baseline schedule revision.

Tr. 1129:2-10 (Andres); DX423.012; JX37.  But updating the activity durations is important

because without those updates, the schedule cannot show the full impact of the change.  By not

updating the individual activities, Lodge was "actually underreporting what the forecasted

completion date would be."  Tr. 1129:11-24 (Andres); *see* DX423.012.

Eventually, Lodge did update the project's baseline schedule to reflect the addition of the

81 calendar days.  Tr. 235:3-8 (Callaway).  But Lodge did not submit the promised revised

baseline schedules to USACE to show the updates to the activity durations.  Tr. 1129:25-1130:3,

1132:2-11 (Andres); DX423.012, DX423.014; Tr. 240:6-18 (Callaway).  Instead, on February

20, 2012, approximately two months after modification P9 was executed, Lodge circulated an

email to its subcontractors instructing them to prepare a "cost impact estimate" of dewatering

damages based on a revised schedule that increased the excavation activity durations to account

for the additional time.  JX 74; Tr. 235:3-8 (Callaway).  The schedule, titled "Revision Baseline

with P00009" is Lodge's baseline schedule with 81 days added for modification P9.  Tr. 238:20-

240:5 (Callaway); JX74.047.  This revised schedule showed the proper method for incorporating

the P9 change into the schedule.  Tr. 1131:1-25 (Andres); JX74.  Consistent with P9, this revised

baseline schedule shows increased excavation durations in Section 1 as a result of P9.  JX 74; Tr. 239:2-240:5 (Callaway).

### 4.  Mr. Dunn Requests The Removal Of The 81 Days Granted In P9 From The Schedule That Lodge Presented To USACE

On April 15, 2012, Mr. Dunn emailed Ms. Callaway asking that she provide him with a an electronic copy of Lodge's December progress schedule, "less the 81 days included" in the December progress schedule.  Tr. 242:21-244:4 (Callaway); JX94.  Mr. Dunn's request was made in the context of the dewatering REA that Lodge was then considering asserting.  Tr. 244:5-10 (Callaway).  Although the December 2011 progress schedule had been adjusted to have the 81 days added to the end date as a result of P9, Mr. Dunn asked Ms. Callaway to send him the December baseline schedule without the 81 days provided in P9.  Tr. 244:18-245:9 (Callaway).  Ms. Callaway cannot remember what Mr. Dunn told her as an explanation for this change.  Tr. 245:6-18, 249:3-7 (Callaway).  Ms. Callaway did not recommend removing the 81 days from the December 2011 progress schedule; instead it was Mr. Dunn's decision.  Tr. 247:9-23 (Callaway).

### 5.  By Not Taking P9 Into Account, Lodge Increased Its Damages

In its Dewatering claim, Lodge requested a 91 calendar day extension.  Tr. 1132:17-20 (Andres); DX423.017; JX108.  To support this extension, Lodge included a schedule update and narrative.  Tr. 1132:12-25; *see* DX423.020.  Specifically, Lodge used the schedule update from December 20, 2011, which had a constraint date (required completion date) of January 18, 2013, and a project completion date of January 7, 2013.  Tr. 1133:1-8 (Andres); DX423.017.  For the purposes of the claim, however, Lodge revised this constraint date back to October 9, 2012 – the original project constraint date – in essence erasing the 81-day time extension granted in P9.  Lodge retained the anticipated completion date of the project as January 7, 2013; the difference

31

between that date and the constraint date of October 9, 2012 is 91 calendar days, which is the amount of time that Lodge requested in the Dewatering claim.  By removing the previously granted 81 calendar days from this analysis, Lodge sought a double recovery for a time impact already granted in P9.  Lodge did not say anything in its Dewatering claim about the time extension granted in P9.  Tr. 1133:1-1134:7 (Andres); DX423.020; JX109.

This is not an acceptable methodology for measuring delay because the schedule update included in the dewatering claim "fails to incorporate already-granted time extensions for P00009."  Tr. 1134:8-13 (Andres).  The result of ignoring P9 in its Dewatering claim is an inaccurate analysis of what was causing the project's delays.  Tr. 1134:22-25; DX423.021.

Adjusting the durations in the Dewatering claim to account for P9 increases the "anticipated durations" in Lodge's inefficiency calculation from 115 days to 184 activity-days (an increase of 69 days).  JX119.009-10; Tr. 1153:25-1154:13 (Schaeb).  And updating Lodge's inefficiency ratio to include the days granted earlier in P9, the "inefficiency percentage" decreases from Lodge's claimed 247.83 percent (285 divided by 115) to 154.89 percent (285 divided by 184).  JX119.009-10; Tr. 1154:14-24 (Schaeb).

### 6.  Knowledge And Intent With Respect To The Failure To Include P9 In Lodge's Inefficiency Ratio

There is no doubt that Lodge knew it should have taken into account P9 because it had already prepared P9-revised baseline schedules.  Thus, the P9 error was not merely an "oversight;" rather, *Mr. Dunn expressly instructed Ms. Callaway to remove the effect of P9 from the baseline schedule*.  *See* JX94.  In doing so, Mr. Dunn expressly instructed the fraudulent calculation, which Ms. Callaway dutifully executed.

Furthermore, Ms. Callaway admitted that it was her intent to exclude the 81 days from P9 *in order to show USACE the magnitude of Lodge's dewatering problem*.  Tr. 251:9-17.

