No. 13-499C
(Judge David Tapp)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LODGE CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**LODGE CONSTRUCTION INC.'S POST-TRIAL BRIEF**

---

/s/ Michael H. Payne
Michael H. Payne
Cohen Seglias Pallas Greenhall & Furman
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA  19103
Tel:  215-564-1700
Fax: 215-564-3066
mhpayne@cohenseglias.com

*Counsel of Record for
Lodge Construction, Inc.*

/s/ Edward Parrott
Edward Parrott, Esq.
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
eparrott@wthf.com

*Of Counsel*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION.................................................................................................. 1

I.   The United States Ignored its Burden of Proof at Trial and Fundamentally Failed to Make a Case that Lodge Committed Statutory Violations. ............................................ 2

II.  The United States Failed to Prove that the Individual Claim Components it Challenged Amounted to Knowing Submissions of a False Claim. .............................. 5

A.   The United States failed to prove that Lodge's Construction Inefficiency Ratio amounted to the knowing submission of a false claim. (P9 and 55 days allegations) ................................................................................................ 6

1.   The evidence established that Lodge's failure to adjust the Construction Inefficiency Ratio to include P9 work was appropriate. ................................... 6

2.   The United States abandoned its 55-days argument and pivoted to a meritless "overcount" argument. .................................................................... 11

B.   The United States failed to prove that Lodge's equipment pricing submissions amounted to the knowing submission of a false claim. (Euclid and Batch Plant allegations). ................................................................................................ 19

1.   Lodge reasonably established its Job Cost Report and equipment rates at the outset of the Project before any claims existed. .............................................. 19

2.   Lodge reasonably repriced its equipment in connection with pricing its certified claims. ..................................................................................... 22

3.   The United States failed to prove that Lodge's Euclid Truck pricing was false or that Lodge submitted its claims with knowledge of that falsity............. 23

4.   The United States failed to produce evidence that Lodge's Batch Plant pricing was false or that Lodge submitted its claim with knowledge of that falsity.   29

a.   Lodge Attempted to Use the USACE Guide Operating Rate for the Batch Plant but failed to do so due to a clerical error........................................... 29

b.   The United States failed to produce evidence to support its assertion that Lodge double billed for the Batch Plant. ....................................................... 32

**C.   The United States failed to produce evidence that Lodge's Dewatering Pump pricing was false or that Lodge submitted its claims with knowledge of that falsity.** ...................................................................................... **37**

**III.   Other, Substantial Evidence was Offered at Trial that Undermines the United States' Allegations and Entitles Lodge to Judgment on the United States' Fraud Claims**.......................................................................................................... **39**

**A.   Lodge retained a professional to assist and guide its Claim preparations.** ......... **39**

**B.   Lodge engaged in a submittal process resulting in reductions to its Claims.**....... **40**

**C.   Any beneficial mistakes Lodge made in pricing its claims were counterbalanced by mistakes in favor of the United States**................................................................ **46**

**CONCLUSION** ............................................................................................................. **48**

## **TABLE OF AUTHORITIES**

**Cases**

*Daewoo Eng'g and Const. Co., Ltd. v. United States*, 73 Fed. Cl. 547, 591 (2006), aff'd, 557 F.3d 1332 (Fed. Cir. 2009) ................................................................................. 26

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999).................... 51

*Horn & Assocs., Inc. v. United States*, 123 Fed. Cl. 728, 754 (2015) ................................... passim

*Reliable Contracting Group, LLC v. Dep't of Vet. Affairs*, 779 F.3d 1329, 1334–35 (Fed. Cir. 2015) .................................................................................................................... 4

*Riley Constr. Co. v. United States*, 65 Fed. Cl. 264, 270 (2005) ........................................... 19, 41

*Trafalgar House Const., Inc. v. United States*, 77 Fed. Cl. 48 (2007)......................................... 28

*Ulysses, Inc. v. United States*, 110 Fed. Cl. 618, 645–47 (2013) ................................................. 11

*United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787 (E.D. Va. 2007) ... 52

*United States ex rel. Lamers v. City of Green Bay*, 186 F.3d 1013, 1018 (7th Cir. 1999) ........... 51

*United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008) ........................... 50

*United States ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 968 (C.D. Ill. 2015)............... 52

*United States ex rel. Wilson Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008).... 51

*United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011).  51

*Universal Health Services v. United States*, 136 S. Ct. 1989, 2003 (2016).................................. 50

**Regulations**

DFARS § 252.243-7001 ................................................................................................................ 33

FAR § 31.205-10 .......................................................................................................................... 34

FAR § 31.205-11 .......................................................................................................................... 34

FAR § 52.236-2 ...................................................................................................................... 34, 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LODGE CONSTRUCTION, INC., et al.    )
                  Plaintiff,    )     No. 13-499C
                            )
                            )     Judge David A. Tapp
          v.           )
                            )
THE UNITED STATES,           )
                  Defendant.    )
_____ )

## <u>LODGE CONSTRUCTION INC.'S POST-TRIAL BRIEF</u>

Lodge Construction, Inc. ("Lodge"), by its undersigned counsel, respectfully submits its Post-Trial Brief and Proposed Findings of Fact in the above-styled action.

## <u>INTRODUCTION</u>

The United States' fraud counterclaims were conceived by the United States Department of Justice with no involvement from the Contracting Officer, United States Army Corps of Engineers ("USACE"), or Defense Contract Audit Agency ("DCAA") solely as a litigation tactic to defeat Lodge's pending $24 million wrongful termination claim. As reflected at trial, Lodge's certified claims and submittals were the product of significant and well-reasoned efforts that impressed the United States' witnesses. *See infra* Part III(B). The United States failed to produce any evidence that the USACE was ever concerned with the individual components of Lodge's certified claims, nor did the United States explain why Lodge's claims were never audited by the DCAA. Over five (5) years after the claim submissions, when Department of Justice lawyers faced the prospect of defending the $24 million wrongful termination claim, the United States' fraud claims were asserted. Notably, the first forensic accounting of the claims did not occur until five (5) months *after* the fraud allegations had been made, and the initial Government accounting report did not even contain the word "fraud." As established below, the United States completely failed

to meet its rigorous burden of proof on both its statutory Special Plea in Fraud ("SPIF") and False Claims Act ("FCA") claims, entitling Lodge to judgment.

## I. The United States Ignored its Burden of Proof at Trial and Fundamentally Failed to Make a Case that Lodge Committed Statutory Violations.

1.      The United States carefully and very intentionally avoided reference to its burden of proof at trial, in effect acknowledging that it was unable to meet the high evidentiary standards imposed by the FCA and the SPIF.  Instead, beginning with its Opening Statement, the United States attempted to downgrade its claims by mischaracterizing them as "garden-variety fraud." The United States proceeded to put on a case that fell far short of meeting the much higher statutory burdens of proof required under the FCA and the SPIF.  Trial Transcript ("Tr.") Vol. 1, (8/2/21, ECF No. 78) p. 12:10–12.

2.      As demonstrated below, the United States failed at trial to establish the falsity of even the individual components it selectively challenged from Lodge's certified claims.  Notably, however, it is the aggregate of Lodge's Dewatering and Design Claims, not their individual components, that can give rise to FCA liability.

3.      The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the '*claim for payment*.'" *Horn & Assocs., Inc. v. United States*, 123 Fed. Cl. 728, 765 (2015) (emphasis added) (citation omitted).  "When a fraudulent claim consists of multiple components, the submission of an aggregate claim, rather than its individual components, is the act that creates liability under the False Claims Act." *Id.* at 766 (internal citations omitted).

4.      Thus, the United States bore the burden at trial to prove, not that there were flaws, mistakes or miscalculations in the *individual cost components* of Lodge's Dewatering Claim or Design Claim, but that one or both of those claims was *overstated or false in the aggregate*.

5.      At trial, the United States failed even to address, let alone prove, that either Lodge's Dewatering Claim or Design Claim was, in the aggregate, overstated.  Though the gravamen of the United States' fraud claims seemed to be that Lodge's certified claims were inflated as a result of the various claim components it challenged, the United States failed to present any evidence of what the reasonable value of Lodge's certified claims would be (*i.e.*, the amount for which the taxpayers would have been liable).  This abject failure of proof dooms the United States' claims.

6.      The United States' failure of proof at trial carried through to the individual claim components it challenged.  For example, while the United States challenged the reasoning behind Lodge's calculation of its Construction Inefficiency Ratio, the United States failed to produce any evidence of what a reasonable ratio would be.  Similarly, while it challenged Lodge's equipment rates as inflated, the United States presented absolutely no evidence at trial quantifying that inflation or otherwise addressing what reasonable equipment rates would be.  Remarkably, the United States never asked any one of its expert witnesses to do these calculations.  Equally importantly, the United States presented no evidence that it attempted to account for the errors and conservative decisions Lodge made in pricing its claims that inured to the United States' benefit, let alone that these issues were outweighed by the alleged mistakes on which it focused at trial. *See infra* Part III(B), (C).  This total lack of proof resulted in the United States' failure to meet its burden to prove the falsity of Lodge's claims and is fatal to the United States' FCA claim.

7.      Instead of presenting evidence that one or the other of Lodge's certified claims was overstated in the aggregate, the United States built its case on narrowly selected evidence, cherry-picked claim components, carefully chosen daily reports, individual equipment rate decisions, and forward priced estimates in connection with its attempt to establish "garden variety" fraud. The United States introduced pleadings and discovery responses as purported "party admissions" that

were drafted by counsel and had ***no probative value*** because they were not made contemporaneous to the facts giving rise to the claims at issue. *See Reliable Contracting Group, LLC v. Dep't of Vet. Affairs*, 779 F.3d 1329, 1334–35 (Fed. Cir. 2015). In many instances, the United States ***actively sought to exclude probative evidence*** relevant to the truth or falsity of Lodge's certified claims. *See infra* ¶ 45.

8.     The United States' counsel further attempted a circumstantial argument at trial that Lodge's withdrawal of its claims was somehow probative as to the falsity or knowledge components of the two statutory fraud actions. The argument, however, is entirely unavailing because the decision to withdraw the claim was made by Cohen Seglias, not C.L Dunn. Tr. Vol. Vol. 4, (8/5/21, ECF No. 81) p. 978:1–12. Mr. Dunn signed the certifications and disagreed with the decision to withdraw the claims, having "nothing to do with it." Tr. Vol. 3 Vol. 1, (8/4/21, ECF No. 80) p. 695:19–25. Mr. Dunn believed at the time of certification, and believes today, that the claims were accurate and truthful:

> I think I mentioned earlier that, I mean,
> throughout this entire ordeal the last ten years, I've
> had numerous meetings with, you know, my attorneys and
> consultants. And I know that there were a lot of
> questions about, well, why did you -- why did you do
> this? Why did you -- why did you do that?
>
> And as I sit here today, my testimony is that
> I employed the greatest resources that I possibly could
> to make sure that that claim was accurate and truthful.
> And as I sit here today, I -- I believe that it is.

Tr. Vol. 4 p. 890:13–22.

9.     The United States' presentation at trial also failed to include evidence of the *falsity* of the individual claim components it challenged. For example, the United States failed to produce evidence, critical to its challenge of Lodge's inefficiency damages, that Lodge performed P9 work

in Section 1 that affected the schedule.  Similarly, the United States failed to presented evidence of what Lodge's Euclid Truck rates should have been in its view.  Finally, the United States presented no evidence that Lodge was not entitled to charge for the Batch Plant and Dewatering Pump cost components in its certified claims.  With regard to each of these individual claim components, "the Government failed to present any evidence to show what it considered to be *reasonable* rates, hours, expenses, and overhead." *Horn*, 123 Fed. Cl. at 778 (emphasis in original).  Thus, on the record built by the United States at trial, there is no factual basis on which the Court could find that Lodge's certified claims were false, let alone that Lodge violated the FCA.

10.     The United States similarly failed to produce evidence that Lodge submitted its certified claims with *knowledge of their falsity* or that Lodge had the requisite *intent to defraud the government* sufficient to meet its burden of proof under the FCA and the SPIF, respectively.  The Court correctly articulated the knowledge requirements for the United States' statutory claims in its summary judgment opinion.  ECF No. 31 p. 9.