**7.  Lodge's Explanation For Its Failure To Include The Days Granted In P9 Is Belied By Lodge's Statements In This Court And Documents Lodge Submitted To USACE**

At trial, the Court admitted into evidence as party admissions Lodge's repeated declarations that it should have taken into account the 81 days granted by P9 and that not having done so was a mistake and the result of Lodge's preoccupation with other matters.

> Undoubtedly, Lodge did overlook the additional dates provided by modification P9 when calculating the impacts of the dewatering problems, but there's a reasonable explanation for the mistake.

Tr. 254:3-7; DX421.024; Tr. 316:25-317:16 (The Court).

> Therefore, it's understandable that Lodge, while it was dealing with two major crises on the project, overlooked the fact that the original durations in the schedules had not been updated to reflect the additional time given for them in P-9.

Tr. 254:12-18; DX421.024; Tr. 316:25-317:16 (The Court).

> Lodge acknowledges now, as Ms. Callaway did at her deposition, that Lodge's calculations should have taken into account to some degree the 81 days provided by P-9.  Lodge admittedly did not.

Tr. 262:8-12; DX421.023-24; Tr. 316:25-317:16 (The Court).

Lodge's admissions are consistent with Ms. Callaway's deposition testimony that she did not know whether Lodge had changed its inefficiency claim to reflect the extensions of time connected with P9, but that it would have made sense to do so because Mr. Dunn had received credit for the time.  Tr. 260:13-261:19 (Callaway).

Lodge's prior admissions in this Court are also consistent with the testimony of Lodge's expert, Mr. Van Noy who testified that he agreed (with Mr. Schaeb) that modification P9 should have affected Lodge's inefficiency calculation.  Tr. 1423:7-16 (Van Noy).  And its admissions are consistent with the language in Lodge's certified REA concerning additional excavation work (including expressly set forth in Section 1) and the resulting P9 modification.

33

Lodge argues that its Dewatering claim did not falsely seek damages it had already received in modification P9 because the work compensated by P9 was not performed in Section 1.  But Lodge has not provided any evidence, other than the statements of Mr. Dunn and Ms. Callaway, to support the opinion that the P9 excavations were not performed in Section 1.[13]  And importantly, Mr. Dunn admitted that some of the P9 work set forth in Lodge's REA was allocated for work within Section 1.  Tr. 842:20-843:3 (Dunn).

The contemporaneous documentary evidence shows that Lodge explicitly sought – and received – a contract time extension and monetary compensation *for Section 1*.  Indeed, Lodge's REA that formed the basis for P9 *specifically sought increased durations for excavation activities **in Section 1***, and even notes, specifically, that Lodge needed further additional time for ***Section 1A***.  *See* JX61.028.  Furthermore, when Lodge internally updated the baseline schedule in February 2012 to account for P9, *it specifically increased the durations of activities **in Section 1***.  JX74; Tr. 239:2-240:5 (Callaway).

In response, Lodge attempts to distance itself from its certified statements in the REA requesting the P9 modification.  For example, Lodge has characterized the P9 modification as forward priced without any effort or intent to model actual schedule impacts (*i.e.*, to predict in

---

[13]  Mr. Gannon testified that he was not aware of the P9 allegation, and that he did not have an understanding of whether P9 work impacted the Section 1 work Lodge performed.  He also disagreed with Lodge's counsel's statement that P9 did not impact Section 1, and instead said he did not know how P9 affected the work in Section 1.  Tr. 103:20-105:1 (Gannon).  And Mr. Gannon, viewing the additional 260,000 cubic yards (of CLIN021 work), testified that Lodge did not *bill* for the P9 work.  Tr. 110:18-111:9 (Gannon).  But *billing* for P9 work against a single CLIN number insofar as it exceeded the original amount of allocated cubic yards for that CLIN, and performing P9 work under that single CLIN, are distinct concepts.  Later during the trial, Mr. Dunn mischaracterized Mr. Gannon's testimony, incorrectly suggesting that Mr. Gannon stated that there was no P9 work performed on Section 1.  Tr. 1070:4-9 (Dunn).

what Sections of the Project the extra work would be performed).  Lodge also argues that, when

the REA was submitted, the P9 work had not yet been undertaken.

The contemporaneous documentary evidence, however, proves that, at the time the REA

was submitted, Lodge was already performing the excavation work in several portions of Section

1.  *See, e.g.*, JX34.034, JX34.085-86 (Lodge's schedule submittals showing the first three

Section 1 excavation activities 1AS-1000, 1CS-1000, and 1ES-1000 100 percent completed in

September 2011); JX35.067, JX35.072-73 (excavation in Sections 1BS and 1DS started prior to

submittal of the REA in October 2011).  Thus, rather than being "forward priced," *Lodge was in*

*fact seeking compensation for impacts that had already happened in Section 1.*

Ms. Callaway and Mr. Dunn also propounded the theory that, irrespective of the

representations to USACE in Lodge's REA concerning the extra excavation work that had been

and was being undertaken in Section 1, the table in the REA setting forth additional contract

performance days was not accurate.  Instead, they stated that Lodge merely spread out the

excavation days evenly across all six sections of the Site 1 project; and that Lodge did not

undertake any additional excavation work in Section 1 corresponding to additional CLIN 0007

material.  Thus, they opined that, because there was no additional CLIN 0007 work in Section 1,

there was no need to include the effect of the additional days granted in P9 in Lodge's

inefficiency ratio.  In support of this theory, Lodge noted that the narrative to the Justification for

Inefficiency Ratio repeatedly stated that the ratio utilized the "baseline schedule" or "original

baseline schedule," demonstrating that Lodge intended to ignore the P9 modification.