11.     The United States failed to produce even a shred of evidence, much less clear and convincing evidence, that Lodge actually intended to defraud the United States.  Moreover, the United States failed to rebut the overwhelming evidence, including testimony from its own fraud expert, demonstrating that Lodge engaged in significant efforts to prepare and submit accurate, truthful claims. On the record established at trial, the Court could never find that Lodge acted with the intent to defraud the United States or that Lodge acted with reckless disregard for the truth or falsity of its claims, mandating judgment on the United States' fraud claims in favor of Lodge.

## II.     The United States Failed to Prove that the Individual Claim Components it Challenged Amounted to Knowing Submissions of a False Claim.

12.     As noted above, the United States' entire case was built at trial upon selective evidence and hypotheticals relating, not to the aggregate of Lodge's Dewatering and Design

Claims, but solely to individual components of those claims.  Even that evidence, however, failed to prove that the individual claim components were false or that Lodge submitted its certified claims knowing that these individual claim components were false.

## A.  The United States failed to prove that Lodge's Construction Inefficiency Ratio amounted to the knowing submission of a false claim. (P9 and 55 days allegations)

13.  Lodge's Dewatering Claim attempted to capture the inefficiencies caused by the dewatering issues Lodge encountered while working in Section 1.  In connection with that effort, Lodge calculated a "Construction Inefficiency Ratio" ("CIR"), which compared Lodge's planned duration for selected Section 1 work activities to Lodge's actual duration to complete those activities.  Joint Stipulation of Facts ("JSOF"), ECF No. 43 ¶¶ 50–51.  The United States attempted to prove at trial that Lodge's CIR was false in two ways, neither of which was accurate.

### 1.  The evidence established that Lodge's failure to adjust the Construction Inefficiency Ratio to include P9 work was appropriate.

14.  The United States argued at trial that because Lodge was granted additional time on the Project in connection with Modification P00009 ("P9"), Lodge should have accounted for that time extension in the planned duration for Section 1 activities used in calculating the CIR.  Case No. 500C ECF No. 123 ¶¶ 127–28.  According to the United States, Lodge's failure to adjust the CIR to include P9 work resulted in Lodge seeking to be "compensated for inefficiency impacts a second time." *Id.* ¶ 128.  The evidence at trial proved conclusively, however, that ***Lodge never performed and was never paid for any P9 work*** and that, as a result, the P9 scope of work had no impact whatsoever on Lodge's performance of work in Section 1.

15.  A necessary predicate to the United States' argument is that the additional excavation work included in P9 was actually performed by Lodge in Section 1, impacting Lodge's performance.  As such, the United States' argument continues, Lodge should have taken the time

extension granted in P9 into account to accurately perform its Section 1 analysis. Remarkably, though absolutely necessary to support the United States' argument, neither the United States nor its testifying experts *ever* analyzed whether the work included in P9 had an impact on the Section 1 schedule. Tr. Vol. 5, pp. 1138:16–1139:11; 1182:4–9; 1186:15–17.

16.     The undisputed evidence at trial reflected that Lodge ***never performed*** or billed the United States for any of the additional excavation work included in P9 while working in Section 1, or in any other section of the Project. Glenn Gannon, the USACE representative who testified at trial, confirmed this fact, when he stated that "[we] never got that far along in the project." Tr. Vol. 1, p. 111:6–9. Lodge's President C.L. Dunn testified that Lodge never billed the USACE for any P9 work and that Lodge had completed Section 1 prior to termination. Tr. Vol. 4 p. 1065:13–22. Lodge's pay applications confirm that Lodge never performed any of the additional P9 excavation work prior to its termination. Joint Exhibit ("JX") 113 (Lodge final Pay Estimate showing a total of 104,958 cubic yards of excavation work performed across the entire Project, still well short of the 294,000 cubic yard base scope amount). Thus, there could be no "double billing" relating to P9 in the inefficiency component of Lodge's Dewatering Claim because Lodge never performed any P9 work and because Lodge never billed the United States for that work in the first place.[1]

17.     As Mr. Gannon candidly testified: "[K]nowing the modification [P9] itself, I don't know how that would have affected the work in Section 1." Tr. Vol. 1, p. 104:22–23. Mr. Gannon's testimony amounts to a party admission by the United States that the additional excavation work included in P9 did not have any impact on Section 1, nor could the P9 work affect

---

[1] While P9 increased the Contract amount by $1,990,000.00, Lodge would not have realized those increased amounts until it started billing for the additional P9 excavation work in payment applications and the USACE issued progress payments based on that work, which never occurred due to the termination of Lodge's Contract.

the time impact or the inefficiencies Lodge experienced in that section of the Project.   Kat Callaway's and C.L. Dunn's testimony confirmed Mr. Gannon's testimony.   Tr. Vol. 2, (8/3/21, ECF No. 79) pp. 446:10–22; 453:8–454:6; Tr. Vol. 4, pp. 1070:1–3; 1071:9–15.

18.     Because P9 had no impact on the Section 1 work, C.L. Dunn reasonably believed that the CIR should not account for P9.   Consistent with that belief, Mr. Dunn's April 15, 2012 email to Kat Callaway (JX94) instructed her to send an updated progress schedule reflecting Section 1 delays without the 81-day time extension granted by P9: "This is the schedule that you and I discussed on Friday would best represent the time impact portion of the REA."   Tr. Vol. 4, p. 1070:10–20.

19.     Lodge's use of the unimpacted progress schedule to prepare its Dewatering Claim was also consistent with the Contract's requirements.   Per the Contract, Lodge submitted an initial Project schedule that was approved by the United States.   DX109.   The Contract Specifications contained a requirement that this approved Project schedule "shall be used to measure the progress of the work, to aid in evaluating time extensions, and to provide the basis of all progress payments." Specification § 01 32 01 3.1, JX3 p. 003.0498–499.

20.     Lodge submitted seventeen payment applications that included Project schedule updates. JX27–42; 113; Tr. Vol. 2, p. 405:5–8.   The United States approved these schedule updates. *Id.* p. 405:14–21.   Each of these approved schedule updates indicates that Lodge's Section 1 work was not impacted by the additional P9 excavation work. *Id.* p. 405:10–25; *see also id.* Vol. 5, p. 1139:12–24 (testimony of Joseph Andres).

21.     The United States failed to offer any evidence at trial that the additional P9 excavation work impacted Lodge's work in Section 1 of the Project.   Rather, the evidence offered at trial reflected that lack of percolation and unanticipated water was the root cause of the Section

1 impacts.  In that regard, Kat Callaway testified that "there was no additional [P9] excavation in Section 1" and that, instead, Lodge had been "getting killed by the water." Tr. Vol. 2, pp. 438:14–439:6.  Ms. Callaway testified that "the water was everywhere" and "[t]he sheer volume of water that started to stack within the lands that we were supposed to be able to use for dewatering storage just . . . overwhelmed everything." *Id.* pp. 448:21–449:12; *see also id.* pp. 451:25–453:7.  Ms. Callaway concluded that "this was [like] trying to work in a lake." *Id.* p. 492:15–22.

22.    C.L. Dunn and Bill Gore similarly testified regarding the substantial impact that the percolation and dewatering problems had on Lodge's schedule and costs. Tr. Vol. 4, pp. 1024:6–1025:22; Tr. Vol. 3, pp. 584:19–601:20; 604:13–609:1; 609:24–613:12; 629:13–630:8.

23.    Lodge's contemporaneous pay applications confirm the testimony offered at trial and describe in great detail the impacts that Lodge's dewatering problems had on the Section 1 schedule. *See, e.g.*, JX33 pp. 033.040–042; JX34 p. 034.033.

24.    Since the United States could not establish through *actual* data that Lodge should have accounted for P9 in the Dewatering Claim, the United States instead relies on Lodge's October 2011 forward priced REA ("REA"), which was part of the negotiations that resulted in P9.  JSOF ¶¶ 10–11. P9 increased excavation quantities for Contract Line-Item No. 0007.  JX21.

25.    As established at trial, the October 2011 REA's schedule narrative, prepared by Kat Callaway, made no attempt to determine the *actual* impact that the increased P9 excavation work would have on the anticipated durations for any of the six Sections of the Project.  Tr. Vol. 2, pp. 442:19–443:6. There was a good reason for that: at the time Lodge prepared this REA, while the total amount of P9 excavation was known, nobody knew where it was located, thus making it impossible to know whether the additional excavation work would impact the Section 1 schedule in anyway.  Tr. Vol. 2, p. 443:10–14.  Consequently, as plainly stated in Ms. Callaway's Claim

Narrative, her schedule calculation simply distributed the Project-wide net increase in P9 excavation quantities of 260,000 cubic yards (increase over base-contract work of 88.35%) evenly across each of the six Project Sections, including Section 1.  JX61 pp. 061.027–029; Tr. Vol. 2, p. 443:7–9.  Ms. Callaway accordingly increased the duration of all Project wide excavation activities by 85%.  *Id.*

26.     After the issuance of P9, Lodge determined that the actual impact of P9 would occur outside of Section 1, which was the only section that was the subject of the Dewatering Claim. This was confirmed by Mr. Gannon, Ms. Callaway, and Mr. Dunn at trial.  Tr. Vol. 1, pp. 104:19–23, 111:6–9; Tr. Vol. 2, pp. 446:10–22, 453:9–454:6; Tr. Vol. 4, pp. 1070:1–3; 1071:9–15.

27.     The United States falsely represented to this Court that "the schedule Lodge presented to USACE to support its damages claim does not acknowledge that it is not taking into account the additional delay days that Lodge obtained through P00009."  U.S. Pretrial Mem. (ECF No. 46) ("U.S. Mem.")  p. 74.  Contrary to the United States' representation, Lodge's Dewatering Claim explicitly and repeatedly notified the United States that it was calculating its Construction Inefficiency Ratio using the "original baseline schedule."  JX109 pp. 109.208–09.  In fact, Lodge's claim narrative refers to the "Baseline Original Duration" and "original baseline schedule" *seven times*.  *Id.*  The United States' own scheduling expert, Joseph Andres, testified that "I think it's pretty clear" that Lodge did not include P9 in its inefficiency calculation.  Tr. Vol. 5, p. 1142:15–19.  Lodge's candid articulation of the methodology it utilized in calculating its damages precludes a finding that Lodge submitted its certified Dewatering Claim knowing it to be false.  *Ulysses, Inc. v. United States*, 110 Fed. Cl. 618, 645–47 (2013).

28.     In sum, the United States failed at trial to prove either that Lodge's Dewatering Claim was false as a result of Lodge's failure to account for P9 in calculating the CIR or that Lodge

submitted that claim knowing it to be false.  Based upon the evidence produced at trial, this Court can reach no other conclusion but that Lodge fully disclosed its methodology for calculating damages to the United States, that Lodge's methodology correctly did not account for the excavation work included in P9, and that Lodge reasonably believed its damage calculation to be accurate and truthful.

### 2.   The United States abandoned its 55-days argument and pivoted to a meritless "overcount" argument.

29.    The United States' Counterclaim asserted that Lodge should not have counted days of excavation and embankment work in Section 1 after January 14, 2012 in its Dewatering Claim's Construction Inefficiency Ratio because no such work was performed.  Case No. 500C ECF No. 123 ¶¶ 124–26.  The United States maintained that position for the duration of this litigation.  The uncontradicted evidence produced at trial, however, reflects that Lodge did in fact perform excavation and embankment work in Section 1 of the Project after January 14, 2012.  In fact, the United States put daily reports into evidence reflecting Section 1 excavation and embankment work being performed after January 14, 2012.  DX3016, 3017, 3018, 3019, 3020, 3003.

30.    At the trial, the United States abandoned its original "fifty-five days" argument, and introduced a new argument that Lodge's CIR included "overcounts."  The United States never advanced this theory of falsity in any of its pleadings, nor did it explain this theory in its pretrial memorandum.  Contrary to the United States' assertions, the purported "overcounts" do not prove that Lodge's CIR was overstated, nor are they evidence that Lodge's Dewatering Claim was false.

31.    At trial, the evidence reflected that Kat Callaway counted the number of days she used in the numerator of the CIR by adding a tick mark to her Production Values Spreadsheet ("PVS") (JX95) for each day on which excavation or embankment work was performed in Section 1, regardless of how many hours of work were performed on that day.  The evidence at trial also

reflected that this methodology was *fully and explicitly disclosed to the United States*. In that regard, the section of Lodge's Dewatering Claim entitled "Justification for Inefficiency Claim" stated explicitly that "[i]f work occurred in a given section then a day was allocated to that section." JX109 p. 109.208.