But Lodge's new explanation is in direct contrast to Lodge's admissions, where it stated

that it had "*overlooked* the fact that the original durations in the schedules had not been updated

to reflect the additional time given for them in Modification P00009."  DX421.024 (emphasis

added); *see also id.* at 20.  This explanation is also inconsistent with the conclusion of its own

fraud expert, Mr. Van Noy.  Tr. 1423:7-16 (Van Noy).

Lodge's witnesses also propounded the idea that the REA's request for extra days in

Section 1 was never actually intended, and that Lodge merely used a simplistic model showing

an even spread of excavation days among all six sections.  But this argument is belied by the fact

that if the actual intent was to place the planned excavation days in Section 1 into the other

sections (Sections 2 – 6), there should be increased excavation days in those sections.  But none

of Lodge's 17 schedule updates showed an increase in planned excavation durations in Sections

2 – 6. Tr. 1143:14-23 (Andres).  Lodge's conflicting explanations underscore that it has no

coherent explanation for its failure to consider the effect of P9 in its inefficiency ratio.

### 8.  The Amount Of The P9 Fraud

The amount of the fraud connected with the fraudulent inefficiency methodology set forth

by Lodge involves the application of the inefficiency ratio against alleged costs Lodge presented

to the CO – including its Euclids, batch plant, and pump costs – compared with the application of

a corrected inefficiency ratio against those same costs.  Tr. 1160:9-1161:10 (Schaeb).

Adjusting for the 69 days added to the planned days changes the inefficiency ratio

denominator from 115 to 184.  In isolation, this lowers Lodge's inefficiency factor to 154.89

percent, lowering Lodge's claim by $900,630.  Tr. 1154:14-24 (Schaeb); JX119.010, 036.

The cumulative impact of making both the P9 and post-January 14, 2012 changes to

Lodge's inefficiency calculation amplifies the effect to Lodge's claim.  Decreasing the

numerator by 55 days, and increasing the denominator by 69 days, leads to 230 actual activity

days divided by 184 planned activity days, and a ratio of 125 percent.  This new ratio causes a

reduction to Lodge's Dewatering claim of $1,474,896.  Tr. 1159:14-24 (Schaeb); JX119.011.

VIII.    **Lodge's Claims For The Batch Plant Costs**

A.    **The Facts Of Lodge's Claimed Batch Plant Costs**

Per contract requirements, Lodge had a batch plant on site to make soil cement that would be placed on the reconstructed levee.  Tr. 72:23-74:2 (Gannon); JX29.007; Tr. 530:12-19 (Gore); JX3.0909; JSOF ¶ 53.  Without a batch plant, Lodge would not have been able to generate revenue for producing or placing soil cement.  Tr. 530:20-531:14 (Gore).

In late 2010, Lodge purchased the batch plant for $656,750 plus $50,850 for freight. JX48; Tr. 963:19-964:3 (Dunn); Tr. 1168:10-23 (Schaeb); JSOF ¶ 55.  It also bought a generator for the batch plant for $110,372.48.  JX47; JX118.002; Tr. 967:2-15 (Dunn); Tr. 1168:10-23 (Schaeb); JSOF ¶¶ 54, 56.  In total, Lodge spent $817,973 on the batch plant.

In January 2011, after Lodge had ordered the batch plant, Lodge negotiated a "Schedule of Values" through which USACE agreed to pay Lodge in two equal installments for the purchase, installation, and commissioning of the batch plant.  JX046; Tr. 523:21-24; 527:20-25 (Gore).  Specifically, Lodge would be paid 50 percent after installation of the batch plant and another 50 percent after certification of the batch plant based upon a trial batch of soil cement. Tr. 523:25-524:20, 620:10-21 (Gore); Tr. 76:5-77:18; Tr. 79:7-81:14 (Gannon); JX46.001, 003; JX35.009.  The batch plant payment was reflected in Pay Estimate No. 2, the schedule of values for the period ending January 31, 2011.  Tr. 525:16-24 (Gore); DX334.001-002; JX28.012. CLIN 0009 in this schedule included a line item for batch plant installation in the amount of $613,800, and another line item for batch plant commissioning/trial batch in the amount of $613,800, for a total of $1,227,600.  Tr. 526:4-19, 535:1-11 (Gore); JX28.012; JSOF ¶¶ 57, 58. The batch plant commissioning/trial batch line item "encompassed all the efforts to get that first trial batch installed."  Tr. 528:16-18 (Gore).  Thus, "Ownership, commissioning, installation, and

trial batch" were all costs included in the initial $1.2 million USACE paid to Lodge for the batch plant.  Tr. 1201:5-18 (Schaeb).  Lodge's request for an upfront payment for material and the cost of the batch plant from the USACE was unusual in that USACE does not typically pay contractors upfront for their equipment costs.  Tr. 800:24-801:8 (Riggs); DX344.002.