32.    At trial, Ms. Callaway explained the rationale behind the methodology she used and why she counted a day for each day on which excavation or embankment work was performed:

> So when we did the tick marks just to see if
> work was happening in those areas -- because if work
> was still happening in those areas on those two items,
> regardless of the magnitude of scale, you couldn't
> proceed to the next -- the next part of the schedule,
> which would have been basically soil cement, whatever
> was coming next.

Tr. Vol. 2, p. 472:3–9. Thus, Ms. Callaway had a logical explanation for using the "tick marks" as she did -- any amount of excavation or embankment work performed in Section 1 on a given day prevented Lodge from proceeding to the next Project activity and contributed to Lodge's inefficiency such that those days should reasonably be counted in the numerator of the CIR.

33.    The evidence at trial further reflected Ms. Callaway's belief that counting days on which less than a full day of excavation or embankment work was performed would not result in an aggregate "overcount" or an inaccurate counting of days being included in the CIR.  She testified:

> I did it because there -- there's a distinct
> awareness that, during our bulk time and our bulk
> excavation, the work efforts to achieve just the basic
> excavating one 500-foot section was significantly
> more than we should have ever expected.
>
> So I guess in my head, it was more like those
> are minor; it's a few days; and it's -- it balances
> with the rest.  It seemed to get very difficult if --
> if we went into every hour of every piece of equipment,
> because then it really blew -- blew the work effort and
> what we had to put into one section completely out of

the water.

Tr. Vol. 2, pp. 500:22–501:8; *see also* Tr. Vol 4 p. 1006:23–1007:6.  Thus, Ms. Callaway was distinctly aware that there would be some days for which she counted one "tick mark" on which more or less excavation or embankment work was performed than anticipated (*i.e.*, more or less than the planned number of hours per activity day).  She reasonably created this methodology based upon her review of Project records and believed in good faith that the calculations were accurate.

34.     Moreover, it is totally illogical for the United States to argue that Lodge should have limited its measurement of the actual duration for its performance of excavation and embankment work in Section 1 to days on which Lodge achieved its expected efficiency (*i.e.,* days on which it could perform the anticipated or planned amount of excavation or embankment work).  As Lodge explained in its certified Dewatering Claim, the Construction Inefficiency Ration compared Lodge's planned duration for Section 1 (based on full, efficient days of work) to Lodge's actual duration for Section 1 (a count of the less efficient days actually worked).  It only makes sense that Lodge's actual duration would include a count of days on which fewer than the planned number of hours were performed.

35.     Consistent with this approach, the United States *itself* offered evidence at trial that Lodge's embankment work suffered from inefficiencies, directing Ms. Callaway to multiple daily reports that indicated that "wet conditions from several inches of rain caused embankment backfill operation to shut down at 8:30 a.m."  Tr. Vol. 2, pp. 335:7–15; 341:23–342:6; 348:7–17 (citing DX3016 p. 3016.003, DX3017 p. 3017.003, DX3018 p. 3018.003).  This evidence does not establish that Lodge "billed" the United States for days on which it performed less than the anticipated amount of work -- a conclusion suggested by the United States that is patently false. To the contrary, this evidence supports and confirms Lodge's position that it counted days *in its inefficiency ratio* on which Lodge attempted to perform work in Section 1, but on which its work

was limited or otherwise made *inefficient because of water problems*.  It made perfect sense for Lodge to include these days in the numerator of the CIR, which was a measure of inefficiency, not a vehicle for Lodge to bill the United States for a full day's work.

36.     The United States' disagreement with Lodge's methodology, based upon a position that is itself illogical, does not render Lodge's methodology, and hence Lodge's CIR, false.

37.     Moreover, and regardless of the inherent error in assuming Lodge should have only counted fully efficient activity days in its inefficiency calculation, the United States failed to offer evidence sufficient to prove that the numerator of Lodge's CIR actually included an "overcount." In that regard, the United States introduced only a tiny fraction of Lodge's Project daily reports, which were not identified on the United States' exhibit list.  The calculations that the United States represented to Ms. Callaway based upon these limited reports were as follows:

| Daily Report Exhibit No. and Date | Amount of Work | Production Values Spreadsheet Entries |
|---|---|---|
| March 8, 2012 (DX3016) | 1.7 Hours Excavation in 1AN, 1BN, 1CN 1 Hour Embankment in 1BN, 1CN | JX95 p. 095.010, 020 3 Tick Marks Excavation 2 Tick Marks Embankment |
| March 9, 2012 (DX3017) | 0.5 Hours Excavation in 1AN, 1BN, 1CN 1 Hour Embankment in 1AN, 1BN, 1CN | JX95 p. 095.010, 020 2 Tick Marks Excavation[2] 3 Tick Marks Embankment |
| March 10, 2012 (DX3018) | 9 Labor Hours Excavation 10.5 Hours Embankment | JX95 p. 095.010, 020 3 Tick Marks Excavation 4 Tick Marks Embankment |
| March 12, 2012 (DX3019) | 3 Hours Excavation | JX95 p. 095.010, 020 2 Tick Marks Excavation |
| March 13, 2012 (DX3020) | 13.5 Hours Embankment | JX95 p. 095.010, 020 4 Tick Marks Embankment |

---

[2] Despite excavation work being performed in three sections on March 9, 2012, Ms. Callaway only counted two tick marks for excavation on this day in the PVS, contrary to methodology explicitly described by Lodge that "[i]f work occurred in a given section then a day was allocated to that section."  JX109 p. 109.208.

38.     The United States also introduced the daily report for January 20, 2012, and the United States' counsel examined Ms. Callaway regarding two tick marks noted in the PVS for embankment work in Sections 1BS and 1CS for that day, despite no embankment work being performed in those sections on that day.  DX3003; JX95 p. 095.018.  Ms. Callaway testified that this was an innocent data entry error. Tr. Vol. 2, p. 371:4–11. This error is evident from the document itself, which sets forth nine and a half hours of embankment work in Section 1AS on January 20, 2012 despite the PVS showing no tick mark for Section 1AS on that day.  DX 3003 p. 3003.23; JX95 p. 095.018.  This is a mistake that benefitted the United States (and one for which the United States never accounts).

39.     The United States suggested at trial that these six daily reports purportedly render Lodge's Dewatering Claim false.[3]  Contrary to the United States' assertions, these six daily reports prove no such thing.

40.     The United States *could have* introduced each of the daily reports that Lodge generated for the 285 days included in the numerator of the CIR and tried to establish that Lodge's CIR included an aggregate "overcount" (*i.e.*, that Lodge counted more "days" than the total number of eight-hour days of work actually performed).  The United States not only failed to do that, but actually objected vigorously to Lodge's introduction of all of the daily reports. Similarly, the United States *could have* had its damages expert look at each daily report Lodge generated for

---

[3] The United States will likely try to rely on its counsel's examination of Ms. Callaway with respect to the seven daily reports the United States introduced, in which she testified that single tick marks in her PVS may not have been accurate, even though she ultimately testified that she believed the PVS and CIR to be truthful. *See, e.g.*, Tr. Vol. 2, p. 369:1–5; see also Tr. Vol. 2 p. 352:10–11 ("For me with the tick marks, it was truthful because we were in those areas working."). As Lodge has shown, Ms. Callaway's testimony regarding these daily reports has no bearing on the accuracy of Lodge's CIR, as these daily reports represent a small fraction of the days counted in the ratio. In fact, Ms. Callaway later testified to her belief that the entirety of the 285 days counted in the CIR would include a greater number of days in which more excavation or embankment would have been performed than anticipated. Tr. Vol. 2, p. 427:17–23. On this record, the Court cannot even determine if the CIR included what the United States deems an "overcount," let alone reach the conclusion that it rendered Lodge's Dewatering Claim false.

each of the 285 days counted in its CIR and determine if a net "overcount" existed.  The United States' failure to have such a count performed was confirmed by the United States' expert.  *See* Tr. Vol. 5, pp. 1188:4–7; 1189:3–13.

41.     Instead, the United States selected six daily reports from March 2012 to support its argument that Lodge's 285-day CIR calculation was overstated.  On the evidence introduced by the United States at trial, however, there is no way that this Court could conclude that Lodge's CIR actually includes an "overcount" (as the United States has defined that concept), nor could the Court possibly conclude that Lodge's 285-day CIR count was overstated or otherwise false.

42.     In response to the United States' last-minute "overcount" argument, Lodge introduced five daily reports reflecting "undercounts" – instances where twenty or more hours of excavation work was performed by Lodge on a day for which Kat Callaway marked only one excavation tick mark in her PVS.[4]  Lodge Exs. L0100-045–0100-049.  The amount of excavation work performed on these days in relation to the PVS "tick marks" is summarized below:

| Daily Report Exhibit No. and Date | Amount of Excavation Work | Production Values Spreadsheet Entry |
|---|---|---|
| September 6, 2011 (Lodge Ex. 100-046) | 28.5 Hours | JX95 095.006 (1 Tick Mark) |
| October 27, 2011 (Lodge Ex. 100-045) | 26.75 Hours | JX95 095.007 (1 Tick Mark) |
| November 5, 2011 (Lodge Ex. 100-049) | 20 Hours | JX95 095.007 (1 Tick Mark) |
| November 9, 2011 (Lodge Ex. 100-047) | 27.75 Hours | JX95 095.007 (1 Tick Mark) |
| November 14, 2011 (Lodge Ex. 100-048) | 28.25 Hours | JX95 095.007 (1 Tick Mark) |

*See also* Tr. Vol. 2, pp. 421:15–425:4; Tr. Vol. 3, pp. 634:11–643:4.

43.     At the end of the day, the United States failed to produce evidence of the "overcounts" that were actually included in Lodge's CIR and whether these "overcounts," in total,

---

[4] To be clear, a "tick mark" reflected on the PVS does not reflect that the United States was "billed" or "charged" for a day of work.  One tick mark simply meant that Ms. Callaway counted that day as a day in the "actual duration" for Section 1 excavation and embankment work that Lodge included in the CIR.  The CIR, in turn, was applied as an inefficiency factor to Lodge's costs incurred performing work in Section 1, resulting in a calculation of Lodge's inefficiency damages.

exceed the number of "undercounts" that were present in Lodge's calculations such as the ones found in Lodge Exhibits L0100-045–L0100-049.

44.     The Court acknowledged the lack of evidence on this ultimate issue, commenting to Lodge's Counsel at trial:

> I get the point you're
> trying to make, which is, at this point, [Ms. Callaway] cannot
> articulate how many undercounts or overcounts appear in
> the daily records. . . . They may all be undercounts or overcounts
> for all we know as we sit here.

Tr. Vol. 2, pp. 475:21–476:2.

45.     On this issue, the United States actively sought to prevent introduction of all the Project daily reports, intending to limit the evidence available to the Court to its carefully curated set of six daily reports.  As the Court will recall, the United States objected to Lodge's identification of the complete set of Lodge's daily reports that would have provided the full picture and, further, objected to Lodge's introduction of individual daily reports at trial.  Tr. Vol. 2, pp. 416:5–23.  The United States went so far as to submit a bench memo in its effort to preclude the Court from considering probative evidence.  *Id.* pp. 416:23–24.  In short, the United States actively sought to exclude the evidence that could prove (or more likely disprove) the existence of the "overcount" on which the United States' entire argument regarding the falsity of Lodge's inefficiency damages hinges.

46.     The United States failed entirely to meet its burden of proof to prove the falsity of the inefficiency damages component of Lodge's Dewatering Claim.  Nor did the United States meet its burden to prove that Lodge submitted the Dewatering Claim with knowledge of its falsity.  Clearly, the United States offered no evidence whatsoever that in preparing the inefficiency damages component of its certified claim Lodge had actual intent to defraud the United States, as is required in connection with the United States SPIF claim. To the contrary, the uncontroverted

evidence at trial reflected that Ms. Callaway had a rational and logical explanation for the methodology she employed and did not believe that this methodology would result in an excess of workdays being counted in the CIR.  *See supra* ¶¶ 31–33.