USACE compensated Lodge for operation of the batch plant through two other line items under CLIN 0009 – producing and placing soil cement.  Tr. 81:15-24 (Gannon); Tr. 529:1-7, 528:1-6, 619:4-25 (Gore); JX28.012; JX38.032.  The producing soil cement item incorporates the material from the borrow pit for processing into soil cement.  Tr. 530:6-19 (Gore).  The placing soil cement line item included "utilizing the batch plant to make the soil cement, and place it on the levee."  Tr. 530:6-19 (Gore); Tr. 1298:23-1299:9 (Lester); JX028.012.

Lodge also made several modifications to the batch plant.  Tr. 648:13-20 (Gore); Tr. 866:11-14 (Dunn).  The modifications included welding steel and adding vibrators to help the soil move faster.  Tr. 606:11-607:15 (Gore).  Mr. Dunn testified that the modifications to the batch plant were necessary due to Lodge's dewatering problems.  Tr. 866:19-867:16 (Dunn).

By October 2011, Lodge had invoiced USACE for 100 percent of the batch plant installation and commissioning costs, for a total of $1,227,600.  Tr. 1168:3-9 (Schaeb); JX119.017; JX35.009; JSOF ¶ 58.  Lodge did not, however, pay an invoice to its vendors for $215,037.81, which reduced Lodge's out of pocket costs to $602,000 for the batch plant and the generator.  Tr. 963:19-968:12 (Dunn); Tr. 1168:22-1169:2 (Schaeb); JX048.001.  Based on Lodge's job cost report, Lodge also spent approximately $300,000 in labor costs associated with assembling the batch plant, getting it running, and producing a trial batch of soil cement.  Thus, in total, Lodge spent approximately $900,000 on the batch plant and associated costs, but was paid $1,227,600 by USACE for batch plant costs.  Tr. 1169:3-22 (Schaeb); JX119.017.

Lodge did not use all the funds provided by USACE for the batch plant costs.  Instead, it took out a $900,000 loan with SunTrust, which obtained a security interest in the plant.  Tr. 970:23-971:5 (Dunn); Tr. 82:10-83:10 (Gannon); JSOF ¶ 61.  As of October 2012, Lodge still owed about $540,000 on its batch plant loan from SunTrust.  JSOF ¶ 64.  Due to nonpayment of loans, Sun Trust seized Lodge's equipment, including the batch plant.  Tr. 971:6-972:10 (Dunn).  SunTrust eventually required USACE to pay $100,000 to allow for the continued use of the batch plant after Lodge's contract termination.  Tr. 82:10-83:10 (Gannon).

### B.  The Batch Plant Fraud

In its claim, Lodge included both operating and standby rates for the batch plant.  For the operating rate, Lodge used an hourly rate of $339.09, which it obtained from EquipmentWatch in June 2011 – prior to any dewatering difficulties.  Tr. 953:25-955:21, 1017:2-1019:21 (Dunn); JX109.097; JX51; JSOF ¶ 62.  Mr. Dunn used an hourly rate, as opposed to a monthly or longer term rate, because he considered the batch plant to be portable, just like wheeled and tracked vehicles.  Tr. 956:17-957:18, 1023:15-1024:5 (Dunn).  Mr. Dunn should have used USACE's CHECKRATE service for an hourly operating rate of $235.88, or otherwise used the Federal Highway Administration (FHWA) rate.  Tr. 957:20-961:15 (Dunn); Tr. 1171:14-25 (Schaeb); JX109.097.  Lodge did use CHECKRATE for the standby hourly rate of $56.16.  Tr. 959:8-961:15 (Dunn); Tr. 1170:8-13, 1172:1-13 (Schaeb); JX119.017; JX81; JX109.097; JSOF ¶ 62.  Importantly, both Lodge's claimed standby and operating rates for the batch plant included recovery for depreciation, or purchase, costs.  Tr. 1172:17-24 (Schaeb); JX119.018.

To determine the claimed operating hours, Lodge used two separate methods for internal and for USACE reporting purposes.  Internally, Mr. Rousseau used the meter from the generator to report both the generator hours and the batch plant operating hours.  Tr. 182:13-183:11,

184:13-19 (Rousseau).  To USACE, however, Lodge reported batch plant operating hours as hours during which Mike Wederath, a Lodge employee, was at the batch plant, even when it was not operating.  Tr. 184:20-185:5, 188:10-12 (Rousseau).  This calculation resulted in Lodge reporting more operating hours to USACE than in internal Lodge records.  JX081.

### C.  <u>Knowledge And Intent</u>

Despite being aware that USACE had paid in full for the batch plant, Mr. Dunn "consciously made a decision to include the [ownership costs of the] batch plant in Lodge's claims."  Tr. 1244:22-1245:6, 1245:14-17, 1246:21-1247:1 (Lester); *see also* JSOF ¶ 65.  Mr. Dunn reviewed the rate information concerning the batch plant and intended that USACE pay Lodge for those costs as presented.  Tr. 950:14-23 (Dunn).  *See, e.g.*, JX109; *see also* JX81 (Mr. Dunn characterizing standby rate for batch plant as "ownership rate").  This was not "a simple mistake or error . . . on Lodge's part."  Tr. 1245:8-13, 1246:21-1247:1 (Lester).