47.     On the evidence produced at trial, the Court cannot find that Lodge acted with "reckless disregard" for the truth or falsity of the inefficiency damages component of its Dewatering Claim.   In that regard, Lodge *explicitly described to the United States in the Dewatering Claim* the methodology that was used to calculate the CIR and Lodge's inefficiency damages.   JX109 p. 109.208.   That is the exact methodology Ms. Callaway used, and Lodge's candid articulation of this methodology in its claim precludes a finding that Lodge acted with reckless disregard to the truth or falsity of its claim.  *Ulysses,* 110 Fed. Cl. at 645–47.

48.     Moreover, the uncontroverted evidence established that Ms. Callaway reviewed Lodge's Project daily reports "two or three times" to determine the days of work that went into the PVS and CIR.  Tr. Vol. 2, p. 473:4–8.  Thus, the United States failed to prove that Lodge calculated the CIR with "reckless disregard for the truth" under the FCA.  Such a finding requires proof of "something more than gross negligence" and has alternatively been referred to as "gross negligence plus" or "aggravated gross negligence."  *Riley Constr. Co. v. United States,* 65 Fed. Cl. 264, 270 (2005); *Horn*, 123 Fed. Cl. at 764.  Ms. Callaway's procedure of reviewing Lodge's Project daily reports "two or three times" to determine the days of work that went into the PVS and CIR certainly does not approach a "failure to make a minimal examination of records" or "baseless claim" of the kind that could constitute gross negligence plus or aggravated gross negligence under the FCA.  *Horn*, 123 Fed. Cl. at 765.

**B.      The United States failed to prove that Lodge's equipment pricing submissions amounted to the knowing submission of a false claim. (Euclid and Batch Plant allegations).**

49.      The United States argues that two (out of approximately 50) equipment rates used in Lodge's Dewatering Claim constitute knowing submissions of false claims—specifically challenging Lodge's rates for the Euclid Trucks and the Batch Plant.  Again, however, the United States failed at trial even to prove falsity of the rates, let alone that Lodge had an intent to defraud the United States or that Lodge acted with reckless disregard for the truth or falsity of its claim.

**1.      Lodge reasonably established its Job Cost Report and equipment rates at the outset of the Project before any claims existed.**

50.      As it did on all of its projects, Lodge created and maintained a Job Cost Report at the outset of the Project using its American Contractor software.  JX118; Tr. Vol. 4, p. 1010:12–22. The Job Cost Report contained "general ledger codes" and "when costs would come into the project, they would be applied to one of these general ledger numbers" listed on the Job Cost Report.  Tr. Vol. 4, pp. 1011:23–1012:9.

51.      The United States' own fraud expert, Todd Lester, testified that contractors like Lodge have an incentive to maintain accurate Job Cost Reports.  Tr. Vol. 5, pp. 1297:10–1298:19. Mr. Dunn agreed with Mr. Lester in his testimony.  *Id.* Vol. 4, p. 1011:6–8.

52.      Based on the Job Cost Report, Lodge would generate "work-in-progress reports" ("WIPs") for the Project.  *Id.* Vol. 4, pp. 1012:16–1013:6. Accurate Job Cost Reporting was important to Lodge.  As Mr. Dunn testified, "the job cost record would tie into the WIP. . . . It was a document that was always desired by bonding companies that would be providing credit to us or – or banks that would be providing credit to - - to our company."  *Id.*  Lodge's Job Cost Report and WIPs needed to be accurate "so that you can, in a summary detail, show your creditors, you know, where you're at relative to - - to the backlog of work and profitability of work and other

information that they use in their financial ratios." *Id.* p. 1013:7–13.  Because of the importance

of the Job Cost Report to financing, under no circumstances would Lodge record a job cost that

was higher than the actual cost.  *Id.* p. 1013:14–19.  Lodge's Job Cost Report, and the equipment

rates contained in them, represent Mr. Dunn's best effort to establish accurate job costs for Lodge

at the outset of the Project and before the existence of any claims.  Tr. Vol. 4, pp. 1020:14–1022:2;

1023:15–1024:5.

53.     Lodge's regular business practice was to record Project costs on its Job Cost Report.

Tr. Vol. 4, p. 1010:12–24.  For some of these costs, Lodge had actual cost data, including data for

labor, materials, and subcontractor work.  *Id.* pp. 1013:20–1014:1. When it came to equipment

rates, however, Lodge did not have actual cost data and, instead, used applied rates obtained from

Equipment Watch ("EW"), a reputable equipment pricing service recognized by the USACE

Construction Equipment Ownership and Operating Expense Schedule ("USACE Guide"). JX1 p.

001.411  (USACE  Guide  recognizing  EW);  Tr.  Vol.  4,  pp.  1014:2–12,  1014:21–1015:1.

Equipment  Watch  had  the  capacity  to  generate  equipment  rates  based  upon  the  unique

characteristics of a particular piece of equipment. C.L. Dunn obtained rates from the Equipment

Watch service for both the Batch Plant and the Euclid Trucks by inputting certain information

about those pieces of equipment.  Lodge Ex. 116 p. L0116-0004–0005 (April 13, 2011 email with

Equipment Watch attachment); Tr. Vol. 4, pp. 1015:5–1017:1.  Mr. Dunn prepared a "detailed list"

of information relating to the Site 1 equipment and consulted with Bill Gore to ensure that the

information that went into the equipment rates was complete.  Lodge Ex. 116 p. L0116-0001.

54.     The equipment rates obtained from Equipment Watch and reflected in Lodge's Job

Cost Report included rates for the Euclid Trucks and Batch Plant on the Project.  *See, e.g.*, Lodge

Ex. 116 p. L0116-00004 (Euclid Pricing from EW); JX51 (Batch Plant pricing from EW); JX118

pp. 118.153, 118.239–40, 118.289–90 (Job Cost Report entries); Tr. Vol. 4, pp. 1020:2–17; 1022:3–16.

55.     There were no applied rates for the particular Euclid Trucks used on the Project in the USACE Guide.  JX1.  Lodge used Equipment Watch to generate applied rates based upon specific information relating to the particular Euclid Trucks used, including *the age of the vehicles*. Lodge Ex. 116 p. L0116-0004.  Based upon this information, Equipment Watch reported that the proper operating rates for the 1988-1993 Euclid Trucks was $138.27 per hour.  Tr. Vol. 4, p. 1020:2–12.  Lodge carried that rate for the Euclid Trucks on Lodge's Job Cost Report for the entire duration of the Project.  *See, e.g.*, JX118 pp. 118.153, 118.239–40.

56.     When Lodge later used the USACE Guide to calculate applied rates for the Euclid Trucks in connection with pricing the Dewatering Claim, Lodge had to use rates for comparable equipment, not based upon actual Euclids.  JSOF ¶ 38; *see generally* JX1.

57.     The Batch Plant Lodge used on the Project was "one-of-a-kind."  Tr. Vol. 3, p. 574:5–11.  As Lodge's Project Manager Bill Gore explained, "the batch plant utilized on this job was being utilized for soil cement installation, which is, by industry practice, not just unusual, it's just not heard of.  Typically this type of work involves utilizing a pugmill . . . , which is a continuous-mix feature.  In this case, it's essentially a ready-mix concrete plant that's been specialty converted to try and create soil cement for this contract."  *Id.* p. 574:13–23. Lodge used this unique Batch Plant "[b]ecause the Army Corps had a very technical specification for . . . what they wanted and the way that batch plant and what it would produce and at what rates and what the strength of the product would be . . . ."  Tr. Vol. 4, p. 1018:4–9.

58.     Due to the unique nature of the Batch Plant and the fact that it had no actual cost data, Lodge obtained a special equipment rate quote for the Batch Plant from Equipment Watch.

21

JX51.  This quote specified an operating rate of $339.09/hour.  *Id.*  Lodge carried that rate on its Job Cost Report throughout the entire duration of the Project.  *See, e.g.*, JX118 p.118.289–90. As explained below, when it came time to price the batch plant for purposes of Lodge's claims, Lodge intended to use an operating rate ($235.88/hr) it determined using the USACE Guide, but only failed to because of a clerical error.

59.     C.L. Dunn testified that he believed in 2011, and believes today, that the equipment rates he obtained from Equipment Watch for the Euclid Trucks and Batch Plant represented accurate costs for those pieces of equipment.  Tr. Vol. 4, pp. 1020:14–1022:2; 1023:15–1024:5.

60.     Lodge had no incentive to inflate its equipment costs because the information in the Job Cost Report informed Lodge's bonding companies and banks as to Lodge's ongoing profitability and credit worthiness.  *See supra* ¶ 52.  Todd Lester, the United States' expert fraud witness, conceded at trial that Lodge had an incentive to maintain an accurate Job Cost Report.  *See supra* ¶ 51.

61.     It would be nonsensical for Lodge to charge itself inflated equipment rates on its Job Cost Report for two pieces of equipment (out of fifty) on the off chance that it might somehow benefit a potential future claim.  Tr. Vol. 4, p. 1069:2–14.[5]

### 2.     Lodge reasonably repriced its equipment in connection with pricing its certified claims.

62.     When it came time for Lodge to calculate its increased costs for inclusion in its certified Dewatering and Design Claims, Lodge *intentionally sought to reduce* the equipment rates for the Euclid Trucks and Batch Plant used on the Project.

63.     As stated above, Equipment Watch provided Lodge with operating rates of

---

[5] Mr. Dunn stated in an April 2011 email that the equipment rates Lodge prepared could be used in a future delay claim, but testified at trial that he did not anticipate any claims at that time.  Tr. Vol. 4, p. 874:17–24.

$138.27/hour for the Euclid Trucks and $339.09/hour for the Batch Plant.  *See supra* ¶¶ 55, 58.

64.     Lodge made a concerted effort to price its equipment rates accurately in connection with its claims.  C.L. Dunn stated in a January 2012 email that "we are also working on converting our equipment rates to USACE Region III (the "USACE Guide") equipment rates and listing our entire daily on site costs."  JX069; Tr. Vol. 4, pp. 1035:17–1036:9. Lodge sought to make these conversions based upon the requirements of the Contract.  JX002 p. 002.194; Tr. Vol. 4, p. 1036:6–9.  C.L. Dunn consulted with colleagues regarding equipment rates.  *See, e.g.*, JX69; JX83 (March 17, 2012 email from C.L. Dunn to JoAnn Daniels, Debbie Packard, and Adam Rousseau).

65.     When Lodge attempted to apply the USACE Guide equipment rates to the Euclid Trucks and the Batch Plant, the conversion resulted in a reduction in Lodge's rates.  With respect to the Euclids, Lodge reduced the equipment rates from the Equipment Watch rate of $138.27/hour to a rate of $133.80/hour obtained from the USACE Guide.  *See infra* Part II(B)(3).  With respect to the Batch Plant, Lodge intended to, but inadvertently left out, a lower rate also obtained from the USACE Guide. *See infra* Part (II)(B)(4)(a).  These reductions provide uncontroverted evidence that Lodge's pricing of equipment rates in its certified claims was not false, that Lodge had no actual intent to defraud the United States, and that Lodge did not act with reckless disregard to the truth or falsity of its claims.

### 3.     The United States failed to prove that Lodge's Euclid Truck pricing was false or that Lodge submitted its claims with knowledge of that falsity.

66.     The United States asserts that the Euclid Truck pricing included in Lodge's Dewatering and Design Claims was inflated and should have been adjusted downward to account for the vehicles' age.  Case No. 500C ECF No. 123 ¶¶ 139.

67.     With regard to the falsity of Lodge's Euclid Truck pricing, the United States' presentation at trial suffered from a complete and utter failure of proof.  In that regard, the United

States failed to produce any evidence of what adjustment Lodge should have made or what rate Lodge should reasonably have charged the United States for the Euclid Trucks.  In clear recognition of this failure of proof, the United States' pretrial Memorandum set out the untenable position that Lodge should not have charged anything for the Euclid Trucks by asserting that the total amount of the fraudulent portion of the Dewatering and Design Claims was $128,561.77, representing one hundred percent of the operating and standby costs sought by Lodge in those claims for the Euclid Trucks. U.S. Mem. p. 63; *see also* Tr. Vol. 5, p. 1167:9–14 (testimony of Eric Schaeb).  In irreconcilable contrast to this position, the United States' fraud argument is based entirely on the unproven proposition that Lodge should have *adjusted* its rates downward for the Euclid Trucks.