Lodge thus claimed ownership costs through its batch plant operating and standby rates, even though USACE had already provided Lodge a lump sum for the complete purchase and installation costs of the batch plant through a contract line item.  JSOF ¶¶ 57-58; Tr. 81:15-24 (Gannon); Tr. 529:1-7, 528:1-6, 619:4-25 (Gore); JX28.012; JX38.032.  Lodge, in fact, "was aware that USACE paid Lodge in full for the purchase of the batch plant months before Lodge filed its claim with USACE."  JSOF ¶ 65; JX046; Tr. 523:21-24 (Gore); Tr. 1245:18-1246:20 (Lester).  Nevertheless, Lodge inflated its batch plant operating and standby rates in its certified claim as part of its monthly billing, resulting in a double-billing for these costs.  JX119.017-18.

Though Lodge should not have claimed *any* batch plant costs, the operating and standby rates Lodge included as batch plant monthly rates are either incorrectly calculated or unsupported.  *See* JX119.017-18.  Lodge argued, in connection with the Euclids, that the contract

required Lodge to select rates according to the USACE manual.  Pl. Opp. to Def. SJ Mot. (Dkt. 21) at 29-30.  However, Lodge specifically rejected the batch plant rates in the USACE manual in favor of inflated rates.  While preparing the claims, Lodge used CHECKRATE to determine an operating rate of $235.88 per hour for the batch plant.  Tr. 178:22-179:20 (Rousseau); JX081.  Mr. Dunn rejected that rate, and instead chose an operating rate of $339.09 per hour, over one hundred dollars more per hour than the published rate in CHECKRATE.

At trial, Mr. Dunn testified for the first time that he apparently intended to use the $235.88 rate, but accidentally transcribed it as the bobcat rate.  Tr. 1041:11-1042:2, 1062:13-18 (Dunn).  However, in an email to Mr. Dunn, Mr. Rousseau stated that the spreadsheet rates were correct, despite the fact that the operating rate for the batch plant was reported as $339.09.  Tr. 179:21-180:25 (Rousseau); JX083.001, 004.  Thus, Lodge had a chance to correct the rate but did not do so.  Regardless, the question of whether Lodge used the correct batch plant operating rates is irrelevant because USACE had already paid for the ownership costs of the batch plant.  Tr. 1200:3-9 (Schaeb).

In sum, Mr. Dunn either failed to make a minimal examination of Lodge's records to ensure Lodge did not double-bill USACE for these batch plant costs, or he intentionally included the inflated batch plant costs so as to improperly increase Lodge's claim against USACE.  Despite the fact that Lodge never produced Mr. Dunn's email account during discovery, and withheld as privileged other emails from Mr. Dunn regarding claim preparation, some emails produced demonstrate that Mr. Dunn was aware of the unique circumstances of the batch plant.  Hours before he submitted the claim, Mr. Dunn requested that Mr. Gore "help [him] make an argument that the batch plant is a piece of equipment owned by Lodge Construction."  DX334.002.  Mr. Dunn's email reflects that he understood Lodge had billed USACE for the cost

of the batch plant, and wanted Mr. Gore's help to "prove ownership [of the batch plant] to help

Lodge Construction survive a possible [Termination for Default]."  *Id.*

### D.  Lodge's Explanations Concerning Its Batch-Plant Charges Do Not Withstand Scrutiny

At trial, Lodge's witnesses suggested that Lodge was entitled to both the upfront batch

plant payment from USACE as well as additional costs set forth in Lodge's dewatering claim.  In

support, both Mr. Dunn and Mr. Gore testified that Lodge had additional ownership costs in the

form of modifications to the batch plant because of the wet soil.  Tr. 606:11- 607:15, 648:13-20

(Gore); Tr. 866:11-14, 866:19-867:16 (Dunn).  Lodge received an invoice dated May 13, 2011,

Tr. 868:17-869:5 (Dunn); DX457, which demonstrates that the installation of a vibrator,

crossbeams, and the modification to a hopper occurred in April 2011.  Tr. 869:14-870:8 (Dunn);

DX457 at Lodge00012319.  But Lodge did not start its dewatering pumping until July 2011, and

its Dewatering claim runs from July 2011 to January 2012.  Tr. 871:2-872:5 (Dunn).

Furthermore, Lodge's batch plant supplier paid for some of these modifications directly; and

Lodge had refused to make the final $215,000 payment due to offsets and back-charges that

Lodge had against the supplier.  DX166; Tr. 965:4-967:1 (Dunn).

### E.  The Amount Of The Fraud

Lodge improperly claimed ownership costs for the batch plant in its dewatering and

design claims through its claim for operating and standby rates.  Tr. 1169:10-25 (Schaeb);

JX119.017.  Because USACE paid Lodge these costs up front, Lodge was not required to finance

the cost of the batch plant over a longer period of time, and thus it should not have included the

cost of capital in its claimed costs.  Tr. 1172:25-1173:8 (Schaeb); JX119.018.  After application

of Lodge's inefficiency ratio and addition of profit, in total, Lodge improperly claimed $153,929

for the generator and batch plant in its Dewatering and Design claims (made up of $114,945.75 in the Dewatering claim, and $38,982.47 in the Design claim).  Tr. 1173:9-15 (Schaeb).