68.     The United States' certified fraud examiner Todd Lester testified at trial, however, that he never calculated the adjustment that Lodge purportedly should have made to its Euclid Truck pricing and, further, that he made no effort whatsoever to determine the rate at which Lodge should have allegedly priced the vehicles; indeed, *he was never asked to do so*.  Tr. Vol. 5, p. 1296:4–15.   The United States' failure to produce evidence of the appropriate adjustment to the equipment rates used by Lodge and corresponding failure to produce evidence of what equipment rates should have been used is fatal to the United States' claims. On the evidence produced at trial, there is no basis on which the Court could conclude that Lodge's Euclid Truck pricing was even overstated, let alone that Lodge's certified claims were false.  *Horn*, 123 Fed.Cl. at 778.

69.     Instead, the uncontroverted evidence produced at trial established that Lodge obtained a rate of $138.27/hour from a reputable equipment pricing service based upon the actual age of the Euclid Trucks at the outset of the Project, that Lodge charged itself that rate of $138.27/hr. in its Job Cost Report before its claims existed and when it had every incentive to

record its costs accurately, and that Lodge ultimately charged the United States a lower rate of $133.80/hour in its certified Dewatering and Design Claims. These uncontroverted facts establish that the equipment rates used by Lodge for its Euclid Trucks were, in fact, not overstated.

70.    As stated above, C.L. Dunn obtained equipment operating rates for the Euclid Trucks from the outset of the Project using the reputable Equipment Watch service, obtaining an operating rate of $138.27 for the vehicles. *See supra* ¶ 55.

71.    When it came to price Lodge's claims, C. L. Dunn and Adam Rousseau referred to the USACE Guide. Mr. Dunn testified that he used the USACE Guide "because . . . it was a lower rate, and I wanted to make sure I was using the correct - - the correct rate . . . ." Tr. Vol. 4, p. 1032:18–22. Mr. Dunn further testified that he lowered the rate for the Euclid Trucks with the intent to make the claim more truthful and accurate. *Id.* p. 1062:6–12.

72.    Lodge's actions to *reduce* the Euclid Truck rates based upon the USACE Guide present the exact opposite fact pattern from the one addressed in *Daewoo Eng'g and Const. Co., Ltd. v. United States*, 73 Fed. Cl. 547 (2006), *aff'd*, 557 F.3d 1332 (Fed. Cir. 2009). In *Daewoo*, the contractor used the USACE Guide, but "purposely avoided looking at its own acquisition costs in favor of the higher manual numbers."[6] 73 Fed. Cl. at 591. This Court found under the *Daewoo* facts that "[t]his intentional inflation of the claim is fraud." *Id.* Here, Lodge compared the USACE Guide rates with the rates it carried on its Job Cost Report from the outset of the Project and found the USACE Guide rates were lower. C.L. Dunn then employed the USACE rates *because they were lower than his Job Cost Record*.

73.    With regard to whether adjustments to the USACE Guide rate were appropriate, Mr. Dunn further testified that a significant amount of capital improvements had been made on the

---

[6] *Daewoo* is further distinguishable from this case because Daewoo had actual "acquisition and maintenance costs in its records." 73 Fed. Cl. at 591. Here, Lodge had no actual cost data for the Euclids. Tr. Vol. 4, p. 1014:2–12.

Euclid Trucks and that he believed the trucks were "closer to new than they were used and would have been in the same condition as" a 2006 vehicle.  Tr. Vol. 4, p. 1067:10–18. Bill Gore confirmed that the Euclids were "completely rebuilt" and that "I don't know that there was anything that wasn't changed on there or . . . redone."  Tr. Vol. 3, pp. 614:13–615:17. The United States' sole witness at trial, Glen Gannon, confirmed that Lodge had mechanics on site performing capital improvements on the Euclids.  Tr. Vol. 1, p. 116:10–21.   Mr. Gannon also confirmed that the Euclids were the largest dump trucks on site and hauled greater quantities of material than any other dump truck on the Project.  *Id.* pp. 116:22–117:5.

74.     Mr. Dunn followed many of the recommendations made by Lodge consultant Paul Perkins regarding changes to the Dewatering Claim.  *See infra* Part (III)(B).  With regard to pricing the Euclid Trucks, however, Mr. Dunn considered but did not agree with a comment Mr. Perkins made regarding the USACE Guide.  Specifically, Mr. Perkins stated in an email to Mr. Dunn that "[q]uite often the DCAA auditor will be the one that takes a position that certain equipment rates be adjusted downward, primarily the older equipment that has been depreciated out per IRS rules." JX68 p. 068.001.  Mr. Dunn testified as to why he did not agree with this comment applying to the Euclid Trucks:

> Well, I mean, first of all, I had an applied
> rate that EquipmentWatch was telling me was accurate
> from -- from Blue Book.  And, you know, at the time I
> felt like EquipmentWatch and Blue Book were very, very
> similar to the Army Corps manual.
>
> And then Adam [Rousseau] gave us the -- the rate -- the
> lower rate.  So I had -- I'm reducing it.  At the same
> time I knew that I -- that we had rebuilt the Euclids.
> We had repainted them.  I knew that they were -- were
> outproducing every other dump truck on that project
> by -- by double.
>
> And I felt like the -- and I felt like the

> Euclids were closer to new than they were used and
> would have been in the same condition as -- as a 2006
> that the -- that the -- the unit price was based on.
> And I made a call to -- to use that rate because I felt
> like it was the correct rate.

Tr. Vol. 4, p. 1067:1–20.

75.     In *Trafalgar House Const., Inc. v. United States*, 77 Fed. Cl. 48 (2007), the prime

contractor hired a consultant who told the contractor that "under no circumstances" should the

contractor certify its subcontractor's pass-through claim because it was unsupported and fraudulent.

77 Fed. Cl. at 53–54.  The contractor disagreed with its consultant and passed the subcontractor

claim through to the United States, while its separate damages expert independently found the

subcontractor claim to be supported.  *Id.* at 54–55.  While the United States relied on the

consultant's warning to the contractor as the basis for its FCA claim, this Court held that the

contractor did not knowingly submit a false claim.  *Id.* at 57.  Specifically, the Court found that

the contractor did not ignore the consultant's advice because the consultant later blessed the

contractor's liquidating agreement with the subcontractor and because the contractor's damages

expert independently provided a basis to believe the costs were supportable.  *Id.* at 56–57.

76.     The case at bar represents an even more justified departure from a consultant's

comment.  Unlike the consultant's unqualified statement in *Trafalgar* that "under no circumstances"

should the contractor certify its subcontractor's claim, Mr. Perkins' statement was a general

comment about a common position the United States' auditors take with respect to the USACE

Guide, not a mandate or recommendation that Lodge was required to follow, or even an expression

of Mr. Perkins' own interpretation of the USACE Guide.  And, as in *Trafalgar*, Mr. Dunn had

independent, reasoned justification for disagreeing with his consultant.  And just like the consultant

in *Trafalgar*, **Mr. Perkins later blessed Lodge's claim**, stating just prior to claim submission that

"[p]ersonally, I would have no reservation about certifying this cost proposal." JX106; Tr. Vol. 4 p. 1056:10–14.

77.    The United States' fraud allegations relating to Lodge's Euclid Truck pricing rest upon both a misreading of the USACE Guide and an apparent defect in the USACE Guide. In particular, the United States' argument, supported by the testimony of its experts, is that a flow chart in the USACE Guide suggests that Lodge should have used Figure 2-1 to adjust the rates for the used Euclids downward to account for age. U.S. Mem. p. 58 (citing JX1 p. 001.011, Bates Number Lodge00012771); JX119 p. 119.018 (United States expert Eric Schaeb arguing that Lodge should have adjusted Euclid Rates for age).

78.    Neither Figure 2-1, nor any other calculation contained in the USACE Guide, however, directly governs the pricing of used vehicles such as Lodge's Euclid Trucks. In that regard, Section 3.14 of the USACE Guide states: "A detailed methodology for computing a total hourly rate for equipment purchased used is not included in this pamphlet." JX1 p. 001.344.

79.    Section 3.14 of the USACE Guide also acknowledges the difficulty in accounting for capital improvements made to used equipment: "The condition of the used equipment at the time of purchase should consider the extent of capital improvements, mechanical condition, and previous hours of operation." *Id. This is exactly what Lodge did when pricing its Euclid Trucks. See supra* ¶¶ 73–74.

80.    Finally, Section 3.14 states: "These conditions are difficult or impossible to determine and evaluate when computing a total hourly rate based on actual acquisition cost." *Id.*

81.    Lodge's expert Timothy Van Noy testified that the United States' reliance on Figure 2-1 is "incorrect." Tr. Vol. 5, p. 1372:1. Mr. Van Noy testified further that the flow chart relied upon by the United States should have noted that pricing for used vehicles is governed by Section

3 of the USACE Guide (including Section 3.14), not Section 2 or Figure 2-1.  *Id.* pp. 1371:23–1373:3.  C.L. Dunn used the USACE Guide rate because he thought it was appropriate to use the lower rate from that publication, *see supra* ¶ 71, but the USACE Guide did not require him to make an adjustment to that rate.

82.     In short, the USACE Guide explicitly acknowledges how difficult it is to generate equipment rates for used vehicles and does not require the downward adjustment that the United States failed to quantify but still asserts makes Lodge's pricing of its Euclid Trucks false.

### 4.     The United States failed to produce evidence that Lodge's Batch Plant pricing was false or that Lodge submitted its claim with knowledge of that falsity.

#### a.     Lodge Attempted to Use the USACE Guide Operating Rate for the Batch Plant but failed to do so due to a clerical error.

83.     The United States argued that Lodge should have used the USACE Guide to price the operating and standby rates for the Project Batch Plant.  ECF No. 46 p. 85.  The undisputed evidence produced at trial reflects that Lodge  used the USACE Guide to calculate operating and standby rates for the batch plant and that it used the standby rate in its claims.  The evidence further establishes that the only reason Lodge did not use the USACE operating rate for the batch plant in its claims was because of a clerical error

84.     At the outset of the Project, Lodge obtained a Batch Plant operating rate from Equipment Watch of $339.09/hour.  *See supra* ¶ 58.  For the entire duration of the Project, Lodge charged itself $339.09/hour for the Batch Plant because Lodge believed that was the most accurate rate available.  Tr. Vol. 4, pp. 1017:20–1018:3; 1019:2–21.

85.     When it came time to calculate equipment rates for the Batch Plant in connection with pricing its Dewatering and Design Claims, Lodge attempted to use the USACE Guide.  As part of this process, Adam Rousseau wrote an email to C.L. Dunn in March 2012 stating that he

had calculated an operating rate of $235.88 and a standby rate of $56.16 for the Batch Plant using the USACE Guide's excel spreadsheet equipment calculator, CHECKRATE.  JX81; *see also* JX1 p. 001.010 (USACE Guide describing the CHECKRATE spreadsheet).

86.     Lodge then prepared a spreadsheet in March 2012 of equipment rates it was preparing to use for the Dewatering and Design Claims.  JX084 pp. 083.002–007.  In this spreadsheet, row 76 contained information and rates relating to the Batch Plant and row 77 contained information regarding another piece of equipment, a 1999 Bobcat used by Lodge on the Project.  *Id.* p. 083.004.  Lodge inputted the standby rate of $56.16/hour obtained from the USACE Guide in cell D-76 for the Batch Plant.  *Id.*  Lodge also inputted the $235.88/hour operating rate obtained from CHECKRATE for the Batch Plant, but inserted that number one cell below the Batch Plant in cell I-77 for the 1999 Bobcat. *Id.*  Instead of inputting the $235.88 rate for the Batch Plant in cell I-76, this spreadsheet retained the $339.09/hour operating rate for the Batch Plant that Lodge had always carried for the plant on its Job Cost Report.  An excerpted depiction of this portion of the spreadsheet is below:

| | A | B | D | I |
|---|---|---|---|---|
| 58 | **Lodge Construction Owned Equipment Costs** | | | |
| 59 | | | | |
| 60 | | | | |
| 61 | | Serial # | Hourly Standby Rate | Hourly Operating Rate |
| 62 | | | | |
| 76 | Batch Plant | 15524 | $56.16 | $339.09 |
| 77 | 1999 Bobcat | 517611540 | $1.79 | $235.88 |

*Id.*

87.     Adam Rousseau caught this error as it related to the Bobcat, highlighting the $235.88/hour rate for the Bobcat in red in the March 17, 2012 version of this spreadsheet (as depicted above) and advising Mr. Dunn in a corresponding email: "Finally I highlighted cell I77 because I never realized how proud of that little Bobcat you are . . . $235/hour huh?"  JX083

083.001.  This rate was clearly an error for the Bobcat, and Lodge corrected the error ultimately

using an operating rate of $11.27/hour for the Bobcat.  JX109 p. 109.094.  Lodge did not, however,

catch the clerical error that resulted in a failure to lower the Batch Plant rate to the intended

$235.88/hour operating rate.