IX.     **Lodge's Claims For Its Dewatering Pumps' Costs**

A.   **The Facts Of Lodge's Claims For Dewatering Pump Costs**

Lodge used pumps to dewater the area inside the cofferdam and around the levee.  Tr. 85:1-86:25 (Gannon); JSOF ¶ 4, 66-69.  Payment for dewatering was included in CLIN 0005, which provided a lump sum of $11 million.  JSOF ¶¶ 66, 70.  This lump sum included pump costs such as:  fuel, maintenance, and monitoring; as well as modifying as needed, without any requirement to dewater a specific number of acres or volumes.  Tr. 87:1-25 (Gannon).  During contract performance, Lodge proposed that it be allowed to bill a fixed monthly amount for "dewatering operation" against this CLIN – meaning "Lodge would receive this monthly amount regardless of how much dewatering progress Lodge made in that month . . . ."  Tr. 539:10-24 (Gore); Tr. 88:1-5, 88:24-89:9, 117:21-118:4 (Gannon); JX029.008-9; Tr. 1203:7-18 (Schaeb).  If Lodge completed the project faster than expected, USACE would still pay the full balance.  Tr. 624:25-625:16 (Gore); JX038.031.

The schedule of values for Pay Estimate No. 3 divided CLIN 0005 into five pay items, and item 5-110 was specifically for dewatering the area inside the cofferdam and around the levee for a lump sum value of $2,640,000, split into 17 monthly payments of $155,294.  Tr. 90:15-93:10 (Gannon); Tr. 537:16-538:17 (Gore); JX29.008-009; JSOF ¶¶ 68, 69, 70.

As of March 2011, however, Lodge had not started dewatering the cofferdam area and had not billed USACE for any cofferdam dewatering.  Tr. 538:18-539:9 (Gore); *see also* JX29.  Lodge completed the cofferdam and began billing for dewatering in July 2011; to ensure it received the full dewatering amount, it compressed the billing to 14 monthly payments of

$188,571, an increase of $30,000 per month.  Tr. 542:4-543:7, 543:16-544:2, 546:20-547:3

(Gore); Tr. 1203:19-1204:5 (Schaeb); Tr. 93:11-96:2 (Gannon); JX33.008, 016; JX32.049-050.

By January 20, 2012, Lodge had billed more than $1.5 million for eight months of dewatering at

the increased rate of $188,571 per month.  Tr. 544:3-23, 545:4-19 (Gore); JX38.008, 031.

### B.  <u>The Dewatering Pump Fraud</u>

During the period of the alleged dewatering inefficiency, Lodge was paid the monthly

dewatering amount, which included "pump costs, including fuel, maintenance, and monitoring."

Tr. 1174:6-19 (Schaeb); JX119.022-023; JX32.050; JX38.031.  As of January 2012, Lodge had

invoiced, and USACE had paid, for eight months of dewatering, including all six months of the

dewatering claim period.  Tr. 1175:8-15 (Schaeb); JX119.022-023; JX032.050.  To the extent

Lodge spent additional time dewatering Section 1 beyond what it had planned, USACE paid

Lodge for that time and associated additional pumping costs.  Tr. 1204:6-17 (Schaeb).

The Dewatering claim Lodge presented to USACE and this Court, however, includes

those same costs of operating the dewatering pumps.  Tr. 1173:21-1174:5 (Schaeb); JX119.022.

Lodge applied its inefficiency ratio to its costs from July 5, 2011, through January 14, 2012 –

costs that included standby and operating expenses for the dewatering pumps.  JSOF ¶ 71.  As

explained above, however, the pump costs were already included in the monthly rate detailed in

the schedules of values, which USACE had already paid.  *See, e.g.*, JX32.049-050; JX33.008;

JX38.008, 031.  *Importantly, nowhere in the claims does Lodge address its monthly pumping

cost payments from USACE.  See* Tr. 560:12-15 (Gore); *see* JX120.054-055.

### C.  <u>Knowledge And Intent</u>

Lodge knew that it was double-billing for the pumps.  And Mr. Dunn intended for

USACE to pay Lodge for the dewatering pumps irrespective of Lodge's agreement with

USACE.  Tr.  972:24-973:6 (Dunn).  He knew that USACE was paying Lodge a monthly lump

sum for dewatering, but he did not make any adjustments in the Dewatering claim to account for

those payments.  Tr. 973:19-974:3 (Dunn).  Mr. Gore prepared the schedule of values along with

USACE, Tr. 88:1-5 (Gannon), JSOF ¶ 66, and also signed all of Lodge's pay estimates, so he

was aware of the amounts Lodge had been paid for dewatering.  Tr. 543:16-544:2, 556:20-22,

628:9-629:12 (Gore).  Mr. Lester determined "that evidence supports that Lodge was aware that

its dewatering pumps in its claim had been paid through . . . other items within Lodge's

contract," and that "Lodge was being paid in full for its dewatering pumps during the period of

time that it is also . . . seeking additional costs in its claim from the government."  Tr. 1247:17-

1248:4, 1249:15-21 (Lester).  At best, Mr. Dunn and Mr. Gore failed to make even a minimal

examination of Lodge's records to ensure it did not double-bill for the dewatering pumps.

Mr. Gore testified that due to unanticipated conditions, Lodge's pumps had to work

harder and longer.  Tr. 597:18-598:11 (Gore) (describing "96 inches of rain" in one month); Tr.

612:9-21 (Gore) (keeping site with Indian bones dry).  Further, Lodge claimed that when it bid

the project and submitted a lump sum price for CLIN 0005, Lodge was anticipating a set amount

of dewatering work, and that was what this was intended to pay for.  Tr. 625:17-24 (Gore).  But

Lodge claims that due to dewatering issues, the pumps "worked harder" and consumed more

fuel, ran longer and harder, and required additional maintenance.  Tr. 629:13-630:3 (Gore).