88.     Mr. Dunn confirmed at trial that the use of the $339.09/hour rate for the Batch Plant

was an innocent error and that his intention was to use the lower CHECKRATE amount.  Tr. Vol.

4, pp. 1036:10–1040:8.  As he testified:

> Q.     What did you intend to do?
>
> A.      It appears that I -- I intended to -- to plug
> it into the batch plant rate.  And that would sort of
> tie back with the testimony earlier where the standby
> rate was also the -- from the Corps manual and not from
> the EquipmentWatch letter.  So, apparently, I attempted
> to do it and -- and, from all this data entry, I missed
> it.
> …
> Apparently, from the -- what the DOJ pointed
> out earlier about the -- that I used the standby rate
> from the Corps book and the operating rate from the
> EquipmentWatch letter, and then now seeing where Adam
> sent me an email saying why do you think -- "you really
> think your Bobcat's worth that much money?" -- which I
> didn't -- and because -- but I had inserted it into the
> Bobcat, where I probably -- where I had likely intended
> it to be inserted into the operating batch -- or the
> operating rate for the batch plant.  It makes sense to
> me.

*Id.* pp. 1040:9–16; 1041:17–1042:2; *see also id.* p. 1062:13–18 ("Q: Is that why you reduced the

batch plant, or attempted to reduce the batch plant?  A:  It is.  Q:  And but for a clerical error, you

would have, in fact, reduced the batch plant?  A:  I believe so.").

89.     Thus, as with the Euclids, Lodge intended to reduce its rates using the USACE

Guide, albeit unsuccessfully due to an innocent clerical error.  "An innocent mistake or mere

negligence, such as a math error or flawed reasoning" is not actionable under the FCA or SPIF. *Horn*, 123 Fed. Cl. at 766; ECF No. 31 p. 9.  Consistent with this case law, the United States' certified fraud examiner suggested that such clerical errors are not evidence of fraud.  Tr. Vol. 5 p. 1231:6–11.

### b.  The United States failed to produce evidence to support its assertion that Lodge double billed for the Batch Plant.

90.     The United States contends that Lodge double billed for the Batch Plant because its claims included operating and standby costs despite the fact that Lodge had already been paid for the purchase and installation of the Batch Plant.  As an initial matter, the United States' contention ignores Lodge's undisputed right to seek additional compensation if the Batch Plant worked harder or longer due to unexpected conditions. In this respect, the United States' *own* damages expert Eric Schaeb admitted that if the Batch Plant worked harder or longer due to unexpected conditions, that Lodge could be entitled to additional compensation as a result of the additional work.  Tr. Vol. 5, p. 1202:9–14; 1205:13–17. The United States' other accounting witness testified that he *never performed any analysis* as to whether the Batch Plant worked more than what had been contemplated under the Contract.  *Id.* p. 1302:10–18.  On this basis alone, the United States' fraud claims relating to the Batch Plant fail.  As explained at trial, Lodge's claim for Batch Plant costs was intended to recover additional operating costs because of a change in Project conditions.  Tr. Vol. 4 pp. 1074:15–1075:10.

91.     The United States' contention is apparently based on the fact that the operating and standby rates include "ownership costs," which are comprised of depreciation and Facilities Capital Cost of Money ("FCCM").

92.     For example, in his expert report, Mr. Schaeb stated that "[b]oth the operating and standby rates include depreciation, which is inappropriate when, as noted above, USACE has

already compensated Lodge for the purchase of the batch plant."  *See* JX119 ¶ 48.  Mr. Schaeb reiterated that assertion at trial.  Tr. Vol. 5, pp. 1172:14–1173:08.

93.     Mr. Schaeb also asserted at trial, for the first time, that the operating and standby rates contain an amount for the "cost of capital" and that such costs were inappropriate because Lodge financed the Batch Plant.  Tr. Vol. 5, pp. 1172:14-1173:08.

94.     At trial, neither Mr. Schaeb nor Mr. Lester provided any explanation why the foregoing charges are improper, including why it would be improper to charge depreciation for a piece of equipment for which the contractor was reimbursed and why charging for the cost of capital is improper for a piece of equipment that was financed.  These failings are inexplicable, especially in light of the United States' failure to have a DCAA audit conducted.

95.     FAR Part 31 contains the rules for determining whether and when costs are allowable in connection with a government contract.  *See* FAR § 31.000.

96.     The Contract in this case contains DFARS § 252.243-7001, which expressly discusses the applicability of FAR Part 31: "When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR part 31 and DFARS part 231, in effect on the date of this contract, apply."

97.     Though the United States contends that it was improper for Lodge to charge depreciation and FCCM for the Batch Plant, that contention is grounded solely in Mr. Schaeb's word.  Neither Mr. Schaeb nor any other United States witness made any reference to the rules for determining which costs can be charged, *i.e.*, FAR part 31.  Nor, for that matter, did the United States' experts identify any other regulation, guidance or accounting standard to support their contention that it was improper for Lodge to charge depreciation or the cost of capital under these circumstances.

98.     FAR § 31.205-11 specifically addresses when depreciation can be charged.  It begins by stating that "depreciation on a contractor's plant, equipment, and other capital facilities is an allowable contract cost, subject to the limitations contained in this cost principle."  FAR § 31.205-11(a).  None of the limitations in that provision are applicable to this case.

99.     Although FAR § 31.205-11(d) states that depreciation is unallowable "on property acquired from the Government at no cost by the contractor," the evidence in this case established that Lodge did not acquire the Batch Plant from the government, and that Lodge in fact incurred costs in acquiring the Batch Plant.  Lodge acquired the Batch Plant from R&S Industries, and the USACE advanced Lodge some of the funds it would receive under the Contract to reimburse Lodge for the cost of the Batch Plant. *See* JX48; Tr. Vol. 1, p. 76:5–18; Tr. Vol. 3, pp. 619:04–624:02; JX46.

100.     FAR § 31.205-10 addresses when the cost of money can be charged.  Nothing in that provision indicates that it was improper for Lodge to include these costs for the Batch Plant in its certified claims.

101.     Although Lodge had received payment for the purchase and installation of the Batch Plant, uncontroverted evidence was presented at trial that Lodge experienced unanticipated use of the Batch Plant as a result of the dewatering difficulties at issue in the Dewatering Claim. Tr. Vol. 3, pp. 604:13–608:11. As a result, Lodge included costs for the unanticipated Batch Plant usage in the Dewatering Claim.  Tr. Vol. 4 pp. 1074:15–1075:10.

102.     The Dewatering Claim including the Batch Plant Component was based on a differing site condition, (*see* JX108), which is governed by FAR § 52.236-2, a clause that was included in Lodge's Contract.  Known as the Differing Site Conditions clause, FAR § 52.236-2 provides that if a differing site condition increases "the cost of, or the time required for, performing

any part of the work . . . an equitable adjustment shall be made under this clause and the contract modified in writing accordingly."  FAR § 52.236-2(b).

103.    The simple fact is that Lodge permissibly submitted claims for costs associated with unanticipated Batch Plant usage due to a differing site condition.  Tr. Vol. 3, pp. 604:13–608:11; Tr. Vol. 4 pp. 1074:15–1075:10.

104.    Lodge's expert, Timothy Van Noy, a Certified Public Accountant, testified unequivocally that Lodge did not double bill for the Batch Plant costs.  Tr. Vol. 5, p. 1383:4–8. Mr. Van Noy testified that "[t]he batch plant is an owned piece of equipment.  It was owned by Lodge.  It was their asset.  They could depreciate it.  They could break it down.  They could sell it.  They could do as they pleased with it.  It was their asset." *Id.* p. 1383:4–14.  Mr. Van Noy further stated: "[T]he way [the Batch Plant] was handled in a fixed-price item was to pay it up front but then reduce the per-unit rate that would be applied as soil cement was placed. . . . I do not believe that that precludes a contractor . . . from claiming standby time during a delay for their own asset because the delay, by definition is not within the scope of the contract and it's not within the scope of the price that the contractor was being paid for that line item." *Id.* p. 1383:21–1384:9.

105.    Mr. Van Noy's testimony that, from an accounting perspective, there was nothing wrong with charging depreciation for the Batch Plant because it was Lodge's asset, was unrebutted. Tr. Vol. 5, pp. 1383:4-1384:9.

106.    It is significant that Lodge's cost expert, Mr. Van Noy (a CPA and a Certified Fraud Examiner), had been retained to address the 2017 report of the Defendant's expert, Mr. Schaeb. The Court allowed the Government the opportunity to respond to Mr. Van Noy's report, but specifically ordered that "Plaintiffs will not be permitted to file a response to defendant's surrebuttal."  Case No. 13-500C ECF No. 112 p. 10.  The Defendant's "surrebuttal" was the expert

report of Mr. Lester.  Counsel for the Government emphasized, during cross-examination, that Mr. Noy had not filed a responsive report, but failed to disclose to the Court that Mr. Van Noy had been precluded from doing so. Tr. Vol. 5 pp. 1362:06- 21; 1391:12-1392:23; 1412:23-1413:09.

107.    Despite being denied the opportunity to file responsive report it was clear from Mr. Van Noy's testimony that he disagreed with Mr. Lester's conclusions.  Significantly, Mr. Van Noy found no evidence of altered documents, manipulated accounting data, unnecessarily complex claim calculations, or erroneous claim assumptions. Tr. Vol. 5 p. 1366:12-25;  Lodge Exhibit 67 pp. 2, 6–7.  He testified that there were mistakes and unacceptable methodologies in the claims, but that they were not indicia of fraud and they were typical mistakes in contract claims, and further explained that it did not take him long to reach that conclusion. Tr. Vol. 5 pp. 1426:02–1427:01. He also emphasized that there were several persons who worked independently in providing information for the claims, including Mr. Rousseau and Ms. Callaway, with advice from a highly qualified claims consultant, Mr. Perkins, and that there was no evidence that they conspired to commit fraud.  *Id.* pp. 1367:09–1368:01: 1389:17–1390:21; 1419:16–1492:06.

108.    Finally, the United States failed to put forth any evidence that Lodge recklessly disregarded the truth or falsity of the Batch Plant pricing.  Specifically, while the United States established at trial that the Batch Plant rates included depreciation and FCCM and that Lodge knew it had received payment for the purchase and installation of the Batch Plant, it did not offer any evidence suggesting that Lodge knew it was improper to charge depreciation and FCCM under those circumstances.  In fact, the evidence establishes that the charges were proper.  *See supra* ¶¶ 98–103.

**C.     The United States failed to produce evidence that Lodge's Dewatering Pump pricing was false or that Lodge submitted its claims with knowledge of that falsity.**

109.    The United States asserts that Lodge double billed for Dewatering Pumps because Lodge's claims included operating and standby costs for Dewatering Pumps during a period when Lodge was being paid in monthly increments for dewatering.  Tr. Vol. 1, p. 13:10–18; Vol. 5, pp. 1247:17–1248:15.  As with the Batch Plant, the United States' allegation disregards Lodge's undisputed right to seek additional compensation if the Dewatering Pumps worked harder or longer due to unexpected conditions. In this respect the United States' own expert Eric Schaeb admitted that if the Dewatering Pumps worked harder or longer due to unexpected conditions, that Lodge could be entitled to additional compensation as a result of the additional work.  Tr. Vol. 5, p. 1205:13–17.

110.    The Contract included a line item (CLIN 0005) for dewatering, which was for a lump sum of $11,000,000.   *See* JX38 p. 31.

111.    Bill Gore developed the schedule of values after Contract award in conjunction with Glen Gannon from the USACE.  Tr. Vol. 3, p. 615:18–22.