Despite this testimony, however, Lodge presented no evidence of any of its claims.

Lodge did not explain what amount of dewatering work it had expected to pay for, nor did it

present any evidence detailing the alleged additional fuel, runtime hours, and maintenance it

supposedly faced.  With the exception of an extra pump for the Indian burial site, Tr. 612:9-21

(Gore), Lodge did not present any evidence that it used more pumps than it had initially planned

for.  *See, e.g.*, Tr. 974:10-13, 974:22-975:5 (Dunn).  Even if Lodge had been able to produce this evidence, the pumps were compensated in fixed monthly amounts, which included not only the costs of the pumps themselves but also the cost of fuel, maintenance, monitoring, and modification as needed.  Tr. 1248:5-15 (Lester).  Thus, "Lodge was paid regardless of whether the pumps were even running or not during this period of time."  Indeed, "the government continued paying even when the pumps were in total shutdown mode."  Tr. 1248:16-1249:21.

Most importantly, Lodge presented no evidence to refute the fact that its pumps were not used in the sites of alleged DSC.  Lodge's pumps were placed to dewater the area directly around the levee itself to pump water out of the levee area into the impoundment area.  Tr. 539:25-540:12 (Gore).[14]  Once in the impoundment area, the water did not percolate as quickly as Lodge had anticipated it would, and USACE granted Lodge permission to let the water out of that area and eventually into the Hillsboro Canal via gravity.  Tr. 540:13-19, 541:3-20 (Gore).  Thus, Lodge did not pump water out of the impoundment area into the canal.  Tr. 541:25-542:3 (Gore).  Because water left the water retention/percolation areas by gravity, Lodge did not need to use pumps in those areas.  Tr. 129:16-131:2, 131:25-132:4 (Gannon).  As such, there was not a percolation issue between the cofferdam and the levee because Lodge did not hold water there; the water that was there was pumped 500 feet away into the percolation areas.  Tr. 848:1-19 (Dunn).  Therefore, because the alleged DSC was related to percolation, the pumping of the levee was not connected to the DSC.  Tr. 121:24-123:8 (Gannon).  Thus, the entire foundation of Lodge's alleged claim of increased dewatering pump costs was without merit.

---

[14]  Lodge did not pump water on any other part of the site; CCT performed dewatering at the borrow pit using its own pumps.  Tr. 584:19–25 (Gore); Tr. 1008:9–19 (Dunn).

### D.  Lodge's Explanations For Its Dewatering Pump Costs Do Not Withstand Scrutiny

Lodge argues that the monthly lump sum payment for dewatering pumps was the payment applicable during normal conditions, and that the dewatering claim attempted to recover monthly costs that exceeded the lump sum amounts.  Tr. 1073:10-1074:14 (Dunn); DX421.026-27.  According to Lodge, it did not double-bill for the pumps because the dewatering claim "only includes the additional monthly operating costs of the pumps over and above the monthly lump sum amounts billed by Lodge and paid by USACE." *Id.*

Lodge's argument is devoid of evidence.  The contention that its "actual monthly dewatering costs exceeded the amounts it anticipated" is unsupported by any evidence, and none of Lodge's witnesses could identify the anticipated monthly pumping cost.  *See, e.g.*, Tr. 625:17-24 (Gore); Tr. 974:10-13, 974:22-975:5 (Dunn).  Further, Lodge's argument that it was "limited to the agreed upon lump sum amount" ignores the fact that Lodge had already increased its monthly dewatering amount from $155,294 per month to $188,571 per month in July 2011, after the pumping to dewater the cofferdam had begun.  This $33,277 increase in monthly payments equates to $199,663.87 in *additional* payments to Lodge during the six-month duration of the Dewatering Claim, above and beyond the monthly payments originally anticipated in the schedule of values.  Thus Lodge's Dewatering claim ignores not just the monthly payments made by USACE, but also the increase in monthly payments Lodge had already received.

### E.  The Amount Of The Fraud

Lodge's improper inclusion of the pump costs fraudulently inflated its Dewatering claim by $387,110.  Tr. 1175:16-22 (Schaeb).  This figure is computed by totaling the pump costs included in Lodge's cost pool ($606,515), then applying Lodge's claimed 247.8 percent inefficiency factor and adding Lodge's 7 percent markup.  Were the Court to find fraud in the

inefficiency factor as discussed above, the total additional fraudulent amount claimed for pumps ($387,110) would be reduced to $129,794.

## X.  **Mr. Van Noy's Opinion Was Unreliable**

### A.  **Mr. Van Noy's Opinion Was Not The Product Of Reliable Principles**

The Fraud Triangle looks at the opportunity, pressure, and rationalization that somebody has to commit fraud, and is a "bedrock principle" of the Association of Certified Fraud Examiners that is important to consider when assessing whether indicia of fraud are present.  Tr. 1231:17-1232:1, 1236:2-15, 1237:11-19 (Lester).  However, Mr. Van Noy did not apply the Fraud Triangle.  Tr. 1343:1-10 (Van Noy); L67.  Instead, he employed his own so-called "hallmarks of fraud."  Tr. 1401:19-1402:13 (Van Noy).  But these factors go only to "concealment and deception."  Tr. 1401:6-18 (Van Noy); L67.6.