112.    The schedule of values divided CLIN 0005 into five pay items, three of which (items 5-000, 5-010, and 5-020) related to construction of the cofferdam and comprised $7,450,000 of the $11,000,000 allocated for dewatering.  *See* JX38 p. 31.

113.    The other two items under CLIN-0005 (items 5-100 and 5-110) represented dewatering activities.  *Id.*

114.    Lodge and the USACE agreed to divide payment for the two dewatering activity items (5-100 and 5-110) into equal monthly installments.  Tr. Vol. 2, pp. 545:20–546:03.

115.    These monthly payments were always intended to cover the Dewatering Pump

usage anticipated by the base Contract, Lodge experienced unanticipated use of the pumps as a result of the dewatering difficulties at issue in the dewatering claim.  Bill Gore testified about this at length at trial.  Tr. Vol. 3, pp. 624:04–628:08; 629:13–630:08. As a result, Lodge included costs for the unanticipated pump usage in its certified Dewatering Claim.

116.    The United States' cost expert, Eric Schaeb, opined that it was improper for Lodge to submit a claim for unanticipated pump costs because it was being paid a lump sum.  Tr. Vol. 5, pp. 1203:7–1204:13.  Mr. Schaeb's opinion, however, was not based on any provision in the FAR or any other regulation, guidance, or accounting principle.  In fact, contrary to Mr. Schaeb's opinion, the FAR indicates that it was appropriate for Lodge to include unanticipated pump costs in its Dewatering Claim.

117.    The Dewatering Claim including the dewatering pump component was based on a differing site condition, (*see* JX108), which is governed by FAR § 52.236-2, a clause that was included in Lodge's contract.  Known as the Differing Site Conditions clause, FAR § 52.236-2 provides that if a differing site condition increases "the cost of, or the time required for, performing any part of the work . . . an equitable adjustment shall be made under this clause and the contract modified in writing accordingly."  FAR § 52.236-2(b).

118.    Nothing in the differing site conditions clause indicates that recovery is unavailable for lump sum line items; it applies equally to lump sum and unit-price items.  Nor is that changed by the fact that USACE took a lump sum item and improperly divorced the monthly progress payments from actual progress.  The simple fact is that Lodge permissibly submitted claims for costs associated with unanticipated Dewatering Pump usage due to a differing site condition.  Tr. Vol. 4, pp. 1073:10–1075:10.

III.    **Other, Substantial Evidence was Offered at Trial that Undermines the United States'**
        **Allegations and Entitles Lodge to Judgment on the United States' Fraud Claims.**

        A.    **Lodge retained a professional to assist and guide its Claim preparations.**

119.    C.L. Dunn testified at trial that he knew Lodge was being "impacted" by the
dewatering issues and communicated to his team that Lodge needed to address this impact.  Tr.
Vol. 4, p. 1027:5–12.  Kat Callaway responded by recommending to Mr. Dunn that Lodge hire
Paul Perkins, who she identified as a claim consultant with significant experience with the USACE
and claim preparation.  *Id.* p. 1027:12–15.

120.    Mr. Dunn retained Mr. Perkins as a consultant for Lodge in 2011.  *Id.*  By that time,
Mr. Perkins had nearly thirty years of experience with the USACE in both active duty and civilian
capacities.  Tr. Vol. 3, pp. 677:19–20; 751:15–752:8. His experience with the USACE included
time as the chief of contracting administration for the USACE's Mobile District.  *Id.* p. 752:13–
16.  Following his time with the USACE, Mr. Perkins consulted for over fifty contractors and
drafted over 150 claims to be submitted to the United States.  *Id.* p. 750:2–20.

121.    Mr. Perkins spent over 300 hours consulting with Lodge on its claims and issues
relating to the Site 1 Project. JX121–135 (Paul Perkins Invoices containing time entries).

122.    Over the course of his consultant work with Lodge, Mr. Perkins made many
recommendations to Mr. Dunn as to how to accurately price Lodge's October 2011 REA and its
2012 claims.  *See, e.g.*, JX58, 80, 84, 105, 106.

123.    Mr. Dunn followed many of Mr. Perkins' recommendations in order to submit more
accurate REAs and claims.  *See infra* Part (III)(B).  Many of the recommendations Mr. Dunn
followed resulted in a significant reduction of Lodge's submittals.  *Id.*

124.    The United States' own fraud expert, Todd Lester, testified that Mr. Dunn's
retention of Paul Perkins was indicative of Mr. Dunn's "attempts to find a . . . methodology to

accurately show his costs."  Tr. Vol. 5, pp. 1267:10–1268:4; *see also id.* p. 1264:16–18 ("I think that . . . hiring Mr. Perkins was kind of an effort by Lodge to put forth a better representation of its claim.").

125.    Lodge's hiring of a consultant to help make its claim more accurate precludes a finding by the Court that Lodge knowingly submitted a false claim or submitted the Dewatering or Design Claim with reckless disregard for the truth or falsity of the claim.  *Riley*, 65 Fed. Cl. at 270.

**B.    Lodge engaged in a submittal process resulting in reductions to its Claims.**

126.    Lodge engaged in a long, deliberative process in preparing its submittals to the USACE on the Project.  This process resulted in well-drafted and well-reasoned scheduling submittals as well as a series of reductions in REA and claim amounts from initial drafts to the final submissions made to the USACE.  The process adopted by Lodge also resulted in certain calculations that were *intentionally conservative* in a way that benefited the United States.

127.    Joseph Andres, the United States' scheduling expert, testified that Lodge's baseline schedule was "very detailed, very well done, in my opinion."  Tr. Vol. 4, p. 1097:10–24.  He further testified that Lodge's schedule was "very well done," *Id.* p. 1103:4–7, and its schedule narratives "were probably some of the best I've seen on construction projects as far as the amount of information that was included in them."  *Id.* p. 1105:22–25.

128.    After Lodge's termination, Glen Gannon, the United States' representative at trial, told Lodge's Bill Gore that "he had wished that [Lodge] weren't removed from the project" and that the USACE "shouldn't have terminated [Lodge]." Tr. Vol. 3, pp. 630:9–632:1.

129.    Lodge's deliberative process resulted in significant reductions in the amounts of its requests for equitable adjustments and claims.  Lodge retained the services of Paul Perkins, who

made a series of recommendations to Lodge regarding both its October 2011 REA and its 2012 claims. Some of these recommendations took the form of guidance, others were "warnings" regarding potential liability under the FCA. With one legitimate exception, Lodge amended its REA and claims to follow both Mr. Perkins's guidance and warnings.

130.    In September 2011, Mr. Perkins provided guidance to Mr. Dunn regarding Lodge's cost proposal issued in connection with the excavation dispute. JX58. These recommendations included concerns over the home office overhead, field general conditions, and profit and bond costs contained in the proposal. *Id.*

131.    Mr. Dunn took Mr. Perkins's advice, removing the cost items identified by Mr. Perkins and intentionally reducing Lodge's proposal *by nearly five million dollars* in the resulting October 2011 REA that led to Modification P00009. JX58; JX61; Tr. Vol. 4, pp. 1063:17–1065:6. Mr. Dunn made these reductions "to be conservative and to be fair and . . . accurate." *Id.* pp. 1067:21–1068:8.

132.    The United States' own fraud expert, Todd Lester, testified that Mr. Dunn's REA reductions were consistent with a contractor trying to do the right thing. Tr. Vol. 5, pp. 1262:18–1263:1.

133.    Lodge's Dewatering Claim similarly went through multiple drafts and iterations. Lodge utilized a team of individuals to compile information to include in the claims and review claim data and drafts, including C.L. Dunn, Kat Callaway, Adam Rousseau, Joann Daniels, Debbie Packard, Dania Rodriguez, and Mr. Perkins. *See, e.g.*, Tr. Vol. 4, pp. 1026:8–25; 1027:5–15; 1029:10–21; 1036:10–1037:5; JX 71, 72, 83, 94, 105, 106. Notably, the final draft submitted to the USACE's Contracting Officer contained both intentional and unintentional reductions from prior drafts and explicitly set forth a conservative estimate of Lodge's costs.

134.     Mr. Dunn intentionally reduced portions of the Dewatering Claim from prior drafts based upon guidance provided by Mr. Perkins.  In one instance, Mr. Dunn made five intentional reductions in response to Mr. Perkins' March 13, 2012 email to him.  JX80 (email); Tr. Vol. 4, pp. 1059:21-1062:8; 1062:19–1063:16. These reductions included elimination of the "miscellaneous gas and vehicle" cost category, certain standby rates, professional service rates, and certain labor costs. *Id.*  Mr. Dunn made these reductions "to be conservative and to be fair and . . . accurate." Tr. Vol. 4, pp. 1067:21–1068:8.

135.     In that same March 13, 2012 email chain, Mr. Dunn stated to Mr. Perkins: "This is a very new situation for me and my company and this has been weighing on my mind for weeks and months now on how to accurately show costs to date and the spreadsheet I copied you on is the best solution I can come up with."  JX80 p. 080.002.  By this point, Mr. Dunn had spent months trying to accurately price the claim and was at his "wits' end."  Tr. Vol. 4, p. 1059:21–25.

136.     The United States' own fraud expert, Todd Lester, ***repeatedly*** testified that Mr. Dunn's reductions in this regard were consistent with Lodge trying to submit an accurate and proper claim. Tr. Vol. 5, pp. 1268:16–1269:8; 1270:3–9; 1273:2–18; 1274:19–1276:15; 1276:16–19 ("Q: So any reduction is consistent with an attempt to accurately reprice the claim? A: I think if they are making an attempt to compile the claim accurately and correctly, yes."); 1278:17–1279:3 ("[Lodge] was going through a process, trying to figure out how to put forth their claim and present it properly.").

137.     In another instance, Mr. Perkins made comments to a proposed subcontractor pass-through claim drafted by Lodge's subcontractor, Civil Construction Technologies, Inc. ("CCT"). JX84 (Perkins Comments). These recommendations included a warning against "rounding" numbers, reducing operating condition assessments from severe to difficult (resulting in a claim

reduction), reducing CCT's daily rate and number of delay days in the claim, and reducing CCT's claim for field office overhead. *Id.* (citing JX84 pp. 084.001–003).

138.    Mr. Dunn directed CCT to make reductions in its claim based upon Mr. Perkins' guidance and warnings. Tr. Vol. 4, pp. 1048:6–1052:8. The net effect of these reductions decreased CCT's claim from $2,517,773.87 in the March 2012 draft (JX84, p. 084.009) to $1,084,017.52 in the final Dewatering Claim (JX109, 109.007), a net decrease of $1,433,756.35. Tr. Vol. 4, p. 1052:9–13. Not only did this reduction mean a lower claim for CCT, but it also meant that Lodge decreased the markup it stood to recover on CCT's claim by over $150,000. *Id.* pp. 1052:14–1053:4.

139.    Furthermore, Mr. Dunn intentionally reduced the hourly rate for the Bobcat equipment from $235.88/hour in the March 2012 Spreadsheet to $11.27/hour in the final claim. JX83 p. 083.004 (containing spreadsheet with Bobcat at $235.88/hour); JX109 p. 109.094 (Dewatering Claim spreadsheet showing Bobcat hourly rate at $11.27/hour); Tr. Vol. 4, pp. 1002:14–1003:9.

140.    Lodge's Dewatering Claim was also explicitly conservative. As Lodge itself stated in the claim regarding its Construction Inefficiency Ration ("CIR"):

> In the baseline schedule, it was anticipated that Section 1 of a total of 6 sections would have a length of 2,500 feet.  In reality, [Lodge] made the management decision to limit Section 1 to only 2,000 linear feet.  This management decision was made for the purpose of enabling the work to begin and to reduce the volume of dewatering effluent in an effort to get the production work going.  The above referenced table [reflecting Lodge's inefficiency claim] does *not* reflect this change in length for Section 1.  It continues to utilize the original number of days from the baseline schedule which were intended for completion of 2,500 linear feet with results in any estimate of the inefficiencies encountered by LCI to be on the conservative side.

JX 109 p. 109.209.  Thus, Lodge utilized a CIR of 285 days divided by 115 days, for a final CIR of 2.478.  *Id.*  Notably, Lodge stated that "if it had utilized the days allocated for a 2,000 linear

foot section" (the actual length Lodge performed in Section 1), the ratio would have been higher (i.e., 3.098). *Id.*; Tr. Vol. 4, pp. 1043:23–1044:20.