Judge Sweeney's September 15, 2017, decision defined fraud under the Special Plea In Fraud and the False Claims Act.  Tr. 1232:12-19 (Lester).  However, Mr. Van Noy did not review, did not rely upon, and did not apply the standards from Judge Sweeney's decision.  Tr. 1337:19-1338:6 (Van Noy).  Instead, Mr. Van Noy relied upon Lodge's counsel's arguments regarding the definitions of fraud.  Tr. 1337:1-18 (Van Noy); L67.4-5.

Given the foregoing, Mr. Lester concluded that "Mr. Van Noy had not applied a rigorous or standardized approach in his evaluation of the errors and inconsistencies that Mr. Schaeb identified in Lodge's claims."  Tr. 1429:10-19 (Lester).  "Mr. Van Noy did not address . . . anything related to the fraud triangle in his report."  Tr. 1241:14-16, 1241:25-1242:2 (Lester).  Mr. Van Noy's factors failed to consider "all the necessary elements . . . in evaluating whether or not there's indicia of fraud."  Tr. 1430:15-1431:7 (Lester).  Specifically, Mr. Van Noy's so-

called "hallmarks of fraud" "were . . . . primarily focused on concealment, deception" which do not "necessarily . . . appear[] in every fraud."  Tr. 1431:22-1432:19 (Lester).

### B.  Mr. Van Noy's Opinion Was Not Based On Sufficient Facts Or Data

Mr. Van Noy did not conduct a fraud investigation of Lodge.  Tr. 1411:20-23 (Van Noy). Instead, he determined only that there was not "adequate predication to have an investigation." Tr. 1332:24-1333:5 (Van Noy).  Mr. Van Noy did not take the steps that he would take in a fraud investigation, such as meeting with the client, interviewing people, and collecting documents. Tr. 1334:14-1336:6 (Van Noy).  Specifically, Mr. Van Noy did not speak with anyone at Lodge or to any of the fact witnesses who testified at trial.  Tr. 1412:3-10 (Van Noy).  He did not request access to the documents that were produced in this action.  Tr. 1414:7-10, 21-22, 1415:2-4 (Van Noy), discussing L67.14-15.  He did not perform any investigation into Mr. Dunn's, Ms. Callaway's, and Mr. Perkins's capabilities to present accurate claims beyond reviewing their deposition transcripts.  Tr. 1417:21-23, 1418:1-2, 1418:5-23 (Van Noy).  And he did not investigate Lodge's schedule, assess Lodge's operations, organization, and key employees, or review Lodge's procedures and processes.  Tr. 1421:18-1422:10 (Van Noy).

As of the date of his deposition, Mr. Van Noy had spent only 46 hours of time on this matter.  Moreover, not all of Mr. Van Noy's time was spent preparing his report, as it also included reviewing analyses and documents.  Tr. 1395:4-21, 1396:11-1397:22 (Van Noy). Mr. Lester concluded that Mr. Van Noy's efforts were "limited . . . .  He didn't conduct a fraud investigation.  He didn't consider many of the types of information that" were necessary "to properly evaluate whether or not there's indicia of fraud."  Tr. 1429:21-1430:6 (Lester).

### C.  **Mr. Van Noy Did Not Reliably Apply His Principles To The Facts**

Mr. Van Noy found mistakes in Lodge's claim, had "reason to question" Lodge's methodologies, and determined that Lodge had not "calculated [its claim] in a proper way."  Tr. 1367:9-11, 1385:22-1386:6, 1420:10-13 (Van Noy).  Indeed, he "[a]bsolutely" agreed with Mr. Schaeb's criticisms of Lodge's claim.  Tr. 1386:18-1387:2 (Van Noy).  Despite this, he did not determine which errors were deliberate, "did not lay out a list" of the errors, and did not provide an assessment of the element of intent.  Tr. 1413:17-1414:6, 1418:24-1419:15, 1420:2-9.

Mr. Van Noy's report is only nine pages long.  Tr. 1330:7-12 (Van Noy); L67.2-10.  He acknowledged that the time he spent drafting it "would not have been long."  Tr. 1412:11-17 (Van Noy).  Mr. Van Noy's report does not contain the word "predication" or state that a fraud investigation was not warranted.  Tr. 1333:11-1334:13 (Van Noy); L67.  Nor does his report mention the Euclid dump trucks, the batch plant, or modification P9 – at all.  Tr. 1332:9-23, 1369:23-1370:6, 1381:12-1382:6 (Van Noy); L67.

Ultimately, Mr. Lester determined that "Mr. Van Noy's scope of work was limited and not a reasonable basis for his opinions," that Mr. Van Noy did not consider "all the necessary elements . . . in evaluating whether or not there's indicia of fraud," and that Mr. Van Noy did not consider all of the necessary documents and materials.  Tr. 1430:7-24 (Lester).  Accordingly, Mr. Lester concluded that Mr. Van Noy's opinions were not "well-founded," and do not "hold much weight."  Tr. 1431:22-1432:24 (Lester).

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Senior Trial Counsel

IOANA CRISTEI
STEVEN C. HOUGH
Trial Attorneys
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-7972
Fax: (202) 514-8640
Email: john.roberson@usdoj.gov

August 30, 2021                                    *Attorneys for Defendant*