141.     Lodge applied the CIR of 2.478 to "[w]hat [Lodge's] cost would have been at 100% of anticipated production" without the dewatering inefficiencies, an amount Lodge calculated to be $1,402,759.53. JX109 p. 109.092. This resulted in an "actual cost of production" figure of $3,476,458.95, from which Lodge then subtracted the 100% anticipated production figure to reach the final calculated cost impact due to inefficiency of $2,073,699.42 (after which Lodge applied its equipment credits). *Id.* If Lodge had applied the ratio of 3.098 that it could have applied "if it had utilized the days allocated for a 2,000 linear foot section," the actual length Lodge performed in Section 1, the actual cost of production figure would have been $4,345,749.02 (1,402,759.53 times 3.098) instead of $3,476,458.95. Thus, Lodge's intentionally conservative calculation of the CIR resulted in a *reduction of Lodge's cost claim of $869,290.07*.

142.     Lodge's Dewatering Claim was conservative in other areas as well. For example, Lodge provided the United States significant credits for its equipment costs based upon equipment down time. JX109 p. 109.092. These credits included a $34,971.60 credit for the fourth Euclid Truck that Lodge was using to find replacement parts for the other Euclids and additional credits for the other three Euclid Trucks. *Id.*; Tr. Vol. 4, pp. 1001:9–1002:7.[7]

143.     Just prior to submitting the Dewatering Claim, Mr. Dunn sent an email to Mr. Perkins stating: "I'm confident that our numbers are correct relative to cost . . . . The only outstanding item is CCT's cost proposal . . . . I guess what I would like for you to do is look at the attached letter and let me know if for any reason you would recommend that I do not certify this CDA [claim] . . . ." JX105. CCT's final pass-through claim included significant backup

---

[7] The United States' suggestion at trial that Lodge claimed inflated costs for a "cannibalized" Euclid, when Lodge provided a complete credit to the United States for that vehicle, borders on the frivolous.

documentation.  JX109 pp. 109.002–109.090.  As a result, Mr. Perkins informed Mr. Dunn that "I can almost tell you with certainty that if CCT is explaining their logic and submitting hundreds of pages of backup data then that constitutes open and full disclosure thereby permitting the USACE to perform a very detailed analysis and form its own opinion relative to the merits of CCT's logic and cost data." JX105.  Mr. Perkins further stated to Mr. Dunn just prior to claim submission: "Personally, I would have no reservation about certifying this cost proposal."  JX106.

144.    Mr. Perkins also issued warnings to Mr. Dunn about False Claims Act liability. JX58; JX80; JX84 p. 084.001. Mr. Dunn responded by following Mr. Perkins's advice (except in one instance, where he legitimately disagreed with Mr. Perkins) and reducing Lodge's claims by millions of dollars in order to avoid FCA liability.  Tr. Vol. 4, pp. 1066:7–1067:20.

145.    Against this backdrop, it is illogical for the United States to suggest that Lodge intentionally or recklessly inflated its claim in connection with the individual claim components challenged by the United States.  Lodge made millions of dollars of reductions in its submittals and could not have stood to gain anywhere close to the amount of those reductions back by making minute edits to its Construction Inefficiency Ratio or adjusting its equipment rates by a few dollars. For example, as Mr. Dunn testified, "there was [sic] very little Euclid truck costs associated with that claim." Tr. Vol. 4, p. 1069:11–12.  It would be counterproductive and fruitless to try and earn its reductions back by inflating the individual claim components identified by the United States. Moreover, it would be foolish for Lodge to knowingly submit an inflated claim after a consultant had warned against such inflation because of potential False Claims Act liability.  That is not what Lodge or Mr. Dunn did in this case.

146.    Instead, these voluntary and intentional reductions are persuasive and uncontroverted evidence that Lodge had no actual intent to defraud the United States.  The

evidence produced at trial reflects that Lodge was clearly trying to accurately price its claims, precluding a finding by the Court that Lodge had actual knowledge that either its certified Claims or individual claim components were false or overstated.  Indeed, Mr. Dunn *explicitly* stated to Mr. Perkins: "This has been weighing on my mind for weeks and months now *on how to accurately show costs to date*."  JX80 p. 080.002.  **The United States' own fraud expert** agreed that Lodge was trying to calculate its costs accurately. Tr. Vol. 5, pp. 1268:16–1269:8; 1270:3–9; 1273:2–18; 1274:19–1276:15; 1276:16–19; 1278:17–1279:3.

147.    The voluntary and intentional reductions made by Lodge to its Claims are further evidence that Lodge did not submit its Dewatering or Design Claim with reckless disregard for the truth or falsity of the claim pricing.  Mr. Dunn and the Lodge team spent "weeks and months" trying to "accurately show costs to date," JX80 p. 080.002, deliberating with consultants, reviewing Project records, and making edits and reductions to its claims in an attempt to make the claims accurate.  This mountain of evidence precludes a finding by the Court that Lodge acted "knowingly" with regard to the truth or falsity of its Claims and entitles Lodge to judgment on both of the United States' counterclaims.

C.    **Any beneficial mistakes Lodge made in pricing its claims were counterbalanced by mistakes in favor of the United States.**

148.    In addition to voluntary and intentional claim reductions, the evidence produced at trial reflected that Lodge also made mistakes in pricing its claims that benefitted the United States (*i.e.,* mistakes that led Lodge to claim less than what it would be entitled to from the United States).

149.    For example, Lodge did not include the cost of 55 days of work performed after January 14, 2021 in Section 1 of the Project in the Dewatering Claim's "Inefficiency Cost Calculation;" such costs (to which Lodge applied the CIR) were only collected through January

14, 2012, even though Lodge performed work in Section 1 after that date. JX109 p. 109.091; Tr. Vol. 4, pp. 1047:21–1048:5.

150.   Lodge's Dewatering Claim also omitted its entitlement to general and administrative (G&A) expenses. Tr. Vol. 4, pp. 1046:10–1047:6. As C.L. Dunn explained, "I should have included 5.3 percent G&A, which is the document I provided to the Army Corps that gave me my three years prior average general and administrative costs or home overhead cost. The contract allowed us to charge for that." *Id.*  Such G&A costs would have amounted to 5.3 percent of the Dewatering Claim subtotal of $3,067,404.69 (prior to factoring in profit). *Id.*; JX109 p. 109.092.  In other words, Lodge unintentionally omitted its entitlement to $165,026.37 in the Dewatering Claim.

151.   Lodge also omitted its entitlement to bond costs in the Dewatering Claim, which would have been "around 1 percent" of the Dewatering Claim subtotal.  Tr. Vol. 4, p. 1047:15–19. This was an unintentional omission of entitlement to an additional $30,674.05.

152.   The United States' damages expert, Eric Schaeb, confirmed that Lodge made mistakes that inured to the United States' benefit.  For example, he confirmed that there were both "overcounts" and "undercounts*"* in Ms. Callaway's Production Values spreadsheet, noting for example that Lodge recorded "26 equipment hours of excavation on October 27, 2011" but that this day "was counted by Ms. Callaway as 1 activity day." JX119 p. 119.009.  Under the United States' incorrect assumption that Ms. Calloway should only have counted a day on which Lodge recorded the anticipated number of hours of excavation, this would amount to a mistake that benefitted the United States.

153.   Mr. Schaeb also noted that some of the days on which excavation or embankment work was performed in Section 1 *were not even counted* in Ms. Callaway's final tally of tick marks

in her PVS, the final tally that resulted in the CIR numerator of 285 days.  JX119 p. 119.010.

154.    These omissions from Lodge's certified claims are uncontroverted by the United States and, in some instances, confirmed by its own witnesses.

155.    These unintentional reductions lead to the inevitable conclusion that the United States cannot prove the falsity of Lodge's Dewatering or Design Claim.  First, the United States cannot prove that the Dewatering Claim or Design Claim in the aggregate was inflated or sought costs for which the United States was not liable.  Indeed, the United States failed to offer evidence of how much the $3,282,123.02 Dewatering Claim or the $679,379.58 Design Claim were overstated, nor did the United States produce any evidence on which the Court could determine what the appropriate amounts for the Dewatering Claim or Design Claim should have been.  This evidentiary failure alone warrants judgment on the United States' fraud claims in favor of Lodge.

156.    Nor did the United States produce any evidence on which the Court could find that Lodge submitted either its Dewatering or Design Claims with reckless disregard for the truth or falsity of the claim.  Lodge made mistakes in the Dewatering Claim that inured to the United States benefit and for which the United States has never accounted in its assertion that Lodge's claims were overstated.  Under such circumstances, there is no basis on which the Court could find that Lodge's claims were false, let alone that Lodge acted with reckless disregard sufficient to create liability under the FCA. *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008).

## CONCLUSION

The United States case is predicated upon a superficial narrative, bereft of context, aimed at convincing the court of Lodge's fraud upon the United States.  If successful, the United States will evade having to defend against Lodge's $24 million wrongful termination claim.  The United States' path to such an end, however, is comprised of evidence so loosely stitched together, that it

unwinds with the slightest tug.  Following 5 days of testimony, including that of its three experts, the United States failed to explain, let alone prove, why Lodge's claim is false. The United States may have succeeded in proving the unremarkable proposition that Lodge's claim is flawed, it failed to prove that Lodge's claim is false or that Lodge knew it was false.

"The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Services v. United States*, 136 S. Ct. 1989, 2003 (2016) (internal citation omitted); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[T]he False Claims Act was not designed to punish every type of fraud committed upon the government.").  An innocent mistake or mere negligence, such as a math error or flawed reasoning, may be excused. *Horn*, 123 Fed. Cl. at 766 (emphasis added); *United States ex rel. Lamers v. City of Green Bay*, 186 F.3d 1013, 1018 (7th Cir. 1999) (errors based simply on faulty calculations or flawed reasoning are not false under the FCA).

As various courts have correctly observed, "[t]he False Claims Act does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity." *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011).  Accordingly, "it is impossible to meaningfully discuss falsity without implicating the knowledge requirement." *Lamers*, 186 F.3d at 1018. Significantly, "fraud may only be found in expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification." *United States ex rel. Wilson Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008) (internal citation omitted).

Here, the government's case does not rest on any empirically verifiable and objective statement.  Rather, the government questions certain cost component values all of which here are

necessarily the product of well-reasoned subjective judgment and none which lend themselves to the binary choice of either being true or false.  As one district court aptly observed:  "Thus, to establish falsity "plaintiff must demonstrate that an objective gap exists between what the Defendant represented and what the Defendant would have stated had the Defendant told the truth." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787 (E.D. Va. 2007) (internal citations omitted).

Under the above paradigm, the government's case collapses because the government fails to explain what Lodge should have stated in its claims.  Amplifying this shortcoming is the government's own experts who could not explain what portion of the claimed costs for questioned equipment was purportedly overstated.  *See United States ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 968 (C.D. Ill. 2015) ("Under the Relator's theory some amount of any given invoice had to be legitimate while some amount was theoretically disallowable. Here, Relator has not adequately described the content of the misrepresentation because he has not provided information that can be used to discern how much, if any, of any individual invoice or voucher submitted to the Government under LOGCAP III was artificially inflated ….").

The record establishes that Lodge made a sincere, honest, and reasonable effort to price the damages to which it believed it was legally entitled as a result of the differing site conditions. No testimony solicited by the government rebuts that point. Indeed, the government's own experts agreed collectively that despite flaws, mistakes, errors, and inconsistencies, the evidence showed that Lodge undertook the effort to get its claim right and to be as accurate as possible.

Respectfully submitted,

Date:   August 30, 2021

/s/ Michael H. Payne
Michael H. Payne
Cohen Seglias Pallas Greenhall & Furman
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA  19103
Tel:  215-564-1700
Fax: 215-564-3066
mhpayne@cohenseglias.com

*Counsel of Record for*
*Lodge Construction, Inc.*

/s/ Edward Parrott
Edward Parrott, Esq.
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102
(703) 749-1000 Phone
(703) 893-8029 Facsimile
eparrott@wthf.com

*Of Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this August 30, 2021, a copy of the forgoing was electronically filed with the Clerk of the Court using the CM/ECF system which will then send notification of such filing (NEF) to the parties indicated on the electronic filing receipt.

/s/ Michael H. Payne
Michael H. Payne

51